# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLUENCE ENERGY, LLC, a Delaware limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>M/V BBC FINLAND, bearing International Maritime Organization No. 9593684 (the "Vessel"), its cargo, apparel, tackle, and appurtenances, etc. in rem,<br><br>    Defendant. | Case No.: 3:21-cv-01239-BEN-JLB<br><br>**ORDER:**<br><br>**(1) AUTHORIZING ISSUANCE OF WARRANT FOR ARREST OF VESSEL PURSUANT TO SUPPLEMENTAL RULE C;**<br><br>**(2) DENYING PLAINTIFF'S REQUEST FOR APPOINTMENT OF A SUBSTITUTE CUSTODIAN; and**<br><br>**(3) GRANTING PLAINTIFF'S REQUEST FOR AN ORDER PERMITTING NORMAL OPERATIONS OF DEFENDANT VESSEL WHILE UNDER ARREST**<br><br>**[ECF Nos. 5, 6]** |

## I. <u>INTRODUCTION</u>

Plaintiff FLUENCE ENERGY, LLC, a Delaware limited liability company ("Plaintiff") brings this verified complaint, *in rem*, against Defendant M/V BBC

-1-

FINLAND, bearing International Maritime Organization No. 9593684 (the "Vessel"), its cargo, apparel, tackle, and appurtenances, etc., *in rem*, for breach of a maritime contract and negligence, seeking arrest and money damages. *See* Complaint, ECF No. 1 ("Compl.").

Before the Court are Plaintiff'S *Ex Parte* Applications for an Order (1) Authorizing Issuance of Warrant for Arrest of Defendant Vessel, ECF No. 5, and (2) Appointing Substitute Custodian and Permitting Normal Operations of Vessel While Under Arrest, ECF No. 6 (collectively, the "Applications"). After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **GRANTS** Plaintiff's *Ex Parte* Application for an Order Issuing a Warrant for the Arrest of the Vessel, ECF No. 5; (2) **DENIES** Plaintiff's *Ex Parte* Application for an Order Appointing a Substitute Custodian, ECF No. 6; and (3) **GRANTS-IN-PART** Plaintiff's *Ex Parte* Application for an Order Permitting Normal Operations While Under Arrest, ECF No. 6.

## II. BACKGROUND

This is a case of marine cargo damage and short delivery resulting from breach of the Vessel's contractual duties under the maritime contract of carriage, affreightment, bailment and other contract. Compl. at 3, ¶ 8.

### A. Statement of Facts[1]

Plaintiff is a world-leading global energy storage technology and services provider that provides grid-scale, industrial-strength energy storage by lithium batteries, referred to as Gen6 Cubes ("Cubes"). Compl. at 2,[2] ¶ 5. Plaintiff's Cubes are modular factory-built, standardized storage systems that deliver safe, scalable, cost-effective systems built to customer specifications and configurations in Vietnam, which are then, assembled into

---

[1] The majority of the facts set forth herein are taken from the operative complaint, and for purposes of ruling on the instant Applications, the Court assumes the truth of the allegations pled and liberally construes all allegations in favor of the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

[2] Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document.

Cubes, packed into containers three Cubes at a time, and transshipped by vessel to United States ("U.S.") customers and end users. Compl. at 2-3, ¶ 5.

The Vessel at issue in this case is a 24,964 deadweight ton Antigua & Barbuda-flagged general cargo ship built in 2012, 161.33 meters in length, bearing IMO Number 9593684, owned by Briese Schiffahrts GmbH & Co. KG MS "Filsum," located at 26789 Leer, Hafenstr. 12, Germany. Compl. at 3, ¶¶ 6-7. It was bareboat chartered to Anger Shipping Company Ltd. Located at 69, Nevis Street, St. John's, Antigua, West Indies and was time-chartered to BBC Chartering, located at 26789 Leer, Hafenstr., 10b, Germany. *Id.* at 3, ¶ 7.

On or about June 24, 2020, Plaintiff, as the purchaser, entered into a Master Supply Agreement ("MSA") with Ace Engineering & Co., Ltd. ("ACE") to manufacture Cubes by supplying various items of equipment, parts, materials, supplies, and services. Compl. at 4, ¶ 11. Once the Cubes were assembled, three Cubes were loaded, secured, and packed into 318 40-foot high-cube ("HC") containers for trans-Pacific shipment, pursuant to a manual provided by Plaintiff detailing the packing and loading procedures. *Id.* at 4, ¶ 12. Of the HC Containers originally on the Vessel, a limited number were packed and loaded with accessory equipment, rather than Cubes. *Id.* ACE Vietnam, an affiliate of ACE, was responsible for loading and packing the HC containers and placed a seal or lock on the containers once the Cubes were loaded into the containers. *Id.* at 4, ¶ 13.

On February 25, 2021, Plaintiff, as the owner of the cargo, contracted with DB Schenker ("DBS") to serve as a Non-Vessel-Operating Common Carrier in booking the loading, stowage, and carriage of the cargo aboard the Vessel and preparing the necessary shipping contracts with the Vessel interests. Compl. at 4, ¶ 14. Between February and April 2021, ACE transported the Cargo by truck in 333 containers from their Vietnam factory to the Hai Phong, Vietnam port, pursuant to delineated responsibilities in the MSA with Plaintiff. *Id.* at 4, ¶ 15. The containers were then offloaded from the truck at the Hai Phong port. Compl. at 4, ¶ 15. The cargo was delivered to the Hai Phong port in good condition and order, awaiting the arrival of the Vessel, so it could be loaded aboard.

-3-

3:21-cv-01239-BEN-JLB

Compl. at 5, ¶ 16. Under the terms of the contract of carriage between Plaintiff and DBC, DBS agreed to ship the cargo under Free on Board ("FOB")[3] transportation or INCOTERMS[4] from the port of Hai Phong, Vietnam, to the delivered-at-place ("DAP") of four different end-customer project locations in California. *Id.* at 5, ¶ 17. Pursuant to the FOB terms, title to and risk of loss of the cargo passed to Plaintiff when the cargo was loaded onto the Vessel at the port of departure (Hai Phong, Vietnam).[5] *Id.* at 5, ¶ 18.

On or about April 15, 2021, DBS entered into four written maritime contracts titled "SCHENKER*ocean* Non-Negotiable SEA WAYBILL for Combined Transport", VNHAN0000031155, VNHAN0000031169, VNHAN0000031567, and VNHAN00000-31568 (the "Sea Waybills"), pursuant to which DBS agreed to (1) accept and safely load and carry (a) 333 40-foot HC containers containing 954 of Plaintiff's Cubes, (b) 13 40-

---

[3] When a delivery term is F.O.B. with no specification, the "goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer." *Litecubes, LLC v. N. Light Prods., Inc.*, 523 F.3d 1353, 1358, n.1 (Fed. Cir. 2008). However, where the delivery term is F.O.B. the place of destination, also known as a "destination contract," the seller must bear the risk and expense of transporting the goods to the place of destination and tender delivery along with documents of title at the destination. C.I.S.G., art. 67(1), 52 Fed. Reg. 6262-02; *see also* Anzivino at § 7:17; *see also* U.C.C. § 2509(1)(b); *Wheeler Lumber Bridge & Supply Co. of Des Moines, Iowa, v. United States*, 281 U.S. 572, 578-79 (1930) (holding that where a seller "engages to deliver f. o. b. . . . at the place of destination, which is the place of sale and delivery[,] [t]here is no delivery, and therefore no sale, until after the transportation is completed").

[4] "Under the Incoterms Ex Works (EXW) commercial term (including Ex Factory and Ex Warehouse), the seller needs only to 'tender' the goods to the buyer by placing them at the buyer's disposal at a named place of delivery and notifying the buyer of the time and place where the goods will be at its disposal." Folsom, Ralph H., 1 *International Business Transactions* § 2:25 (3d ed.) (Dec. 2020 Update). "The risk of loss transfers to the buyer at the time the goods are placed at its disposal." *Id.*

[5] Contrary to the allegation risk of lass passed when the cargo was loaded onto the Vessel, by pleading that the contract was "F.O.B. transportation . . . to the delivered-at-place" and Incoterms, Compl. at 5, ¶ 17, the complaint indicates that the risk of loss passes under the contract at the time of arrival in San Diego. This is irrelevant to the Court's analysis of who bears responsibility for the damages goods as well as the viability of a maritime lien.

foot HC containers containing accessories, and (c) 2 40-foot HC Containers containing CRTs (the "Cargo") aboard the Vessel in Hai Phong, Vietnam as well as (2) discharge the Cargo at San Diego, California on voyage number 1312001. Compl. at 5, ¶ 19. Plaintiff, as the consignee,[6] signed the Non-Negotiable Sea Waybill for Combined Transport, which redacts the Shipper/Exporter for reasons not explained to the Court but does show the Vessel as the BBC Finland; the port of loading as Hai Phong, Vietnam; the port of discharge as San Diego, California; and the number of containers received by the Carrier as 179. Exhibit 1 to Compl.,[7] ECF No. 1-2 at 2. It provides: "Below Particulars Furnished by Shipper – carrier not responsible – For Merchant's use only and Part of the Bill of Lading Contract." *Id.* It also states that "[d]elivery will be made to the Consignee or his authorized agent on production of reasonable proof of identity" and (2) "[i]n presenting this Waybill or by requesting delivery of the Goods, the Consignee undertakes all liabilities of the Shipper without prejudice to the Shipper's own liability." *Id.* at 2-3.

The Complaint alleges that also on April 15, 2021, the Cubes were loaded in apparent good order and condition at the port of Hai Phong, Vietnam for carriage to San Diego, California. Compl. at 3, ¶ 10, 7, ¶ 39. Additionally, the only cargo carried onboard the Vessel for that voyage was Plaintiff's Cargo. *Id.* at 5, ¶ 20. Plaintiff alleges that the total value of the Cargo aboard the Vessel was **$109,677,308.50**. *Id.* at 5, ¶ 22.

On April 28, 2021, the crew or master aboard the Vessel reported that it was experiencing rolling, pitching, and pounding with persistent heavy sea spray over the deck, in response to which the Vessel made various course and speed changes to minimize heavy rolling, pitching, and pounding. Compl. at 6, ¶ 23. Because of a

---

[6] With respect to bill of ladings, a "consignee" is "[t]he person named in a bill to whom or to whose order the bill promises delivery." Garner, Brian A., Black's Law Dictionary, CONSIGNEE, (11th ed. 2019). In laymen's terms, the consignee is the entity financially responsible for the receipt of the shipment, and usually, is also the recipient of the goods.

[7] Plaintiff alleges that Exhibit 1 is "an exemplar Sea Waybill for one of the damaged containers," and "[a]ll of the waybills related to this incident are in the same form." Compl. at 3, ¶ 8.

-5-

subsequent report of smoke in the cargo holds, the Vessel initially diverted towards Petropavlovsk–Kamchatskiy, Russia, but then, made its way to Aomori, Japan instead to assess any damage to the Cargo and Vessel in port. *Id.* at 6, ¶ 24.

On May 8, 2021, the Vessel arrived in Aomori, Japan. Compl. at 6, ¶ 25. Upon arrival at the pier, the Vessel's interests and surveyors, along with the Japanese Coast Guard and local fire department (as a safety precaution when opening the hatches), attended to the Vessel to investigate the scope of damage to the Cargo. *Id.* at 6, ¶ 25. All containers were discharged from the holds for inspection on the pier in order to assess any damage to the containers and/or potential need for salvage, repacking, and continued transshipment. *Id.* at 6, ¶ 27. Plaintiff alleges "that the attending surveyors indicated that a cause of the collapsed and damaged containers in the Vessel's holds was due to improper usage of twist locks and insufficient lashing to the containers, in particular as full-auto type twist locks were set incorrectly in an 'upside down' position when the Cargo was loaded by the Vessel interests." *Id.* at 6, ¶ 28.

As a result of the onboard survey, inspection, and investigation, Plaintiff estimates that approximately 179 containers containing its Cargo suffered some damage, with another estimated 87 containers deemed by surveyors to be damaged to an extent that they were not safe for reloading on the Vessel and transshipment to San Diego. Compl. at 6, ¶ 29. Consequently, 84 forty-foot HC containers with a total 252 Cubes, and three forty-foot HC containers with accessories, remain in Japan for further inspection and possible salvage. *Id.* at 7, ¶ 30. Owing to limited port capacity at the Aomori port in Japan to conduct the necessary surveys of the damaged containers and their contents, including unpacking, inspecting, and repacking the Cubes, the 87 damaged containers must be transferred by barge to Hakodate, Japan in several voyage segments for further inspection and transshipment or salvage depending on the results of those inspections. *Id.* at 7, ¶ 31.

On June 16, 2021, Plaintiff paid ACE in full for all the Cargo pursuant to the prevailing purchase orders. Compl. at 7, ¶ 32.

On June 18, 2021, the Vessel departed Aomori, Japan to continue the Voyage to

-6-

3:21-cv-01239-BEN-JLB

San Diego, California, but the Vessel was only partly loaded with 246 containers and short the number of containers contracted for in the Sea Waybills. Compl. at 7, ¶ 33. The Cargo in those 246 containers will be inspected in San Diego, California. Compl. at 7, ¶ 34. Plaintiff estimates its current losses due to the damage to the Cargo caused by the Vessel, and depending on the results of the inspection, is no less than $30 million. *Id.* at 7, ¶ 35.

On or about July 8, 2021, at approximately 5:04 a.m., the Vessel moored starboard side to Pier 105 at the SSA Marine Terminal in the Port of San Diego, California. ECF No. 6 at 7:9-11 (citing Declaration of Matthew P. Vafidis, ECF No. 6-1 ("Vafidis Decl.") at 2, ¶ 2).

## B. Procedural History

On July 8, 2021, Plaintiff filed suit alleging two claims for relief for (1) breach of maritime contract of carriage and (2) negligence. Complaint, ECF No. 1. The summons issued that day but has not yet been served on Defendant. ECF No. 2. That same day, Plaintiff also filed the instant *Ex Parte* Applications. ECF Nos. 5, 6.

## III. LEGAL STANDARD

The Constitution extends the jurisdiction of federal courts "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST. art. III, § 2. Congress, in turn, embodied that judicial power into a statute vesting federal courts with exclusive jurisdiction over admiralty and maritime claims. 28 U.S.C. § 1333(1); *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d 913, 918 (9th Cir. 2002).

A vessel need not be engaged in commerce to be subject to admiralty law. *Goodman v. 1973 Foot Trojan Vessel, Arkansas Registration No. AT1439SN*, 859 F.2d 71, 73 (8th Cir. 1988) (providing that the term "vessel" includes "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water") (citing 3 U.S.C. § 3). The Federal Maritime Lien Act, 46 U.S.C. § 31342, entitles "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner," to (1) a maritime lien on the vessel; (2) bring a civil action in rem to enforce the lien; and (3) to pursue those rights without alleging or proving in the action that credit

was given to the vessel. 46 U.S.C. § 31342(a); *see also Ventura*, 305 F.3d at 919 (providing that a plaintiff demonstrating that the plaintiff provided necessaries to a vessel "may invoke the admiralty jurisdiction of the federal courts to enforce a necessaries lien in rem"). The Act defines "necessaries" as "repairs, supplies, towage, and the use of a dry dock or marine railway." 46 U.S.C. § 31301(4). However, this definition is not exhaustive, and courts have broadly construed the term to refer to "anything that facilitates or enables a vessel to perform its mission or occupation." *Ventura Packers*, 305 F.3d at 923. Further, a maritime contract is not needed to invoke the admiralty jurisdiction pursuant to the Maritime Lien Act. *Id.* at 919-922.

## IV. **DISCUSSION**

"To commence an action in rem against a vessel, the plaintiff must file a verified complaint that describes the vessel 'with reasonable particularity' and states that the vessel 'is within the district' or will be so 'while the action is pending.'" *Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 529 (9th Cir. 2018) (citing Fed. R. Civ. P. Supp. Adm. & Mar. Cl. R. C(2); *see Madeja v. Olympic Packers, LLC*, 310 F.3d 628, 637 (9th Cir. 2002)). "If the plaintiff meets these conditions, the district court must take the boat into custody—unless the plaintiff requests otherwise—by issuing an arrest warrant to be served by the marshal." *Barnes*, 889 F.3d at 529 (citing Fed. R. Civ. P. Supp. Adm. & Mar. Cl. R. C(3)(a)–(b), E(3)(b)).

"Once the district court issues warrants for the arrest of the vessels pursuant to Rule C, and the warrants are successfully served, jurisdiction is complete." *Barnes*, 889 F.3d at 529 (internal quotations omitted). "After the vessel is arrested, the owner is entitled to 'a prompt post-seizure hearing at which he can attack the verified complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings up to that point.'" *Id.* at 531 (citing, *inter alia*, Fed. R. Civ. P. Supp. Adm. & Mar. Cl. R. E(4)(f)). "Once the owner has appeared, whether due to the vessel's arrest or because the owner learned of the proceeding through some other means, no further procedural purpose is served by requiring the verification of amended pleadings." *Id.* "To the extent the verification provides

-8-

evidentiary value, the original complaint 'does not lose its character as the equivalent of an affidavit just because a later, amended complaint, is filed.'" *Id.*

In this case, the Court finds it proper to institute an *in rem* action, in admiralty law, to enforce a maritime lien against the Vessel, seeing as the requirements of 46 U.S.C. § 31342 have been met. Plaintiff has provided the Court with a verified complaint sufficient to create *in rem* jurisdiction and arrest the Vessel. Further, the contract provides for necessaries to a vessel. *See* Exhibit 1 to Compl. Thus, the Court **GRANTS** Plaintiff's *Ex Parte* Application for an Order Issuing a Warrant for the Arrest of the Vessel. ECF No. 5. However, as detailed below, the Court **DENIES** Plaintiff's *Ex Parte* Application for an Order Appointing a Substitute Custodian, ECF No. 6, finding that Plaintiff has not provided the Court with adequate information to allow it to grant this request. Finally, the Court **GRANTS-IN-PART** Plaintiff's *Ex Parte* Application for an Order Permitting Normal Operations While Under Arrest. *See id.*

### A. Arrest Warrant

Rule C of the Supplemental Federal Rules of Civil Procedure ("Rule C") expressly allows an *in rem*[8] action to be brought (1) to enforce any maritime lien or (2) "[w]henever a statute of the United States provides for a maritime action in rem or a proceeding analogous thereto." FED. R. CIV. P., Supp. R. C(1). However, a complaint for such an *in rem* action must (1) be verified; (2) describe the property that is the subject of the action with reasonable particularity; and (3) "state that the property is within the district or will be within the district while the action is pending." FED. R. CIV. P., Supp. R. C(2). If upon review of the complaint and supporting papers, "the conditions for an in rem action appear to exist, the court must issue an order directing the clerk to issue a warrant for the arrest of

---

[8] Jurisdiction of courts falls into one of three categories: (1) *in personam* jurisdiction; (2) *in rem* jurisdiction; or (3) *quasi in rem* jurisdiction. *Shaffer v. Heitner*, 433 U.S. 186, 199 n.3 (1977). In the case of *in rem* jurisdiction, the Court asserts authority over property within its territory, which may be used to satisfy the judgment, but the property owner will not be held personally liable. *Id.* In this case, Plaintiff asks the Court to assert jurisdiction over the Vessel.

the vessel or other property that is the subject of the action." FED. R. CIV. P., Supp. R. C(3)(a)(i). "According to the Advisory Committee's Note for Rule C, 'the rule envisions that the (arrest) order will issue upon a prima facie showing that the plaintiff has an action in rem against the defendant in the amount sued for and that the property is within the district.'" *Cahuenga Assocs. II v. S/V MAKO*, 256 F. Supp. 3d 1092, 1095 (S.D. Cal. 2017) (Curiel, J.). "A simple order with conclusory findings is contemplated." *Id.* That being said, "Rule C(3) has been amended to provide for judicial scrutiny before the issuance of any warrant of arrest" in order "to eliminate any doubt as to the rule's constitutionality." FED. R. CIV. P., Supp. R. C, advisory committee's note to 1985 amendment.

Where "the plaintiff or the plaintiff's attorney certifies that exigent circumstances make court review impracticable, the clerk must promptly issue a summons and a warrant for the arrest of the vessel or other property that is the subject of the action." FED. R. CIV. P., Supp. R. C(3)(a)(ii). "If the property that is the subject of the action is a vessel or tangible property on board a vessel, the warrant and any supplemental process must be delivered to the marshal for service." FED. R. CIV. P., Supp. R. C(3)(b)(i). "If the property that is the subject of the action consists in whole or in part of freight, . . . the clerk must issue—in addition to the warrant—a summons directing any person controlling the property to show cause why it should not be deposited in court to abide the judgment." FED. R. CIV. P., Supp. R. C(3)(c).

In this case, Plaintiff has satisfied the requirements of Rule C. Plaintiff alleges that it is the owner and consignee of the Cargo, that was damaged while aboard the Vessel, Compl. at 7, ¶ 38, but also attaches the relevant Bill of Lading Contract to the Complaint, indicating that the port of discharge is San Diego, California, and "[d]elivery will be made to the Consignee . . . on production of reasonable proof of identity." Exhibit 1 to Compl.,[9] ECF No. 1-2 at 2. Plaintiff also describes the Vessel. Compl. at 3, ¶ 6. Plaintiff's counsel

---

[9] Plaintiff alleges that Exhibit 1 is "an exemplar Sea Waybill for one of the damaged containers," and "[a]ll of the waybills related to this incident are in the same form." Compl. at 3, ¶ 8.

-10-

1 | also submits a declaration, *see* ECF No. 1 at 13, declaring under penalty of perjury that the facts laid out in the complaint are true and correct; however, the Court has concern over whether a declaration by counsel is adequate in this case. *Compare Schroeder v. McDonald*, 55 F.3d 454, 460 n.10 (9th Cir. 1995) (stating that to verify a complaint, the plaintiff must swear or affirm that the facts in the complaint are true "under the pains and penalties" of perjury) *with Indian Hills Holdings, LLC v. Frye*, 337 F.R.D. 293, 304-05 (S.D. Cal. 2020) (describing, in the analogous situation of the California Code of Civil Procedure's requirement that a motion for service by publication must be supported by a declaration as to the cause of action against the defendant, how a declaration of counsel as counsel is insufficient as the attorney lacks personal knowledge as to the facts at issue); *but see Cahuenga*, 256 F. Supp. 3d at 1096 (accepting a declaration by counsel under penalty of perjury in granting the application for arrest of a vessel). Further, according to the evidence presented to the Court, Plaintiff should be entitled and able to take possession of the Cargo once it arrives in San Diego. Nonetheless, Plaintiff seeks an order authorizing issuance of a warrant for arrest of the Vessel, and sets for the legal authority regarding maritime liens and *in rem* liability without detailing any facts as to (1) when the Vessel will depart from San Diego, California and/or (2) why Plaintiff would be unable to take possession of the Cargo without court intervention. *See* ECF No. 5. However, Plaintiff (1) filed a verified complaint on July 8, 2021, *see* Compl.; (2) described the property that is the subject of the action with reasonable particularity (*i.e.*, the Cubes/Cargo); and (3) stated that the Cargo is within the district (*i.e.*, at the port in San Diego) while the action is pending, on July 8, 2021. *See* FED. R. CIV. P., Supp. R. C(2); *see also* ECF No. 6 at 7:9-11 (citing Vafidis Decl. at 2, ¶ 2). Thus, the conditions for an *in rem* action appearing to exist, the Court issues an order for the clerk to issue a warrant for the arrest of the Vessel.

Plaintiff's complaint also asks for "the Vessel [to] be condemned and sold and the proceeds of the Vessel be applied to costs and expenses associated with this action, and then applied to payment of the amounts owing, plus interest, to [Plaintiff]." ECF No. 6 at 6:3-10. However, Plaintiff provides no affidavits, declarations, or evidence indicating that

the Vessel or its owners would otherwise be unable or unwilling to satisfy any judgment in this case sufficient for the Court to order the sale of the Vessel.

Rule E of the Supplemental Rules also applies to actions in rem. FED. R. CIV. P., Supp. R. E(1). It requires that "[i]n admiralty and maritime proceedings process in rem . . . may be served only within the district" and may "be held in abeyance if the plaintiff so requests." FED. R. CIV. P., Supp. R. E(3)(a). Where "tangible property is to be . . . arrested, the marshal or other person . . . having the warrant shall take it into the marshal's possession for safe custody." FED. R. CIV. P., Supp. R. E(4)(b). "In furtherance of the marshal's custody of any vessel the marshal is authorized to make a written request to the collector of customs not to grant clearance to such vessel until notified by the marshal or deputy marshal or by the clerk that the vessel has been released in accordance with these rules." *Id.* "Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." FED. R. CIV. P., Supp. R. E(f).

While the Court will issue the arrest warrant for the Vessel, the Court finds that a hearing is appropriate to determine whether the Vessel should be sold. Further, "[a]ny vessel, cargo, or other property in the custody of the marshal or other person or organization having the warrant may be released . . . upon the marshal's acceptance and approval of a stipulation, bond, or other security, signed by the party on whose behalf the property is detained or the party's attorney . . . if all costs and charges of the court and its officers shall have first been paid." FED. R. CIV. P., Supp. R. E(c). Unless such costs and charges of the Court and its officer have first been paid, "no property in the custody of the . . . person or organization having the warrant. . . shall be released without an order of the court." *Id.*

As detailed in further detail below, Plaintiff provides no information regarding having paid any expenses or a willingness to post a pond sufficient to ensure the Court that if the Vessel is permitted to depart San Diego, the interests of the Vessel or its owner, neither of which have appeared in this case, will be adequately protected. Thus, the request

to issue a warrant is **GRANTED** but Plaintiff's request that the Vessel be sold is **DENIED**.

### B. Substitution of Custodian

Plaintiff has moved the Court to appoint Alan Schwimmer of National Maritime Services as the Substitute Custodian of the Vessel. *See* ECF No. 6 at 7:19-9:11. Generally, once the warrant for arrest of a vessel issues, the U.S. Marshal Service will seize the Vessel. The Southern District of California's Local Rules governing *in rem* actions provides that once a Vessel is arrested pursuant to process issued by the Court, "the marshal must place one or more keepers thereon who must remain aboard until the vessel is released or disposed of pursuant to Rule E, unless otherwise ordered." S.D. Cal. Civ. R. E.1(c)(2). However, "[o]n motion of any party, made after notice to the marshal and all parties who have appeared, a judge may order that custody of the vessel be given to the operator of a marina or similar facility, repair yard, or company regularly carrying on the business of ship's agent," upon a finding "that such firm or person can and will safely keep the vessel and has in effect adequate insurance to cover any liability for failure to do so." *Id.* Further, "[i]f the vessel must be moved to the place where custody will be maintained, a judge may also require insurance or other security to protect those having an interest in the vessel, as well as those claiming against her, from loss of or damage to the res, or liability of the vessel, incurred during the movement." *Id.* This "order allowing such custody must fix fees to be charged therefor and for any other services to be rendered the vessel and must provide for their payment to the marshal in advance." *Id.*

Plaintiff notes that "[c]ustody by the U.S. Marshal requires the services of one or more keepers and does not include charges for wharfage and the other services usually associated with safekeeping vessels similar to the Defendant Vessel." ECF No. 6 at 7:22-26. It argues that "[t]he fees charged by National Maritime Services are less than those charged by the U.S. Marshal," so it asks the Court to transfer custody of the Vessel to a substitute custodian: Alan Swimmer ("Mr. Schwimmer") of National Maritime Services, Inc. ("NMS") with offices at 1560 Sawgrass Corporate Parkway, 4th Floor, Fort Lauderdale, Florida, 33323. *Id.* at 7:25-8:2 (citing Affidavit of Alan Swimmer, ECF No.

-13-

6-2 ("Swimmer Aff."), at 1-2, ¶ 1). Plaintiff advises that NMS "is a global leader in the seizure, recovery, arrest, and custody of marine vessels and has successfully administered hundreds of seizure, arrest and custody cases related to marine vessels." *Id.* at 8:2-5. Plaintiff also provides an affidavit from Mr. Swimmer, attesting to NMS' (1) experience as a vessel owner, operator, and broker; (2) previous service as a U.S. Marshal's substitute custodian for vessels under arrest within the Southern District of California; (3) familiarity with the Local Admiralty Rules pertaining to the custody of property within this district; (4) non-party status in and lack of interest in the outcome of this case; (5) familiarity with the Vessel to the extent of her size, type, construction, and condition; and (6) access to adequate facilities and supervision for the Vessel during the pendency of this lawsuit. *Id.* at 8:6-17 (citing Swimmer Aff. at 1-2, ¶¶ 1-2).

Finally, Plaintiff informs the Court that NMS will provide insurance for the Vessel as well as provide normal and customary service for the Vessel, including but not limited to "attending mooring lines, bilge pumping as necessary, and providing locks and security during the custodianship at the rates set forth in the Service Rate Schedule attached to the Domestic Commercial Vessel Custody Agreement excluding moorage, plus expenses for materials and services such as locks, welders, etc., as needed for properly maintaining the security of the Vessel and its appurtenances." ECF No. 6 at 8:18-24 (citing Swimmer Aff., ¶ 4, Ex. 1). Mr. Swimmer advises that (1) "[t]he total cost for said custody services and keeping expenses, including relocation of vessel to anchorage, should not exceed the sum of **$39,750** plus an additional sum of $5,000 per day" and (2) NMS "has liability insurance adequate to respond in damages for loss of, or injury to, the Defendant vessel during said custody." Swimmer Decl. at 2, ¶¶ 4-5; *see also* ECF No. 6 at 8:26-28. However, the actual Estimate attached as an exhibit to Mr. Swimmer's Declaration shows a ***monthly*** charge of **$38,700.00**, and a daily charge of **$1,290.00** per day. *See* ECF No. 6-2 at 10. Plaintiff states that the costs for NMS' service will be less than those charged by the U.S. Marshall for providing such services through professional keepers. ECF No. 6 at 8:28-9:2 (citing Vafidis Decl., ¶ 5). However, Plaintiff provides no comparison as to what the costs

-14-

associated with having the U.S. Marshal Service maintain custody of the Vessel would be.

Mr. Swimmer provides no discussion as to his specific experience beyond generally stating that his company (as opposed to him personally) "has successfully administered hundreds of seizure, arrest and custody cases related to marine vessels." Swimmer at 2, ¶ 1. Further, Mr. Swimmer does not indicate how many insurance policies NMS has; what types of insurance (*e.g.*, commercial general liability, ocean marine, and/or excess/umbrella policies); and the amounts of coverage. In fact, neither Plaintiff nor Mr. Swimmer provides an estimate of the value of the Vessel so as to permit the Court to ensure the value of the Vessel being arrested is adequately secured. Finally, the Court founds that the rate of almost **$40,000.00** per day or **$1,290.00** seems excessive, especially considering Plaintiff provides no comparison of the costs that would be associated with having the U.S. Marshal Service maintain custody of the Vessel. In *Cahuenga Assocs. II v. S/V MAKO*, on the other hand, where the Court granted the plaintiff's order for a substitute custodian, the plaintiff set out the three different types of insurance maintained by the proposed substitute custodian along with the amounts of coverage. 256 F. Supp. 3d at 1096-97. Further, the cost of the custodial services in *Cahuenge* was a mere $140.00 per day as compared to the almost $40,000.00 per day requested in this case. *See id.* Thus, the Court, finding that it has been provided with inadequate information to determine whether the proposed substitute custodian "has in effect adequate insurance to cover any liability for failure to" to keep the vessel safe, *see* S.D. Cal. Civ. R. E.1(c)(2), **DENIES** Plaintiff's request that the Court appoint a substitute custodian.

### C. Maintenance of Operations

The Southern District of California's Local Rules governing *in rem* actions provides that "[t]he marshal, deputies[,] and keepers of a vessel arrested or attached must not interfere with the conduct of cargo and other operations normal to a vessel in berth, repair work, dry-docking or undry-docking (in the case of a vessel in a shipyard) unless a judge so orders." S.D. Cal. Civ. R. E.1(c)(3). Additionally, "[u]pon motion of any interested party (which may be made ex parte when the urgency of the matter requires) and for good

cause shown, a judge may order the marshal to . . . require the conduct of any operations of a vessel under arrest or attachment." *Id.*

Plaintiff asks the Court to permit the Vessel to continue its normal port operations while under arrest at Pier 105 at the SSA Terminal, including by unloading the Cargo as scheduling and conducting whatever normal port operations are required while she is at the berth. ECF No. 6 at 9:14-17. Plaintiff advises this will minimize the potential disruption to the Terminal and Port caused by the arrest. *Id.* at 9:17-19 (citing Vafidis Decl. at 2, ¶ 6). The Court **GRANTS** Plaintiff's request to allow the Vessel to continue operations except to the extent such operations might involve leaving the Port of San Diego.

## V. <u>CONCLUSION</u>

The Court, having reviewed the Verified Complaint of the Plaintiff and the Declarations of Matthew P. Vafidis, an attorney acting on its behalf, and upon application of Plaintiff for an Order Authorizing a Warrant of Arrest of the Defendant Vessel, finds that the conditions for an action *in rem* appear to exist, and it is therefore, **ORDERED** as follows:

1. A warrant for the arrest of the Defendant Vessel M/V BBC FINLAND, bearing International Maritime Organization No. 9593684 (the "Vessel"), a 24,964 deadweight ton Antigua & Barbuda-flagged general cargo ship built in 2012, 161.33 meters in length, bearing IMO Number 9593684, owned by Briese Schiffahrts GmbH & Co. KG MS "Filsum," along with its engines, machinery, boilers, tackle, furniture, licenses, masts, bowsprit, boat, anchors, cables, chains, rigging, tackle, apparel, and all other appurtenances shall immediately issue.

2. The Clerk of the Court shall immediately prepare the warrant for arrest and deliver it to the U.S. Marshal Service of the Southern District of California for service.

3. If the character or situation of the Vessel or other property is such that the taking of actual possession is impracticable, the U.S. Marshal Service shall affix a copy of this warrant in a conspicuous place on the Vessel or other property and leave a copy of the warrant and verified complaint in the action with the person having possession of the

Vessel or other property, or his agent.

4. Any person claiming an interest in the Defendant Vessel is entitled, upon request, to a prompt hearing, at which time Plaintiff must show why the arrest should not be vacated or other relief granted consistent with the Supplemental Rules for Certain Admiralty and Maritime Claims.

5. Until any party requests a hearing sooner, the Court sets a hearing for this matter for Wednesday, **July 14, 2021**, at 10:30 a.m. Plaintiff is ordered to provide notice of this hearing to the owners of the Vessel by Monday, **July 12, 2021**, at 10:30 a.m. Notice should be attempted by personal service as well as e-mail with return receipt requested.

6. Plaintiff must comply with the notice provisions as outlined in Fed. R. Civ. P. Supp. Admiralty Rule C(4) and Local Civ. R. C.1(b), requiring notice required by Rule C(4) to be published once in the official newspaper of the Court. This notice must contain (1) the title and number of the action or proceeding; (2) date of the arrest; (3) identity of the property arrested; (4) name of the marshal; (5) name and address of the attorney for Plaintiff; and (6) a statement that (a) claims of persons entitled to possession must be filed with the District Court and served upon Plaintiff's attorney within fourteen (14) days after publication; (b) answers to the complaint must be filed and served within twenty-one (21) days after the filing of the claim, or within such additional time as may be allowed by a judge; (c) in lieu of an answer, default may be noted and condemnation ordered; and (d) applications for intervention under Rule 24, Fed. R. Civ. P., by persons claiming maritime liens or other interests, may be untimely if not filed within the time allowed for claims to possession.

7. A copy of this order must be attached to and served with the said Warrant for Arrest in Action in Rem.

8. Plaintiff's counsel is reminded that pursuant to Local Rule 83.9, governing correspondence and communications with the judge, attorneys should refrain from communicating with a judge outside of the presence of opposing counsel (even where the defendant(s) in a case have not yet been served) and especially pertaining to facts that have

not been included in the parties' briefing.

9. Plaintiff's *Ex Parte* Application for an Order Appointing a Substitute Custodian is **DENIED** for failing to provide adequate information to the Court sufficient to (1) ensure the proposed substitute custodian maintains adequate insurance; (2) determine the comparison of costs associated with the proposed substitute custodian as opposed to the U.S. Marshall Service; or (3) clearly determine the daily costs associated with the substitute custodian.

10. Plaintiff's *Ex Parte* Application for an Order Permitting Normal Operations of the Vessel While Under is **GRANTED-IN-PART** as follows: Any ongoing operations may be maintained except to the extent such operations involve the Vessel departing from the Port of San Diego. The Vessel may not depart from the Port until the hearing in this matter takes place.

**IT IS SO ORDERED.**

DATED: July 9, 2021

**HON. ROGER T. BENITEZ**
United States District Judge