# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLUENCE ENERGY, LLC, a Delaware limited liability company,<br><br>                    Plaintiff,<br><br>v.<br><br>M/V BBC FINLAND, in rem,<br><br>                    Defendant. | Case No.:  3:21-cv-01239-BEN-JLB<br>**Related Case:** 3:21-cv-02014-BEN-JLB<br><br>**DECISION**<br><br>**[ECF Nos. 158, 159, 161, 163, 164, 166, 202, 203, 205, 211, 234]** |
| BBC CHARTERING CARRIERS GmbH & CO. KG,<br><br>                    Plaintiff,<br><br>v.<br><br>FLUENCE ENERGY, LLC; et al.,<br><br>                    Defendants. | |
| FLUENCE ENERGY, LLC,<br><br>                    Counter-Claimant,<br><br>v.<br><br>BBC CHARTERING CARRIERS GmbH & CO. KG,<br><br>                    Counter-Defendant. | |

-1-

# I.   __INTRODUCTION__

In this consolidated maritime action,[1] Fluence Energy, LLC, a Delaware limited liability company brings its Verified Complaint, *in rem*, against M/V BBC Finland, bearing International Maritime Organization No. 9593684, its cargo, apparel, tackle, etc., *in rem*, for breach of a maritime contract and negligence.  *See* Amended Complaint, ECF No. 75 ("FAC").  BBC Chartering Carriers GmbH & Co. KG brings a Complaint for Declaratory Judgment against Fluence Energy, LLC, Schenker, Inc., and Schenker Deutschland AG, seeking various forms of declaratory relief including the enforcement of an alleged liability limitation in the contracts between the parties.  *See* Consolidated Action Dkt., *Fluence Energy, LLC v. M/V/BBC Finland*, 21cv2014-BEN-JLB, ECF No. 7. There are also crossclaims and counterclaims lodged between the parties.

Many of the parties relevant here are related entities.  In resolving the various motions before it, the Court will generally refer to Fluence Energy, LLC and Fluence Energy, GmbH as "Fluence."   Schenker, Inc., Schenker Deutschland AG, and SCHENKERocean, Ltd. will be referred to as "Schenker."  The M/V BBC Finland, bearing International Maritime Organization No. 9593684 will be referred to as the "Vessel" or the "BBC Finland."  And Briese Schiffahrts GmbH & Co. KG MS Filsum will be referred to as "Briese"[2]  The Court will distinguish between the entities only as necessary throughout. The Schenker entities, BBC, Briese, and the Vessel share a unity of interest in seeking to enforce a liability limitation in the contacts at issue, and for purposes of resolving summary judgment, these parties will be collectively referred to as "Defendants," despite the different statuses they may hold as plaintiffs, cross-claimants, counter-defendants, etc.

Before the Court are the parties': (1) motions for summary judgment and partial summary judgment; (2) motions to strike expert reports and declarations, and to exclude testimony; (3) Fluence's motion for adverse inference; and (4) various objections and responses to filings and evidence supporting the parties' numerous motions.  *See* ECF Nos.

---

[1]    *See* Order Consolidating Admiralty Actions, ECF No. 64.
[2]    Briese is a specially appearing claimant to the Vessel.

158, 159, 161, 163, 164, 166, 202, 203, 205, 211, 234.  The motions were submitted on the papers without oral argument[3] pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  *See* ECF Nos. 176, 189, and 229. After considering the papers submitted, supporting documentation, and applicable law, the Court rules on the various motions as set forth below.  *See infra* Part.VII.

## II.   **BACKGROUND**

This case arises from damage to Fluence's cargo that allegedly occurred while being transported by the BBC Finland from Hai Phong, Vietnam to San Diego, California.[4]

### A.   **Statement of Undisputed Facts**

In February 2021, Fluence contracted with DB Schenker—a Non-Vessel Operating Common Carrier ("NVOCC")—to transport lithium battery cargo in the form of "Cubes" from Hai Phong, Vietnam to San Diego, California.  FAC at ¶¶ 1, 5, 12, 16.  Email communications between Schenker and Fluence representatives discussed the amount of cargo, shipping prices, and other details regarding the Voyage as circumstances evolved between February and April 2021.  *See generally* ECF No. 161-1, Ex. 1 at 1–43[5] (the "Email Communications").  Although the cargo count on the BBC Finland changed throughout these discussions, it ultimately "consisted of 318 containers holding [3] Cubes [per container], 13 containers holding accessory equipment, and 2 containers holding CRTs [(the "Cargo")] as identified in [the] Sea Waybills."  FAC at ¶ 10.

On March 1, 2021, Schenker entered into a Booking Note with BBC Chartering to secure the BBC Finland to carry Fluence's Cargo.  ECF No. 161-1, Ex. 2.  On March 15, 2021, BBC entered into a Time Charter/Charter Party agreement with Briese—the Vessel's

---

[3]    On August 17, 2023, Fluence filed a notice requesting oral argument as to the summary judgment motions.  ECF No. 234.  Given the voluminous record before it, the Court declines to hold argument.
[4]    The Court will refer to the transport of the Cargo by the BBC Finland from Hai Phong to San Diego as the "Voyage."
[5]    Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document.

owner—requiring Briese to supply the Vessel and crew, while requiring BBC to handle the Cargo's loading. ECF No. 161-1, Ex. 3 at 2. On April 1, 2021, BBC and Schenker signed an Addendum to the Booking Note after Fluence increased its Cargo count to the 333 containers described above. ECF No. 161-1, Ex. 4. On April 15, 2021, Schenker issued four Sea Waybill drafts and four final Sea Waybills between it and Fluence, all in the same in form. *See* ECF No. 161-1, Exs. 6, 7, 9, 10, 12, 13, 15, 16.[6] On April 14, 2021, BBC issued a Bill of Lading between it and Schenker. ECF No. 164-1, Ex. 29.

On the Sea Waybills, the Booking Note, and the BBC Bills of Lading there are designated spaces to declare the value of the Cargo being shipped. No value was declared in those spaces. *See* ECF No. 161-1, Ex. 2 at 1, Ex. 16 at 1; ECF No. 164-1, Ex. 29 at 1. Schenker never asked Fluence to provide a declared value for the Cargo, and Fluence never asked Schenker to include a declared value. ECF No. 204, Ex. 558 at 6. The Sea Waybills incorporate by reference the SCHENKERocean Bill of Lading, which sets forth various terms. *See* ECF No. 161-1, Ex. 16 at 1; ECF No. 164-1, Ex. 154. The Booking Note, the SCHENKERocean Bill of Lading, and the BBC Bills of Lading all contain a liability clause incorporating the language of § 4(5) of the Carriage of Goods by Sea Act of 1936 ("COGSA"), *see* 46 U.S.C. §§ 1300–1315. ECF No. 161-1, Ex. 2 at 3; ECF No. 164-1, Ex. 29 at 2, Ex. 154 at 15. In essence, the language provides that a $500 per package liability limitation would apply if no cargo value was declared. *See id.*

After several delays, the BBC Finland arrived at the Hai Phong port in Vietnam on April 12, 2021. ECF No. 161-1, Ex. 44. The Cargo was transported by the manufacturer, Ace Engineering & Co. ("ACE"), in 333 containers via truck from a Vietnam factory to the Hai Phong port. FAC at ¶¶ 13, 17. The Cargo was loaded on April 13, 2021. ECF No. 161-1, Ex. 44. Captain Rogelio Ponce was the Vessel's Master/Captain and did not review the Cargo Storing Manual (the "CSM"), which instructs the crew on how to secure cargo

---

[6]   For efficiency, and because the parties do not dispute that the Sea Waybills are all the same in form, the Court will cite to only one Sea Waybill, *see* ECF No. 161-1, Ex. 16, throughout the remainder of this Decision.

-4-

aboard the particular Vessel.  ECF No. 161-1, Ex. 24 at 2–5; ECF No. 167-1 at 61–62, 71.  Chief Mate, Andrey Simakin, was also not entirely familiar with the CSM.  ECF No. 167-1 at 186.  Although other methods were employed to secure the Cargo, it was not secured in a manner consistent with the CSM.  *See, e.g.*, ECF No. 161-1, Ex. 25 at 10–11.

The BBC Finland left the Hai Phong port on April 15, 2021.  *See* ECF No. 161-1, Ex. 44.  Before the Vessel left port, Captain Ponce was alerted to a Tropical Depression Surigae.  ECF No. 161-1, Ex. 25 at 376–77, Ex. 49.  Once at sea, Tropical Depression Surigae was reportedly moving away from the Vessel, but another low-pressure system was approaching.  ECF No. 161-1, Ex. 26 at 381–82, Ex. 51.  There were communications between Captain Ponce and BBC representatives concerning the route and speed of the Vessel.  *See* ECF No. 161-1, Ex. 68.  On April 28, 2021, Captain Ponce wrote to Briese's legal department, stating: "damage containers was found in cargo hold no. 2 due vessel was caught/encountered the remnant of TS Surgigae, vessels was heavy rolling / pitching and pounding since 27th evening up to 28 evening."  ECF No. 161-1, Ex. 71 at 1.  Captain Ponce also informed BBC that a fire broke out in Hold 2.  *Id.*  The Vessel diverted to Amori, Japan, where the Cargo holds were opened and damage to the Cargo in Hold 2 was apparent.  One hundred and thirty-three of Fluence's Cubes were damaged.  ECF No. 161-1, Ex. 29 at 424–25.  Of those damaged Cubes, 99 were damaged to the extent that they were considered a total loss.  *Id.* at 425.

Many other facts are referenced throughout this Decision in the context of the parties' arguments.

**B.   Procedural History**

The lengthy procedural history of this litigation can be found in this Court's prior Orders, *see* ECF Nos. 7 and 63, and by reviewing the instant docket and the docket of consolidated case no. 21-cv-2014-BEN-JLB, *Fluence Energy, LLC v. M/V/BBC Finland*.  The briefing resolved in this Decision is outlined below.

On April 17, 2023, Fluence filed a motion to strike the expert report and testimony of Rosemary A. Coates.  ECF No. 158.  On May 8, 2023, in response to Fluence's motion,

Schenker and BBC filed oppositions, ECF Nos. 169, 170, 171, and BBC filed an objection, ECF No. 172. On May 15, 2023, Fluence filed a reply. ECF No. 174. On May 23, 2023, Briese filed a notice of joinder to BBC's opposition, ECF No. 177, and on May 23, 2023, Fluence filed an objection to the notice of joinder, ECF No. 178.

On April 24, 2023, Fluence filed a motion for adverse inference. ECF No. 159. On June 12, 2023, in response to Fluence's motion: (1) Schenker filed an opposition, ECF No. 183; and (2) Briese filed an opposition, ECF No. 185-1. On June 16, 2023, Fluence filed a reply. ECF No. 188. On June 13, 2023, BBC filed a notice of joinder to Briese's and Schenker's oppositions to Fluence. ECF No. 184.

On May 5, 2023, Fluence filed a motion for summary judgment. ECF No. 161. On July 24, 2024, several oppositions, objections, and motions to strike were filed in response to Fluence's summary judgment briefing. Schenker filed: (1) an opposition, ECF No. 204; (2) a motion to strike Fluence's separate statement of material facts, ECF No. 203; and (3) a motion to strike the declaration and report of Fluence's expert Professor Martin Davies, ECF No. 202. Briese filed: (1) an opposition, ECF No. 206; (2) an objection and a motion to strike Professor Martin Davies' declaration and report, ECF Nos. 205, 207; (3) an objection to Daniel Millet depositions cited by Fluence, ECF No. 208; and (4) a motion to strike and objection to Fluence's separate statement of material facts, ECF Nos. 209, 211, 213. BBC filed: (1) an opposition, ECF No. 210; (2) a notice of lodgment, ECF No. 212; (3) a notice of joinder to Briese's objections, ECF No. 215; and (4) a notice of joinder to Briese's motion to strike, ECF No. 216.

On July 31, 2023, Fluence filed: (1) three replies in support of its motion for summary judgment responding to the oppositions of each Defendant, *see* ECF Nos. 217, 219, 220; and (2) responses in opposition to Briese's objections and motions to strike, ECF Nos. 218, 222. On the same day, Briese filed replies to Fluence's responses to Briese's objections and motions to strike. ECF Nos. 224, 227. Then, Briese filed a notice of joinder to various objections and motions to strike filed by Schenker and BBC in opposition to Fluence's summary judgment motion. ECF No. 228. On August 4, 2023, BBC objected

to Fluence's reply in support of its motion for summary judgment, ECF No. 232, to which Fluence responded, ECF No. 233.

On May 5, 2023, SchenkerOcean filed a motion for summary judgment. ECF No. 163. On July 24, 2023, Fluence filed an opposition to Schenker's summary judgment briefing. ECF No. 201. On July 31, 2023, Schenker filed a reply. ECF No. 223. On May 6, 2023, BBC filed a motion for summary Judgment. ECF Nos. 164, 165. On July 24, 2023, Fluence filed an opposition to BBC's summary judgment briefing. ECF No. 199. On July 31, BBC filed a reply. ECF No. 221. On May 6, 2023, Briese filed a motion for partial summary judgment. ECF No. 166. On July 24, 2023, Fluence filed an opposition to Briese's partial summary judgment briefing. ECF No. 200. Briese also filed various lodgments of exhibits supporting its opposition to Fluence's motion for summary judgment. ECF Nos. 195, 196, 197. On June 5, 2023, Briese and Schenker filed notices of non-oppositions and joinders to different summary judgment motions filed by Defendants. ECF Nos. 179, 180.

On August 1, 2024, Fluence filed: (1) a notice of lodgment with supplemental disclosures, ECF No. 230; and (2) a declaration from Andrew S. Chamberlain, ECF No. 231. On December 22, 2023, Schenker filed an objection to Fluence's supplemental disclosures. ECF No. 239. On December 28, 2023, Fluence responded to Schenker's objection. ECF No. 240.[7]

## III. <u>JURISDICTION</u>

The Constitution extends the jurisdiction of federal courts "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST. art. III, § 2. "Congress, in turn, embodied that [judicial] power in a statute" vesting federal courts with exclusive jurisdiction over admiralty and maritime claims. *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 305 F.3d

---

[7]     On May 5, Briese filed a reurged motion to vacate the vessel arrest and for return of security. ECF Nos. 160, 162, 167, 168. On July 24, 2023, Fluence filed an opposition to Briese's reurged motion. ECF No. 198. On July 31, 2023, Briese filed a notice of withdrawal of its reurged motion to vacate. ECF Nos. 225, 226.

1  913, 918 (9th Cir. 2002) (citing 28 U.S.C. § 1333(1)).

2  ## IV.  FEDERAL LAW

3  Although certain contracts analyzed below contain choice of law provisions, the

4  parties primarily cite to federal maritime law.  As such, the Court applies federal maritime

5  law to the facts of this case and considers any future choice of law arguments waived.

6  ## V.  MOTIONS TO STRIKE

7  The parties set forth various motions for summary judgment, motions to strike, a

8  motion for adverse inference and numerous objections.  Defendants seek partial summary

9  judgment, asking the Court to hold that Fluence is bound by COGSA's $500 per package

10  liability limitation.  Fluence's summary judgment briefing also addresses the issue, arguing

11  it is not bound by the liability limitation, in addition to seeking summary judgment on its

12  claims for negligence and breach of contract against Schenker, the Vessel's *in rem* liability,

13  and breach of bailment as to all Defendants.

14  Before the Court are five motions to strike various filings in the record.  Fluence

15  seeks to strike the expert report and testimony of Rosemary Coates.  ECF No. 158.

16  Schenker and Briese seek to strike the declaration and expert report of Martin Davies—

17  filed in support of Fluence's summary judgment motion and Fluence's motion to strike

18  Rosemary Coates' report and testimony—for improper legal conclusions and as an

19  untimely expert rebuttal report.  Schenker and Briese also seek to strike Fluence's Separate

20  Statement of Material Facts, *see* ECF No. 161-2 ("SSMF"), supporting Fluence's summary

21  judgment motion as being an improper extension of the briefing.  *See* ECF Nos. 202, 203,

22  205, 211.  Each motion is dealt with in turn.

23  ### A.  Legal Standard

24  In ruling on a motion to strike, the Court "must view the pleading under attack in the

25  light most favorable to the pleader."  *Simpson Performance Prod., Inc. v. NecksGen Inc.*,

26  No. 3:18-cv-01260-BEN-MDD, 2019 WL 4187463, at *2 (S.D. Cal. Mar. 25, 2019) (citing

27  *Gottesman v. Santana*, 263 F. Supp. 3d 1034, 1038 (S.D. Cal. 2017)).  Importantly, a court

28  should not grant a motion to Strike "unless it is clear that the matter to be stricken could

-8-

have no possible bearing on the subject matter of the litigation." *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). Accordingly, if there is any doubt as to whether the allegations may raise an issue of fact or law, the motion should be denied. *See In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000).

### B. Fluence's Separate Statement of Material Facts

Schenker argues that the Court should strike from the record Fluence's SSMF because it: "(1) violates the page limit for such motion set by the local rules and this Court's Order . . . ; (2) is not concise and contains immaterial facts, perceptions, beliefs and arguments; and (3) improperly contains 'facts' which Plaintiff knows are disputed." ECF No. 203. Briese makes the same arguments, adding that 87 of the alleged facts are disputed and that Fluence knew or should have known this. ECF No. 211 at 2. Expanding on the page limit argument, Briese further contends that "[a]t no point in Fluence's Memorandum does it reference the following and allegedly "undisputed material facts:" 2, 10, 11, 20, 52-58, 63, 67, 68, 130, 131, 133, 135, 136.

The Court agrees that Fluence's SSMF has muddied the waters. All citations to the actual evidence are made in the SSMF, creating an extra step for the Court to find the evidence to which Fluence refers. The Court also agrees that Fluence's facts (and explanations of such) listed in the SSMF but omitted from its memorandum of points and authorities border on being an improper expansion of the previously set page limit. At the same time, the Court recognizes that Fluence is not the only party to have filed excessive briefing. After reviewing the multitude of pretrial motions at issue here, the Court finds no indication as to why Briese, BBC, and Schenker all needed to file separate summary judgment briefs respecting COGSA's liability limitation when much of the briefs assert essentially the same arguments. This is also true of the objections and motions to strike, which are numerous and duplicative, each accompanied by oppositions and replies, and with many lacking any analysis or relevance. The briefing as a whole totals at least 57 filings comprised of over 10,000 pages, cluttering the Court's docket and ability to get to

the heart of the issues.

That being said, the Court will not strike Fluence's SSMF. Because Fluence's SSMF contains citations to the evidence, those citations are necessary to evaluate the arguments at issue. Furthermore, it is not as if the SSMF has no bearing on the litigation to justify striking it from the record entirely. *See Colaprico*, 758 F. Supp. at 1339. The Court will, however, disregard and/or proceed cautiously when reviewing those portions of the SSMF that: (1) are not included in Fluence's memorandum of points and authorities (including any elaboration of facts); and (2) state legal conclusions without citations to authority.[8] The Court will further determine whether those relevant facts included in the points and authorities are truly undisputed based on the evidence cited.

Finally, the Court notes that given the breadth of the record spread across 57 filings, it was the parties' responsibility to point the Court to relevant evidence. After all, "Judges are not like pigs, hunting for truffles buried in briefs." *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam)) (alteration omitted). *See also Wright v. United States Dep't of Just.*, 379 F. Supp. 3d 1067, 1074 (S.D. Cal. 2019) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) ("It is not [the] task ... of the district court[ ] to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.")). As such, if the evidence is not properly cited, it may not be considered. Accordingly, the Court **DENIES-IN-PART** Briese and Schenker's Motions to Strike Fluence's SSMF. The Court will not strike the document from the record but will proceed in light of the above reservations.

## C.   <u>Expert Witnesses</u>

The parties move to strike the expert reports of Rosemary Coates and Professor

---

[8] The Court notes that to the extent certain facts in the SSMF are utilized in this Decision but are not included in Fluence's memorandum of points and authorities, the Court uses said facts in reliance on the record evidence and not on the SSMF. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Martin Davies.  For all practical purposes, however, they seek to exclude Coates' testimony at trial.  As discussed below, to preserve judicial resources, the Court will not engage in a premature discussion of whether the testimony can be used at trial and instead, focuses on the arguments as they relate to the instant summary judgment briefing.

### 1. *Expert Report and Testimony of Rosemary A. Coates*

The parties make numerous arguments as to BBC and Briese's retained expert, Rosemary Coates, and whether her expert opinions and report should be excluded at trial.  However, Coates' expert testimony and report are not cited to support the summary judgment motions currently before Court, and the summary judgment findings herein will influence any potential trial.  Because this summary judgment Decision is likely to shape the parties' trial positions, the Court finds any analysis of Coates' testimony to be premature.  Should this case proceed to trial, the Court will set a deadline for motions in *limine*, and Fluence will be free to renew its arguments.  However, to conserve judicial resources and for purposes of efficiency, the Court **DENIES** as premature Fluence's motion to exclude Coates' report and testimony.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (explaining that a court possesses the inherent power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").  The Court's denial is *without prejudice* and makes no findings as to the merits of Fluence's motion.

### 2. *Expert Report and Declaration of Professor Martin Davies*

Schenker first argues that Professor Davies' declaration and report are untimely because they were submitted in support of Fluence's motion to exclude Coates' testimony and report.  ECF No. 202 at 4.  Schenker points to Professor Davies' following statement: "I have been asked by Fluence Energy LLC to provide my opinions about the evidence provided by Rosemary Coates in this matter, as stated in her expert report . . . ."  *Id.* at 4.  Schenker argues that expert disclosures and reports were due on February 10, 2023, and that Professor "Davies' rebuttal report was provided over two months later on April 17, 2023.  As such, Schenker asks that the rebuttal report, in the form of his declaration be

-11-

1   excluded" pursuant to Federal Rule of Civil Procedure 37(c)(1).  ECF No. 202 at 4.

2       As an initial matter, because the Court finds any decision on the exclusion of Coates'

3   expert report and testimony to be premature, the Court will not address the argument that

4   Professor Davies' declaration and report serve as an untimely rebuttal.  Should the case

5   proceed to trial and should Fluence renew its motion to exclude Coates' testimony, the

6   Court may consider the issue.  As such, any argument in relation to Coates' expert report

7   and testimony is **DENIED** as premature and *without prejudice*.

8       Schenker argues that Professor Davies' declaration and attached report should not

9   be considered because: (1) they contain inadmissible legal opinions on domestic law; (2)

10  the declaration serves as an untimely rebuttal expert report; and (3) the opinions are

11  unreliable.  ECF No. 202 at 2.  Schenker argues that Professor Davies' legal opinions are

12  inadmissible because it is the Court's job to interpret the law.  *Id.* at 2–4.  Schenker explains

13  that the exception allowing legal interpretation of foreign law does not apply because

14  COGSA—the law at issue—is domestic.  *Id.* at 3.  Schenker also points out that Professor

15  Davies is not a licensed attorney and is not listed as a member of either the Louisiana State

16  Bar Association (where he teaches) or the California State Bar Association.  *Id.* at 4–5.

17      Fluence counters that Professor Davies is a recognized forensic maritime expert,

18  who has submitted amicus briefs to the United States Supreme Court and Third Circuit.

19  ECF No. 222 at 6.  Fluence contends the declaration and opinions at issue "do not contain

20  an expert legal opinion on the ultimate legal issue for the Court."  *Id.*  Fluence contends

21  that Professor Davies' opinions set forth "rarely presented maritime legal issues related to

22  contracts of private carriage" that do not replace the Court's judgment.  *Id.*  Fluence also

23  argues that because there will be no jury trial—and only a bench trial—there is no concern

24  about Professor Davies' opinions usurping the role of the Court.  *Id.*

25      The Court agrees that Professor Davies' declaration and report contain legal

26  conclusions that attempt to supersede the Court's role of interpreting and applying the law.

27  For example, Professor Davies' cites various maritime law cases, attempting to inform the

28  Court of its application by distinguishing common carriers from private carriers.  ECF No.

161-81 at 13–14.  The report also lays out certain legislative history, attempting to interpret COGSA alongside other statutory legislation.  *Id.*  The report further analyzes cases cited by the parties, instructing the Court on how to apply those cases.  *Id.* at 15–22.  As such, the Court agrees with Briese's characterization of the expert report in that it reads more like a legal brief than expert opinions based on experience in the industry.

The Ninth Circuit has held that matters of law for the Court are "inappropriate subjects for expert testimony."  *Aguilar v. Int'l Longshoremen's Union Loc. No. 10*, 966 F.2d 443, 447 (9th Cir. 1992) (citing *Marx v. Diners Club, Inc.*, 550 F.2d 505, 509 (2d Cir.1977)).  In addition, "[e]xpert testimony offering legal conclusions is impermissible when it concerns an ultimate issue which will be decided by the fact-finder."  *Leeds LP v. United States*, No. 08CV100 BTM BLM, 2010 WL 3911429, at *1 (S.D. Cal. Oct. 5, 2010) (citing *United States v. Moran*, 493 F.3d 1002, 1008 (9th Cir.2007) and *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir.2004)).  But the reasoning behind this notion is that "[w]hen an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."  *Leeds LP*, 2010 WL 3911429, at *1 (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994)).  As such, despite Professor Davies' legal conclusions, the Court also agrees with Fluence in that the issues currently before the Court are not (and will not)[9] go before a jury, eliminating the concern of usurping the jury's role as fact finder, or confusing the jury with multiple interpretations of the law.  For this reason, the Court does not find it necessary to strike Professor Davies' declaration and report from the record.

Furthermore, Fluence only cites to Professor Davies' declaration and report in the context of its argument that the contract is one of private rather than common carriage.  That issue involves questions of both law and fact.  *See infra* Part VI.B.1–2.  In resolving the common versus private carriage distinction, the Court does not consider Professor

---

[9]     Any potential trial would be a bench trial.

Davies' legal conclusions as evidence or fact and instead, performs its own review of the law as it applies to the evidence in the record.  Because the Court finds an issue of fact as to whether the contract is one of private or common carriage, it need not (and will not) consider the opinions at issue to resolve the remaining disputes on summary judgment.[10] *See infra* Part VI.B.2.  To the extent the Court states the law in a manner consistent with Professor Davies' legal conclusions, the Court does so based on an independent review of the legal authority and not in reliance on Professor Davies.  As for the disputed factual assertions, those cannot be resolved on summary judgment.  *See infra* Part VI.B.2.

Accordingly, the Court **DENIES-IN-PART** Schenker's and Briese's motions to strike Professor Davies' declaration and report, thereby refusing to strike the report from the record, but engaging in its own review and analysis of the applicable law.  *Cf. In re Novatel Wireless Sec. Litig.*, No. 08CV1689 AJB RBB, 2012 WL 5463214, at *5 (S.D. Cal. Nov. 8, 2012) (citing *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 298 (7th Cir.1990) ("A court has broad discretion in assessing expert testimony and should only exclude those portions which it deems impermissible.")).

## VI.  <u>MOTIONS FOR SUMMARY JUDGMENT</u>

Fluence, Schenker, Briese, and BBC each filed separate motions seeking summary judgment on various issues.  Fluence asks the Court to find: (1) the Vessel liable *in rem* and for breach of bailment; (2) Schenker Deutschland and SchenkerOcean liable for negligence, breach of contract, and breach of bailment; (3) BBC liable for breach of bailment; (4) that the contract of affreightment is one of private rather than common carriage; (5) that COGSA's $500 per package liability limitation cannot stand, because

---

[10]  The Court notes that Professor Davies' report engages in a discussion of whether *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004) applies to cases of private carriage, arguing that it does not.  However, it is the role of the Court to interpret the holdings in *Kirby* and specifically, its application to different types of maritime contracts.  Though not specifically cited by Fluence in its *Kirby* analysis, the Court considers only those arguments made in Fluence's summary judgment briefing and engages in its own analysis of the law, disregarding the legal arguments set forth by Professor Davies.

-14-

Defendants did not provide Fluence notice or fair opportunity to avoid the limitation; (6) alternatively, that COGSA's liability limitations cannot be enforced because there has been an unreasonable deviation; and (7) that an adverse inference is warranted as to Fluence's unreasonable deviation claim.  Defendants oppose the relief Fluence seeks and request that the Court enter summary judgment in favor of Defendants and hold Fluence bound by COGSA's $500 per package liability limitation.  Although the majority of the claims at issue raise disputes of material fact, the Court agrees with Defendants in that Fluence is contractually bound by COGSA's $500 per package liability limitation.

### A.   Legal Standard

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if it could affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party."  *Id*.  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving party meets its burden, the nonmoving party must go beyond the pleadings to establish a genuine issue of material fact, using affidavits, depositions, answers to interrogatories, admissions, and specific facts.  *Ford Motor Credit Co. v. Daugherty*, 270 F. App'x 500, 501 (9th Cir. 2008) (citing *Celotex*, 477 U.S. at 324); *see also* Fed. R. Civ. P. 56(c)(1)(A) (purported factual disputes must be accompanied by "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials").

"The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor."  *City of Pomona*, 750 F.3d at

1049. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, the nonmoving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion for summary judgment. *See* Fed. R. Civ. P. 56(c); *see also Phytelligence, Inc. v. Washington State Univ.*, 973 F.3d 1354, 1364 (Fed. Cir. 2020) ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (quoting *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)). Furthermore, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *See Anderson*, 477 U.S. at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## B.   <u>Private v. Common Carriage</u>

Fluence argues that the contract at issue here is one of private carriage. Defendants argue that the contract is one of common carriage. This threshold question is important because if the contract is for common carriage, COGSA, including its $500 per package liability limitation will apply. If the contract is for private carriage, the liability limitation will only apply if properly incorporated into the contracts. None of the parties cite authority that binds this Court in distinguishing common and private carriage given the facts on record, and Ninth Circuit precedent on the matter is limited. Having considered the parties' arguments and briefing, the Court finds a dispute of fact as to whether or not the contract of carriage should be categorized as one for common or private carriage.

### 1.   *Legal Standard*

COGSA "generally governs the responsibilities of carriers involved in the shipment of goods into the United States from ports outside the United States." *Man Ferrostaal, Inc. v. M/V Akili*, 763 F. Supp. 2d 599, 609 (S.D.N.Y. 2011), *aff'd on other grounds*, 704 F.3d 77 (2d Cir. 2012). "COGSA does not apply, however, when the carrier at issue has acted

-16-

as a private carrier, rather than as a common carrier." *Id.*; *Associated Metals & Mins. Corp. v. S/S Jasmine*, 983 F.2d 410, 412 (2d Cir. 1993) (explaining that contracts of private carriage are statutorily exempted from COGSA).

"[T]he essential attribute distinguishing common carriage from private (contract) carriage has been the presence, or lack, of an offer of holding out to serve the public generally." *Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 326 (2d Cir. 1972); *Nichols v. Pabtex, Inc.*, 151 F. Supp. 2d 772, 777 (E.D.Tex.2001) (*Kelly v. General Electric*, 110 F. Supp. 4, 6 (E.D.Pa.), *aff'd*, 204 F.2d 692 (3d. Cir.), *cert. denied*, 346 U.S. 886 (1953)) ("A common carrier has been defined as 'one who holds himself out to the public as engaged in the business of transportation of persons or property from place to place for compensation, offering his services to the public generally.'"); *Ispat Inland, Inc. v. Am. Com. Barge Line Co.*, No. 2:99 CV 58, 2002 WL 32098290, at *4 (N.D. Ind. Sept. 30, 2002) (citation omitted) (explaining that "[c]arriers are held to be common if they have held out, by a course of conduct, that they would accept goods from whomever offered to the extent of their ability to carry.")). As such, "[a] common carrier is one that holds itself out to the public as ready to carry for anyone who requests its services, while a private carrier reserves the right to accept or reject employment as carrier." *See J. Aron & Co. v. Cargill Marine Terminal, Inc.*, 998 F. Supp. 700, 704 (E.D. La. 1998) (citing *United States v. Stephen Bros. Line*, 384 F.2d 118, 122–23 (5th Cir.1967); *The Monarch of Nassau*, 155 F.2d 48 (5th Cir.1946); and *Carver's Carriage By Sea* 4 (12th ed.1971)); *see also In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 754 F. Supp. 2d 1239, 1254 (W.D. Wash. 2010), *aff'd*, 450 F. App'x 685 (9th Cir. 2011) ("Common carriers 'hold themselves out to serve the public in a nondiscriminatory manner and on a regularly scheduled, previously announced basis,' usually moving a variety of materials . . . for numerous different shippers at the same time.").

Even so, courts have looked to other factors in distinguishing common carriage from private carriage. For example, in *Associated Metals & Mins. Corp. v. S/S Jasmine* the court held: "A contract unique to admiralty law, a voyage charter party describes a form of

-17-

'private carriage', which is distinguished from so-called 'common carriage' agreements by two factors: (1) the entire ship is usually engaged to carry the charterer's cargo on a single voyage, and (2) the vessel is typically navigated by its owner."  983 F.2d at 411 (citing Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty, Ch. 4 (2d ed. 1975)).  The Supreme Court has also "giv[en] qualified approval to the . . . requirement of a showing of 'specialization' to negate common carriage," meaning a "specialized" carrier would indicate private carriage. *Nichimen Co.*, 462 F.2d at 326 (citing *United States v. Contract Steel Carriers, Inc.*, 350 U.S. 409 (1956)).  Accordingly, although the Court is interpreting a contract of carriage, the determination involves certain questions of fact specific to the relationships between and conduct of the parties.

### 2.   *Discussion*

Fluence's FAC states that it contracted with Schenker "in booking the loading stowage, and carriage of the Cargo aboard the M/V BBC Finland."  FAC at ¶ 16. Fluence describes Schenker as "a Non-Vessel-Operating Common Carrier" but states that a full, private charter was booked—not a common carrier arrangement.  *Id.*  Fluence alleges a breach of "contractual duties under the maritime contract of carriage, affreightment, bailment and other contract, as identified in Exhibit 1."  *Id.* at ¶ 9.  Exhibit 1 served as "an exemplar Sea Waybill for one of the damaged containers."  *Id.*  Fluence alleges that it entered into four Sea Waybills with Schenker, all in the same form.  *Id.* at ¶¶ 9, 21.  As such, the Sea Waybills represent a portion of the contracts at issue for purposes of defining the contract as one of private or common carriage.  However, as held in this Court's prior Order, Fluence's allegations allege that numerous contracts make up the contract of carriage thereby leaving open the theory that other contracts or agreements may also be relevant and/or controlling.  *See* ECF No. 63 at 16–18.  And because the issue of common and private carriage pulls from multiple factors, the Court considers the different contracts and facts as argued by the parties.

Although Fluence hired a "Non-Vessel-Operating Common Carrier," it argues the contract was not a common carriage arrangement.  Fluence contends that because the BBC

Finland carried only Fluence's cargo, the contract here was for private carriage. The fact that the BBC Finland carried only Fluence's cargo is undisputed, which does create a rebuttable presumption in favor of Fluence that the contract was one of private rather than common carriage. *See Ispat Inland, Inc.*, 2002 WL 32098290, at *3 (citing *J. Aron & Company*, 998 F.Supp. at 704). Schenker and Briese cite *United States v. Ultramar Shipping Co.*, 685 F. Supp. 887 (S.D.N.Y. 1987) to rebut this presumption. There, the vessel at issue was carrying wheat from the United States to Bangladesh when it sank in the night. *Id.* at 889. Following trial, the defendants asked the court to amend the findings of fact and conclusions of law as to the nature of the contract. *Id.* at 900. The defendants argued that the contract between the parties was one of private carriage (implicating certain statutory law). *Id.* *Ultramar* held the contract to be one of common carriage, first explaining:

> It is accepted law in this circuit that if there is cargo of two or more shippers on one vessel in one voyage, then the vessel is a common carrier. It does not necessarily follow, however, that a vessel is a private carrier because it actually carries the cargo of only one shipper. For example, a common carrier may book only a partial load, and be unable to contract with other shippers to fill the rest of the ship. This fortuitous event would not convert the contract negotiated with the original shipper to one for private carriage.

*Id.* at 901 (citations omitted). In holding the contract as one of common carriage, the court pointed to a statement in the bill of lading that the cargo "MUST NOT BE STORED IN ANY HOLD THAT IS BEING USED TO CARRY INSECTICIDES OR OTHER TOXIC SUBSTANCES." *Id.* That condition, "negotiated by the parties and typed into the form," showed that the parties "did not contract for the full reach of the vessel, and anticipated that other cargo might be transported by the vessel on the same voyage." *Id.*

This Court agrees with the line of reasoning in *Ultramar—i.e.*, that a vessel carrying only the cargo of one shipper does not alone make the arrangement one of private carriage.

*See id.* at 901.  Defendants argue that common carriage was intended, and the only reason Fluence's Cargo was the sole Cargo is because Fluence increased its Cargo load, making it very difficult for BBC to find additional cargo that would fit within those spaces not already occupied by Fluence.  BBC points out that the Booking Note contains a term "Last in / first out," making the case analogous to *Ultramar*.  ECF No. 164-1 at 9, Ex. 2 at 1.  The Court agrees that the term supports Defendants' theory, because it implies that when the Booking Note was issued, the parties expected other shippers to load cargo on the BBC Finland.  If Fluence's Cargo was to be the only cargo, the term "Last in / first out" would not be necessary.  As such, this evidence supports Defendants' contention that the parties' arrangement was for common carriage.

Next, Fluence argues that "[t]wo types of services exist in maritime shipping—liner trade and tramp trade."  ECF No. 161-1 at 21.  Fluence explains that "Tramp trade 'is roughly synonymous with' private carriage," while "Liner trade 'is roughly synonymous with' common carriage."  *Id.*  Fluence contends that "BBC operates primarily as a tramp service, and that the voyage at issue was such."  *Id.* at 22.  Fluence cites the declaration of Professor Martin Davies, which, as explained above, the Court will not accept as law or fact.  *See supra* Part V.C.2.  However, in the interest of justice, the Court has found that certain cases do support this categorization of tramp and liner services in maritime law.  *See In re Hawaiian*, 754 F. Supp. at 1254 (distinguishing common carriers from tramps); *St. Ioannis Shipping Corp. v. Zidell Expls., Inc.*, 222 F. Supp. 299, 306 (D. Or. 1963), *aff'd*, 336 F.2d 194 (9th Cir. 1964) (explaining that the vessel was a tramp and thus did not have the obligations of a common carrier); *Nat'l Ass'n of Recycling Indus., Inc. v. Fed. Mar. Comm'n*, 658 F.2d 816, 820 (D.C. Cir. 1980) (stating that "[t]ramps are not common carriers . . . .").  As such, the Court considers the argument and supporting evidence cited by Fluence.

First, Fluence points to the deposition testimony of Schenker Deutschland AG's 30(b)(6) witness, Christoph Hilgers, who confirmed that the only option was to ship Fluence's cargo on tramp vessels, and "not a regular liner service."  ECF No. 161-1, Ex.

17 to at 2–3.  BBC's executive operations manager, Jennifer Neilsen, also confirmed during deposition that she would describe the journey as a tramp service.  ECF No. 161-1, Ex. 21 at 3.  In supplemental discovery responses, when asked to admit that the M/V BBC Finland was a "tramp vessel" and had "no published ports of call disclosed to the public," BBC objected explaining that "tramp vessel" and "disclosed to the public" were not defined. ECF No. 161-1, Ex. 36 at 3–4.  Subject to its objections, BBC denied "that the M/V BBC FINLAND was a tramp vessel but admit[ted] that for the Voyage . . . , the [V]essel's position and planned direction (US West Coast) were disclosed to BBC's clients until April 1, 2021 . . . ."  *Id.* at 4.  On that date, "Schenker confirmed that 333 containers [of Fluence's Cargo] would be carried [aboard the Vessel], after which additional cargo could not be carried."  *Id.*  BBC's 30(b)(6) witness stated that after April 1, 2021, no efforts were made to find additional cargo for the Vessel.  ECF No. 161-1, Ex. 20 at 2.

Fluence's oppositions to Defendants' summary judgment motions cite the same evidence with a few additions.  First, from Neilsen's deposition testimony the confirmation that if Fluence shipped more than 301 units, it would be charged a lesser amount per container.  ECF No. 199, Ex. 2 at 2–3.  Second, from corporate designee, Guenther Siemen, deposition testimony that BBC is not a 100 percent tramp services but also not a full liner service.  ECF No. 199, Ex. 3 at 4.  Third, Siemen statement of how "here, it was the case where they took a full cargo from A to B" but it was not meant to be full tramp service.  *Id.* Siemen's explained that it was "only due to the fact that Schenker increased . . . the quantity to -- to almost a full load."  *Id.* at 4.  This evidence supports Fluence's argument that the contract was one of private carriage, but also supports the notion that the contract was intended to be one of common carriage until April 1, 2021, when Fluence upped its Cargo load and the planned direction of the Vessel was no longer disclosed to BBC's clients.

In addition, the Booking Note—which contains the "Last in / first out" term— states "Liner Terms" multiple times throughout, contradicting Fluence's tramp service argument. *See* ECF No. 161-1, Ex. 2.  But Fluence argues that other terms of the Booking Note establish a contract of private carriage, including: "a laycan date, laytime and demurrage,

standard BIMCO clauses for charter parties, and other rider clauses." ECF No. 161-1 at 22. The Court will not analyze all terms at issue (because disputes of fact exist), but notes that the term "charter parties" supports the argument that the contract was private in nature. After all, certain courts have considered charter parties to be somewhat synonymous with private carriage. *See Associated Metals & Mins. Corp.*, 983 F.2d at 412 (noting that charter parties are roughly synonymous with private carriage); *Fortis Corp. Ins., S.A. v. Viken Ship Mgmt. A.S.*, 481 F. Supp. 2d 862, 865 (N.D. Ohio 2007), *aff'd sub nom. Fortis Corp. Ins., SA v. Viken Ship Mgmt. AS*, 597 F.3d 784 (6th Cir. 2010) (same); *Underwriters at Lloyd's v. Seariver Mar., Inc.*, No. C.A. H-98-1391, 2000 WL 33302237, at *8 (S.D. Tex. Sept. 1, 2000) (same); *see also* Bills of lading under charter parties, 2 Admiralty & Mar. Law § 11:6 (6th ed.) ("[T]he case law clearly preserves the distinctness of the charter party as private carriage to which COGSA does not apply."). Accordingly, the contents of the Booking Note—cited by both parties—create a dispute of material fact.[11]

Finally, the primary characteristic of a common carriage arrangement is whether the carrier holds itself out to the public to carry goods. After April 1, 2021, the evidence shows that the Vessel's route was no longer disclosed to BBC's clients," because on that date, Fluence upped its Cargo load, making it difficult to fill any remaining space with additional cargo. ECF No. 161-1, Ex. 36 at 4. This indicates that although BBC's route was disclosed to clients until April 1, 2021, after that date, it was not. Based on the record before the Court, it appears that before Fluence increased their Cargo count to almost a full load, the parties may have intended a common carriage arrangement. However, once Fluence increased its Cargo count, the contract may have become one of private carriage. Given the terms of the Booking Note and deposition testimony, however, the Court cannot say one way or the other.

Because competing evidence cannot be weighed at the summary judgment stage, the Court finds a dispute of material fact as to whether the contract constitutes one of private

---

[11]    The Court also notes that the Time Charter agreement between Briese and BBC is referred to as a Charter Party. ECF No. 161-1, Ex. 3 at 1.

or common carriage.  Although Fluence made a *prima facie* case for private carriage by showing that the Vessel carried only Fluence's Cargo, Defendants successfully rebutted that presumption with other evidence.  Accordingly, the Court **DENIES** summary judgment as to all parties respecting the categorization of the contract as one of common or private carriage.

### C.   COGSA's $500 Per Package Liability Limitation

The Court must next determine whether COGSA's $500 per package liability limitation applies to this case and to which Defendants.  The Court's above conclusion on the threshold issue of common versus private carriage complicates the analysis.  If the contract is one of common carriage, the COGSA package limitation will apply making much of the discussion below irrelevant.  However, if the arrangement is one of private carriage, the Court must analyze whether COGSA's liability limitation was properly incorporated into the contract.  Therefore, the Court must look to the terms of the contracts at issue to determine if Defendants successfully incorporated COGSA's $500 per package liability limitation by providing proper notice to Fluence.  Fluence argues it was not given proper notice as required by the fair opportunity doctrine, because it was not provided copies of the contracts.  Fluence also argues that even if the Court finds Fluence contractually bound by the liability limitation, Defendants conduct rises to the level of unreasonable deviation, vitiating any contractual obligation.

The Court also notes that the characterization of private versus common carriage may influence the determination of which contract controls.  *See, e.g.*, *Associated Metals & Mins. Corp.*, 983 F.2d at 413 ("Here, 'so long as it remains in [the charterer-shipper's] hands, [the bill of lading] usually is a mere receipt as between the parties to the charter and does not perform the additional function of a contract for the carriage of goods.'") (citations omitted).  The Court sidesteps this issue because, as a matter of law, Fluence is bound by COGSA's $500 per package liability limitation under those contracts it has previously relied on during this litigation.

-23-

### 1.   *Legal Standard*

"Section 4(5) of COGSA limits a carrier's liability for loss of damage of goods to $500 per package." *Mbacke v. Transcon Cargo, Inc.*, No. CIVS06-1356 FCD EFB, 2008 WL 220369, at *5 (E.D. Cal. Jan. 25, 2008) (citing 46 U.S.C. App. § 1304(5)). "Under Ninth Circuit law, a carrier may take advantage of COGSA's $500 liability limit only if it gives the shipper a 'fair opportunity' to opt for a higher liability by paying a correspondingly higher freight rate." *Mori Seiki USA, Inc. v. M.V. Alligator Triumph*, 990 F.2d 444, 448 (9th Cir. 1993) (citing cases). "[T]he fair opportunity requirement is meant to give the shipper notice of the legal consequences of failing to opt for an ad valorem freight rate." *Tokio Marine & Fire Ins. Co. v. Mitsui O.S.K. Lines, Ltd.*, No. CV 02-3617 ER, 2003 WL 23181013, at *3 (C.D. Cal. June 27, 2003) (quoting *Carman Tool & Abrasives, Inc. v. Evergreen Lines*, 871 F.2d 897, 899 (9th Cir.1989)).

"A short form bill of lading may incorporate by reference the terms in a long form bill of lading without providing specific notice of those terms so long as the incorporated provisions are not special terms or exceptions that differ from the governing federal statutes," *Starrag v. Maersk, Inc.*, 486 F.3d 607, 613 (9th Cir. 2007) (citing *Comsource Indep. Foodservice Cos. v. Union Pac. R.R.,* 102 F.3d 438, 443–444 (9th Cir.1996)), in this case, COGSA. "The reason for refusing to enforce inconsistent contractual terms is that by 'accepting the short form, the shipper relies upon the fact that the long form, which is incorporated by reference, contains only the usual provisions which closely follow COGSA, unless there is some warning on the face of the short form of special terms or exceptions which differ from the COGSA provisions.'" *Starrag*, 486 F.3d at 613 (quoting *Encyclopaedia Britannica, Inc. v. S. S. Hong Kong Producer*, 422 F.2d 7, 14 (2d Cir. 1969)).

"The carrier has the initial burden of producing *prima facie* evidence showing that it provided notice to the shipper that it could pay a higher rate and opt for higher liability." *Vision Air Flight Serv., Inc. v. M/V Nat'l Pride*, 155 F.3d 1165, 1168 (9th Cir. 1998) (citing *Royal Insurance Co. v. Sea–Land Service, Inc.*, 50 F.3d 723, 726 (9th Cir.1995)). "If the

bill of lading contains an express, legible recitation of the $500 limitation, and of the opportunity to declare a higher value, the bill of lading will constitute *prima facie* evidence that the shipper was given the requisite fair opportunity." *Yang Mach. Tool Co. v. Sea-Land Serv., Inc.*, 58 F.3d 1350, 1354 (9th Cir. 1995) (citing *Travelers Indem. Co. v. Vessel Sam Houston*, 26 F.3d 895, 898 (9th Cir.1994)).  If the carrier satisfies this *prima facie* showing, "[t]he burden then shifts to the shipper to prove it was denied such an opportunity." *Vision Air*, 155 F.3d at 1168–69 (citing *Royal Ins. Co.*, 50 F.3d at 727).  The Court notes that Fluence does not appear to dispute that the Bills of Lading and Booking Note at issue contain the language required by COGSA's § 4(5).  Instead, Fluence primarily argues that it was not provided notice of liability limitation, because it was never provided copies of these contracts.

### 2.    *Sea Waybills and Email Communications*

The Court begins its analysis with the Schenker Sea Waybills, because Fluence is a party to the Waybills.  Fluence initially argues that the Sea Waybills are not binding because they were issued after the original contract was formed.  ECF No. 161-1 at 22–23.  However, Fluence attaches an exemplar Sea Waybill to both its Verified Complaint and FAC, basing its lawsuit, at least in part, on the Waybills.  Fluence's FAC alleges:

> This is a case of marine cargo damage and short delivery resulting from breach or other fault by the Defendant Vessel, *in rem*, of the Vessel's contractual duties under the maritime contract of carriage, affreightment, bailment and other contract, as identified in Exhibit 1. *See* Exhibit 1, an exemplar Sea Waybill for one of the damaged containers. All of the waybills related to this incident are in the same form.

FAC at ¶ 9.  The above allegation shows that Fluence references the Sea Waybills in identifying the contract of carriage, going so far as to attach one to the FAC in alleging the Vessel's contractual duties, while simultaneously referencing other contracts. *See id.*  In contrast, Fluence's motion for summary judgment argues that the Email Communications

between Fluence and Schenker representatives now make up the contract of carriage.  ECF No. 161-1 at 8.  In Fluence's reply to Briese's opposition, Fluence again shifts its argument, stating how "the sea waybills are further evidence of the contract," and that "[t]heir terms apply to the extent that they are not inconsistent with the [Email Communications]."  ECF No. 219 at 5.  Because Fluence references multiple contracts in its allegations, this leaves open the theory that the Email Communications could make up part of the contract of carriage.  *See* FAC at ¶ 9; ECF No. 63 at 17.

Moving to the Email Communications, Fluence cites certain pages but provides little in terms of the language it is actual referencing, other than noting the cost to ship each container and the absence of any reference to the $500 per package liability limitation.  One citation is to an email dated February 4, 2021, from Schenker representative, Florian Liesert, to Fluence's counsel, Claudius Rochow.  ECF No. 161-1, Ex. 1 at 35–36.  The email sets forth supposed terms agreed to on a "teams calls."  *Id.* at 36.  Those terms include the shipping price of $6,500 per container for the transport of cargo from Hai Phong to San Diego, with a minimum of 100 containers per voyage.  *Id.*  No vessel had been selected at this point and the timeframe for shipment was between February and March 2021.  *See id.* The next citation is to an email dated February 24, 2021, from Liesert to Rochow, again stating the shipping price, but with respect to "booking with BBC," also stating a 250 minimum container count and a 350 maximum.  *Id.* at 32.  This email further noted that "[t]his scale might give us the possibility to ship at least certain smaller quantities of [] [containers] with some earlier vessel(s) in case such possibility will be identified based on our continuous investigations over the next days," given the limited options, but that BBC would need to consent.  *Id.*

An email dated February 26, 2021, from Liesert to Fluence representative, Mattias Becker, states that Shenker was in contact with the Vessel owners and waiting for a final booking confirmation.  *Id.* at 30.  On March 2, 2021, Maximillian Meibohm of Schenker emailed Rochow confirming a minimum of 250 containers at $6,500.00 per container for the BBC Finland Voyage, with certain additional terms.  Again though, without more

-26-

explanation in Fluence's briefing, it is difficult to discern what terms Fluence would like the Court to take note of.  Upon review of the Email Communications, it seems that the terms of the alleged contract were evolving based on the situation.  After all, Fluence upped its Cargo container count to 333 around April 1, 2021. *Id.* at 10–14.  Also on April 1, 2021, an email was sent by Liesert to Rochow and Becker discussing the increase in Cargo on the BBC Finland, further stating: "we are pleased to inform you that these additional containers can be shipped at the same conditions as per governing booking note." *Id.* at 12.  As such, the email communications themselves provided notice of a booking note, going so far as to inform Fluence that a booking note would govern. *See id.*

Schenker disputes that the Email Communications form the offer and acceptance (*i.e.*, the contract of carriage) for arranging the transport of Fluence's Cargo on the BBC Finland.  ECF No. 204 at 7.  Schenker argues that "there were distinct offers for each of the four project shipments eventually carried on the BBC FINLAND." *Id.*  Schenker cites an email from Rochow of Fluence, which states: "Fluence confirmed your attached offer for our SPower Luna project and nominated Schenker for our freight forwarder for this project." ECF No. 204, Ex. 44 at 2.  Schenker argues that "[t]he 'attached offer' was an excel spreadsheet with the basic terms." ECF No. 204 at 7.  This document contains cargo counts, prices, costs, and more.  ECF No. 204, Ex. 40 at 2.  In addition, the document states "B/L-and/or B/N-Conditions of carrier's to apply." *Id.*  Schenker argues that B/L means bill of lading and B/N means booking note.  ECF No. 204 at 7.  Unlike Fluence's evidence of the alleged contractual terms, Schenker's evidence includes excel spreadsheets with terms specific to the BBC Finland and terms implying that other contracts of the carrier would apply.  However, the Court cannot way the evidence at this stage.  Because both Schenker and Fluence attach evidence supporting their positions, there is a dispute of fact as to what constitutes the initial contract between Fluence and Schenker.

Even if the Court were to accept the Email Communications as part of the contract of carriage, Fluence's reference to multiple contracts in its FAC—specifically pointing to the Sea Waybills—forecloses any argument here that the Sea Waybills do not bind Fluence.

-27-

As such, the Court will not rely solely on the Email Communications in determining whether the $500 per package liability limitation applies.  Furthermore, Fluence itself stated that the terms of the Sea Waybills apply to the extent they are consistent with the Email Communications.  Because there is no discussion of Fluence rejecting the $500 per package liability limitation in the Email Communications, such an additional term would not be inconsistent, making the absence of the term in the Email Communications nondeterminative.

### 3.   *Sea Waybills and SCHENKERocean Bill of Lading*

Schenker makes several arguments with respect to the Sea Waybills, first arguing that the Waybills incorporate terms of the SCHENKERocean Bill of Lading.  ECF No. 163 at 14.  Schenker contends that although not mandatory, "the SchenkerOcean Sea Waybill . . . 'contain[s] a designated space in which to declare a higher value . . . ."  *Id.* at 24.  Schenker cites *Travelers Indemnity Co. v. Vessel Sam Houston* to argue that "[c]onsidering its size and sophistication, if Fluence 'wanted a higher carrier liability, it would have contracted for it.'"  *Id.* at 25 (quoting *Travelers Indem. Co.*, 26 F.3d at 899).  Schenker also argues that: (1) Fluence shipped over $500 million in cargo to the United States in 2020, making it a sophisticated shipper; and (2) "had shipped goods with Schenker and BBC Chartering 'on several previous occasions' and 'was familiar with [carrier's] shipping procedures,' including having received several Schenker Sea Waybills from prior shipments in January and February 2021."  ECF No. 163 at 25.  Schenker further points to Fluence's admission that "it has not attempted to declare a value on a bill of lading or a sea waybill for cargo bound for the United States."  *Id.* at 25; *see also* ECF No. 204, Ex. 558 at 6.

Fluence argues it never received the draft Sea Waybills during the negotiation process, and that Schenker first sent drafts to Fluence on April 15, 2021, after the Cargo had been loaded on the Vessel.  ECF No. 161-1 at 9.  Fluence contends the final Sea Waybills, also issued on April 15, 2021, were marked as non-negotiable and stated "NO VALUE DECLARED."  *Id.* at 9–10.  Fluence argues there was no space remaining for it

-28-

to act, and that Schenker never informed Fluence that it could avoid the package limitation through a declaration of value on the Sea Waybills. *Id.* at 10. Fluence also contends that the Sea Waybills do not unambiguously incorporate COGSA. *See id.* at 22–23. As such, Fluence argues it was not given a fair opportunity to declare value and avoid COGSA's liability limitation.

To make a *prima facie* case that Fluence had a fair opportunity to opt out of the liability limitation and declare value, the Court first looks to the SCHENKERocean Bill of Lading.[12] After review of the SCHENKERocean Bill of Lading, the Court finds that, Schenker—identified as the carrier therein—satisfies its initial burden. Clause 7, subsections (2) and (3) contain the terms required to show fair opportunity. Clause 7(2) reads in part:

> Where the Hague Rules or Hague Visby Rules or any legislation making either of such Rules compulsorily applicable (such as COGSA) to this Bill of Lading apply, the Merchant agrees that the Carrier has no knowledge of the value of the Goods and shall not, unless a declared value has been noted in accordance with Clause 7(3) below, be or become liable for any loss or damage to or in connection with the Goods in an amount per package or shipping unit in excess of the package or shipping unit limitation as laid down by such Rules or legislation. Where Carriage is to, from or through the United States of America, such limitation amount of the Carrier or the Vessel according to COGSA is US $500 per package or customary freight unit unless a declared value has been noted in accordance with Clause 7(3) below.

ECF No. 164-1, Ex. 154 at 15. Immediately following, is Clause 7(3), which reads:

> The Merchant agrees and acknowledges that the Carrier has no

---

[12]   Even though Fluence does not appear to dispute that the contracts at issue contain the language required by COGSA's § 4(5), in the interest of justice, the Court engages in a limited review of the language.

-29-

knowledge of the value of the Goods and the Carrier's liability may be increased to a higher value only by a declaration in writing of the value of the Goods by the Merchant upon delivery to the Carrier of the Goods for shipment, such higher value being inserted with the consent of the Carrier on the front of this Bill of Lading in the space provided and, if required by the Carrier, extra freight paid. In such case, if the actual value of the Goods shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

*Id.* Clause 7(2) clearly states that when cargo is being shipped to or from the United States, COGSA's $500 per package limitation applies, "unless a declared value has been noted in accordance with Clause 7(3)." *Id.* The language in Clause 7(3) then plainly states that the carrier's liability may be increased to a higher value if one is declared by the Merchant upon delivery of the goods to the carrier for shipment, but that an extra freight price may be required. *Id.* The language thus specifies the benefits and consequences of not declaring a higher value, states how to declare a higher value, and explicitly identifies COGSA, as well as its $500 per package liability limitation. *See id.* All of this is outlined in legible print, which is not disputed. As such, Schenker has made a *prima facie* showing that its SCHENKERocean Bill of Lading includes legible language mirroring COGSA's § 4(5) thus satisfying the fair opportunity doctrine. *See Int'l Fire & Marine Ins. Co. v. Silver Star Shipping Am., Inc.*, 951 F. Supp. 913, 916 (C.D. Cal. 1997).

Fluence's primary argument, however, is that it never received actual notice of the $500 per package liability limitation, because it was not provided a copy of the SCHENKERocean Bill of Lading until after the litigation commenced. ECF No. 161-1 at 24. But Fluence did receive four Sea Waybills (drafts and final versions) and as noted above, Fluence filed suit based on the Sea Waybills foreclosing any argument that they are not binding. Even so, Fluence argues the Sea Waybills "do not recite this statutory language or anything similar." *Id.*

-30-

Turning to the Sea Waybills, all of which are in the same form, the first page contains a clause that reads in part:

> This contract is subject to the terms and conditions, including the law and jurisdiction clause and limitation of liability & declared value clauses, of the SCHENKERocean Bill of Lading, which are applicable with logical amendments.

ECF No. 161-1, Ex. 16 at 1.  Immediately below this clause is a space/box titled "Declared Cargo Value," which also states in parentheses "see clause 7.3 of the SCHENKERocean Bill of Lading terms." *Id.*  In that space, and in all capital letters, it reads "NO VALUE DECLARED." *Id.*  As such, the Sea Waybills at the very least incorporate by reference the SCHENKERocean Bill of Lading, including the language required to provide fair opportunity.

Fluence cites *Mori Seike* to argue that although the Sea Waybills incorporate by reference the SCHENKERocean Bill of Lading—which does contain the liability limitation—"the mere incorporation of COGSA by reference is not adequate" to provide notice of such.  *Id.* (citing *Mori Seiki*, 990 F.2d at 449).  Fluence misreads *Mori Seike*.  There, the Ninth Circuit did hold that "the mere incorporation of COGSA by reference is not adequate." *Mori Seiki*, 990 F.2d at 449.  However, the Court was referring to a long-form bill of lading, and not a short-form sea waybill.  The correct interpretation of *Mori Seiki* is that the long-form bill of lading—in this case, the SCHENKERocean Bill of Lading—cannot merely incorporate COGSA by reference without providing the specific language of COGSA's $500 liability limitation and the resulting consequences of not declaring a higher value.  *See id.*  This interpretation is further supported by the Ninth Circuit's holdings in *Starrag v. Maersk, Inc.*

There, the Non-Negotiable Waybill, which the Court referred to as the "Short Form," stated: "[t]he contract evidenced by this Waybill is subject to the exceptions, limitations, conditions and liberties (including those relating to pre-carriage and on-carriage) set out in

-31-

Maersk Sealand's current Combined Transport Bill of Lading." *Starrag*, 486 F.3d at 611, 611 n.3, 612.  The Combined Transport Bill of Lading in *Starrag* contained a "period of responsibility clause," which extended the circumstances under which the $500 per package liability limitation applied. *See id.* at 611–13.  Like this case, the Non-Negotiable Sea Waybill in *Starrag* was provided to the shipper, where the Transport (*i.e.*, long form) Bill of Lading, containing the terms of clause at issue, was only "made available."[13] *Id.* at 613.  The Ninth Circuit held that the carrier need not provide actual notice of the contractually extended terms of COGSA, because the Short Form Sea Waybill incorporated the terms of the long-form bill of lading by reference and those terms were consistent with COGSA. *See id.* at 611, 613–15.  As such, Ninth Circuit precedent supports finding that a short-form sea waybill can incorporate by reference a long-form bill of lading, so long as the long-form includes the necessary language.

Plaintiff cites *Mbacke v. Transcon Cargo, Inc.* to argue that the Sea Waybills' incorporation of the SCHENKERocean Bill of Lading is inadequate to give sufficient notice of COGSA's terms.  *Mbacke*, 2008 WL 220369.  The Court disagrees for two reasons.  First, in *Mbacke*, the movant did not receive the bill of lading containing the clause at issue, nor did it receive the waybill incorporating the clause. *Id.* at *7.  Here, Fluence not only received the Sea Waybills but filed suit based on the Waybills, making this case distinguishable.  Second, *Mbacke* serves as only persuasive authority, while *Starrag* remains binding authority.  In *Mbacke*, the Court made the following assertion in a footnote on which Fluence relies:

> [T]he issue in *Staragg* [sic] was whether a long form bill of lading extending liability limitations beyond the term in Section 7 of COGSA conflicts with COGSA such that the package limitations cannot be enforced. *Starrag* is therefore not a case about "fair opportunity."

---

[13]   By the terms of the Sea Waybill, the Bill of Lading terms were available upon request.  *See* ECF No. 161-1, Ex. 16 at 30.

-32-

*Id.* at *11 n.15.  This Court does not entirely agree.  As noted above, one of the issues in *Starrag* was whether the short-form waybill's incorporation of the bill of lading by reference provided adequate notice to the shipper, even though the shipper did not receive actual notice.  The Court held that actual notice was not required.  *See id.* at 610, 611, 613–15.  Although this Court engages in a deeper analysis of the fair opportunity doctrine, Fluence attempts to rebut Schenkerocean's *prima facie* evidence by arguing that it did not receive actual notice of the SCHENKERocean Bill of Lading.  As such, Fluence's argument invokes a discussion of whether actual notice was required, and whether the Sea Waybills here can effectively incorporate by reference the long-form, SCHENKERocean Bill of Lading.

*Mbacke* also cites *Komatsu*, where the Ninth Circuit previously held that COGSA cannot be incorporated by reference into a bill of lading.  *See Komatsu, Ltd. v. States S.S. Co.*, 674 F.2d 806, 809–10 (9th Cir. 1982).  There, the bill of lading contained a clause stating: "Reference is hereby made specifically to value limitations (46 U.S. Code 1304(5)) and time limitations for filing claim and bringing suit (46 U.S.C. Code 1303(6)) which shall apply and are incorporated herein by reference."  *Id.* at 810.  *Komatsu* is distinguishable from the instant case because there, like in *Mori Seiki*, the Court was analyzing a long-form bill of lading and not a sea waybill incorporating a bill of lading.  *Komatsu* held the clause insufficient because "the 'opportunity' to declare a higher value must 'present itself on the face of the bill of lading' to constitute *prima facie* evidence."  *Komatsu*, 674 F.2d at 810 (quoting *Pan Am. World Airways, Inc. v. California Stevedore and Ballast Co.*, 559 F.2d 1173 (9th Cir. 1977)).[14]

Here, as established above, the SCHENKERocean Bill of Lading contains sufficient language outlining the consequences of not declaring a higher value.  ECF No. 161-1, Ex.

---

[14]   *Komatsu* based its holding on *Pan Am. World Airways, Inc.*, which also analyzed only clauses in the bill of lading (the liability and paramount clauses), and not whether a short-form sea waybill could incorporate provisions into that bill of lading.  *See Komatsu*, 674 F.2d at 810 (citing *Pan Am. World Airways, Inc.*, 559 F.2d at 1174–75).

16 at 1.  Although Fluence claims it was not provided the SCHENKERocean Bill of Lading, on the face (and first page) of the Sea Waybills—which Fluence was provided—there is a box to declare the value of the Cargo.  *Id.*  The box states, "No Value Declared" and points Fluence to Clause 7.3 of the SCHENKERocean Bill of Lading terms, which provides the consequences of not declaring a higher value.  As such, Fluence cannot argue that it was not given notice to declare value, when the documents it concedes to receiving leaves an obvious space for such and points to the terms associated with declaring value in the SCHENKERocean Bill of Lading.[15]  Nor can Fluence argue it was not on notice of the SCHENKERocean Bill of Lading given that the Sea Waybills clearly referenced and incorporated its terms.  The same is true respecting COGSA's liability limitation, because the Sea Waybills both reference liability limitations and point Fluence to the SCHENKERocean Bill of Lading for full terms and conditions.  This language appears on the first page of the Waybills, making it Fluence's responsibility to obtain a copy of the SCHENKERocean Bill of Lading.

Finally, Fluence points to the Paramount Clause on the last page of the Sea Waybills, which states:

> The contract evidenced by this Waybill is deemed to be a contract of carriage as defined in Article 1(b) of the Hague Rules, Hague Visby Rules and the US COGSA. However, this Waybill is a non-negotiable document. It is not a bill of lading and no bill of lading will be issued. However, it is agreed that the Hague Rules contained in the International Convention for the Unification of certain rules relating to Bills of Lading, dated Brussels the 25th August 1924 as enacted in the country of shipment which would have been applicable in this Waybill if it were a bill of lading shall apply to this Waybill. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall

---

[15]   This fact further distinguishes *Mbacke* from the case at hand because there, the waybill did not "recite the opportunity to declare a higher liability 'on its face.'"  *Mbacke*, 2008 WL 220369, at *11 (citing *Komatsu*, 674 F.2d at 810).

-34-

1
2

apply, but in respect of the shipments to which no such enactments are compulsorily applicable, the terms of the said Convention shall apply exactly the same way.

3

4   Ex. 16 or 19 to ECF No. 161-1 (161-19) at 45.   Fluence argues that this clause is a

5   "convoluted morass of ambiguities" and as such, the COGSA liability limitation does not

6   apply here.   ECF No. 161-1 at 23.   If the Court were looking at only the Sea Waybills, it

7   would agree with Fluence that the Paramount Clause attempting to incorporate COGSA

8   would be insufficient to provide notice of the liability limitation at issue.   *See Pan Am.*

9   *World Airways, Inc..*, 559 F.2d at 1177 (rejecting the argument that a paramount clause in

10   the bills of lading could incorporate COGSA absent the required language).   The

11   Paramount Clause Fluence points to does not effectively incorporate the $500 per package

12   limit.   This is irrelevant.   As explained above, the Sea Waybills incorporate the long-form

13   SCHENKERocean Bill of Lading, which *does* provide the necessary language for

14   declaring value and sets forth the $500 per package limitation.   *See Carman Tool &*

15   *Abrasives, Inc.*, 871 F.2d at 901 ("The underlying premise has always been that, so long as

16   the bill of lading, on its face, provides adequate notice of the liability limit and an

17   opportunity to declare a higher value, the carrier has discharged its responsibility.").   The

18   Paramount Clause leaves open the possibility for a bill of lading to be issued, and the first

19   page of the Sea Waybills point to the precise portions of the SCHENKERocean Bill of

20   Lading providing COGSA's § 4(5) required language.   As discussed above, under *Starrag*,

21   this is sufficient.

22       Finally, the Court finds that the protections of the $500 per package liability limitation

23   in the SCHENKERocean Bill of Lading also extend to the Vessel per the language in

24   Clause 7(2), stating that "such amount of the Carrier or the Vessel according to COGSA is

25   US $500 per package or customary freight unit unless a declared value has been noted in

26   accordance with Clause 7(3) below."   ECF No. 164-1, Ex. 154 at 15.   This is a Himalaya

27   Clause, which extends liability limitations to downstream parties.   *See Norfolk S. Ry. Co.*

28   *v. Kirby*, 543 U.S. 14, 20 n.2 (2004).   The Court finds Fluence is bound by the

-35-

SCHENKERocean Bill of Lading, and "[a] Himalaya Clause is interpreted like any other contract term." *Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*, 776 F. Supp. 2d 375, 387 (S.D. Tex. 2011) (citing *Kirby*, 543 U.S. at 31). Consequently, Fluence is bound by the term extending the $500 per package liability limitation to the Vessel. *See Mazda Motors of Am., Inc. v. M/V COUGAR ACE*, 565 F.3d 573, 577 (9th Cir. 2009) (citing *Kirby*, 543 U.S. at 31–32) ("Particularly, the Supreme Court has rejected a rule of narrow construction for Himalaya clauses, holding that the plain language of such a clause is the best evidence of the parties' understanding of which other entities may invoke the carrier's contractual defenses.")

### 4.   *Fluence's Purchase of Insurance*

The analysis above, is sufficient to hold that Fluence is bound by the $500 per package liability limitation in SCHENKERocean Bill of Lading. However, the parties also argue over the meaning of Fluence's attempt to obtain additional Cargo insurance, and whether this provides further evidence that Fluence did not opt out of COGSA's $500 per package liability limitation.

Briese asserts that "[a]lthough Fluence has been paid its $10,000,000 policy limit in an effort to override the controlling provisions of COGSA and to cure its failure to secure the extra cargo insurance it sought, Fluence now . . . contends that it was not afforded a 'fair opportunity' to declare value on this shipment." ECF No. 166-1 at 9. Schenker argues that although Fluence did not receive additional insurance coverage, Fluence sought additional coverage in March 2021 but failed to accept the coverage before the date of the incident. ECF No. 163 at 27. Schenker argues that "[b]ecause Fluence intended to insure its cargo through a third party, it cannot contend that it was not given a fair opportunity to declare value to Schenker." ECF No. 163 at 27 (citations omitted). BBC makes similar arguments,[16] explaining that "Fluence's actions with regard to obtaining insurance, both

---

[16]   As discussed *infra* in Part VI.C.5.iii., BBC is also contractually protected by COGSA's $500 per package limitation under Supreme Court precedent. Even so,

1 historically, and with specific regard to the BBC FINLAND shipment show their
2 'conscious decision not to opt out of'" the package limitation. ECF No. 164-1 at 24.

3     Fluence argues that its attempt to obtain insurance is only relevant if the shipper
4 received notice of the liability limitation and here, Fluence maintains it did not receive
5 notice. ECF No. 16-1 at 25. Fluence further explains that it could not have made a
6 conscious decision to opt out of the package limitation if it never knew the limitation
7 existed. *Id.* at 25–26.

8     Turning to the evidence, Fluence's 30(b)(6) witness, Thomas Winter, confirmed
9 during his deposition that Fluence had "a process or procedure for obtaining insurance for
10 shipments on vessels prior to the sailing of the BBC Finland." ECF No. 163, Ex. 550 at
11 14. Winter explained that "Fluence had a standing $10 million policy with Marsh for such
12 shipments, and if the value of the shipment were to exceed the amount of that policy, the
13 $10 million, then there was a form that members of Fluence were to fill out and submit to
14 Marsh to begin the process of getting additional coverage." *Id.* Winter also confirmed that
15 Fluence representatives "were working to obtain coverage for the full shipment value in
16 the days leading up to the BBC Finland's departure." *Id.* Another Fluence 30(b)(6)
17 witness, Frank Fuselier, also confirmed that "Fluence sought to insure the total value of the
18 510 cubes carried on the . . . BBC Finland through its insurance broker Marsh." ECF No.
19 204-1, Ex. 564 at 35.

20     In an interrogatory response, when asked the reason it did not have insurance covering
21 the value of the Cubes prior to the start of the Voyage, Fluence responded in part that:

22
23         Fluence identified the need for excess coverage and began
        working with Marsh in March 2021 to secure transportation
24         insurance sufficient to cover the full value of the CUBES. Marsh,
        acting on FLUENCE's behalf, sought to contract for excess
25         coverage regarding the CUBES for $100M x/s $10M but has
26         stated to FLUENCE that it was unable to bind excess coverage

27
        Fluence's attempt to purchase excess insurance provides more evidence of notice with
28 respect to all contracts discussed herein.

1
2
3
4
5
6

> prior to the VOYAGE. Marsh subsequently advised that it had obtained support from the following entities for the excess coverage: Southern Marine & Aviation (Lead); MunichRe; Ascot US; Sompo; and AIG. However, before confirmation was received by FLUENCE that the coverage was bound, smoke was reported on the vessel. Thereafter, Marsh advised the excess insurers of the smoke on the vessel and that coverage had not yet been bound.

7   ECF No. 163, Ex. 559 at 255–56. As such, it is an undisputed fact that Fluence attempted
8   (though it subsequently failed) to procure excess insurance coverage for the Cargo aboard
9   the BBC Finland.

10      The Ninth Circuit has held that "a shipper who chooses to insure its cargo through an
11  independent insurance company has made a conscious decision not to opt out of COGSA's
12  liability limitation." *Travelers Indem. Co.*, 26 F.3d at 900. Fluence argues that this rule
13  does not apply because Fluence did not receive notice of the package limitation. *See* ECF
14  No. 161-1 at 26. In *Vision Air*, the Ninth Circuit held that the shipper in that case could
15  not "contend that it was not given a 'fair opportunity' to opt for higher coverage precisely
16  because [the shipper] did opt for higher coverage when it insured" the cargo at issue there.
17  *Vision Air*, 155 F.3d at 1169. With respect to the purchase of insurance in that case, the
18  Ninth Circuit stated: "This decision in and of itself demonstrates that Vision knew liability
19  was limited by COGSA, and that Vision made a conscious decision *not* to opt out of the
20  liability limitation." *Id.*; *see also Carman Tool & Abrasives, Inc.*, 871 F.2d at 901 n.10
21  ("Indeed, there is every reason to believe that Carman made a knowing and deliberate
22  choice in foregoing the additional cost that would have been incurred in raising the liability
23  limit: it insured the shipment here with St. Paul Fire and Marine Insurance Company.").

24      The Ninth Circuit made no rule, as Fluence suggests, that courts must first find
25  sufficient notice before analyzing whether or not insurance has been purchased. Instead,
26  the procurement of insurance appears to be part of that analysis, if applicable. The case
27  Fluence cites for this proposition is *Travelers Indem. Co.*, 26 F.3d at 900. There, the Ninth
28  Circuit addressed the party's purchase of insurance within the notice analysis, after

discussing the space for declared value, holding that by choosing to insure cargo through an independent insurance company, the shipper "has made a conscious decision not to opt out of COGSA's liability limitation." *Id.* at 900. This hardly serves as a rule that insurance can only be analyzed after notice has been established.

Even so, accepting Fluence's proposition as true, Fluence's argument that it did not receive notice was made in response to Schenker's *prima facie* showing of notice respecting the SCHENKERocean Bill of Lading. Therefore, Fluence's attempt to purchase insurance is essentially, a rebuttal argument in response to Fluence claiming it did not receive notice of the various contracts at issue. Although Fluence was unsuccessful in obtaining higher coverage, Fluence made the conscious choice to opt for higher coverage. And while Fluence disputes its reason for trying to obtain excess insurance, as a matter of law, that decision serves as evidence that Fluence chose not to opt out of COGSA. This is true with respect to the SCHENKERocean Bill of Lading, as well as the Booking Note and BBC Bills of Lading analyzed below.

In sum, after review of the legal authority and evidence cited, the Court finds no dispute of material fact. As a matter of law, Fluence was given sufficient notice of the terms in the SCHENKERocean Bill of Lading and provided a fair opportunity to declare value for its Cargo. With respect to downstream carrier BBC, the Court continues its notice analysis below.

### 5.   *Booking Note and BBC Bills of Lading*

The Sea Waybills and SCHENKERocean Bill of Lading extend COGSA's liability limitation Schenker and the Vessel but not BBC. Nevertheless, BBC argues it is protected by COGSA's liability limitation in both the Booking Note and BBC Bills of Lading, because these protections cover downstream carriers under the law. Fluence argues that it is not bound by the Booking Note or BBC Bills of Lading because it was not a party to these agreements and never received them. BBC has the better argument.

#### i.   Content and Language

The BBC Booking Note was signed by Schenker Deutschland AG and BBC

Chartering in Singapore on March 1, 2021. ECF No. 161-1, Ex. 2 at 1. Similar to the Sea Waybills, the first page of BBC's Booking Note contains a space to declare value. *Id.* There are actually two spaces related to value on the Booking Note, with one reading "Shippers declared value" and the other reading "Declared value charge." *Id.* Neither box contains a value and instead, "XXX" is inserted in both boxes. *Id.* Below the declared value boxes is an area listing "Special terms, if agreed (including Liner Terms or F.I.O.S. Terms for loading/discharging)." *Id.* Below the special terms is the following statement:

> It is hereby agreed that this Contract shall be performed subject to the terms contained on Page 1 and 2 hereof, which shall prevail over any previous arrangements and which shall in turn be superseded (except as to deadfreight, detention, demurrage and breach of contract damages) by the terms of the Bill of Lading.

*Id.* The third page of the Booking Note states various terms, including "Liability under the Contract" and "Special Clauses," which read in part:

> **3. Liability under the Contract**
> . . . .
> (c) The aggregate liability of the Carrier and/or any of his servants, agents or independent contractors under this Contract shall, in no circumstances, exceed the limits of liability for the total loss of the cargo under sub-clause 3(a) or, if applicable, special clauses.
>
> **B. U.S. Trade Period of Responsibility**
>
> (i) In case the Contract of carriage evidenced by this Bill of Lading covers a shipment to or from a port in the United States, including any US territory, the U.S. Carriage of Goods by Sea Act of the United States of America 1936 (U.S. COGSA) shall apply. The provisions stated in said Act shall govern before loading, and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall

be payable on the cargo coming into the Carrier's custody. For US trades, the terms on file with the U.S. Federal Maritime Commission shall apply to such shipments. In the event that U.S. COGSA applies, then the carrier may, at the Carrier's election commence suit in a court of proper jurisdiction in the Untied States in which case this court shall have exclusive jurisdiction.

(ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in any amount exceeding USD500 per package or customary freight unit. If despite the provisions of subclause 3(a), the Carrier is found to be liable for deck cargo, then all limitations and defenses available under U.S. COGSA (or other applicable regime) shall apply and suit may be brought by the Carrier at the Carrier's election in the U.S. District Court of proper jurisdiction.

*Id.* at 3. On April 1, 2021, BBC issued the Booking Note Addendum, reflecting Fluence's increase in Cargo, payment terms, and date revisions. ECF No. 161-1, Ex. 4. The Addendum further reads: "All other terms and conditions to remain as per booking note dated Singapore, 1 March 2021." *Id.*

On April 14, 2021, BBC issued the BBC Bills of Lading, containing the same spaces for declared value on the first page filled in with "XXX." ECF No. 164-1, Ex. 29 at 1. The second page of the BBC Bills of Lading contains terms for "Liability under the Contract" and "Special Clauses" that are identical to the language in the Booking note with respect to invoking COGSA. *Id.* at 2. However, the BBC Bills of Lading do not include the same forum selection language for parties bringing suit and instead, requires suit be brought in the Southern District of Texas. *Id.* at 2. The terms at issue here are those invoking COGSA and setting the $500 per package liability limitation. Because those terms are the same and the Court finds Fluence bound by both agreements as held *infra*, the Court need not

-41-

1  determine whether the Booking Note or the BBC Bills of Lading govern.[17]  Either contract

2  binds Fluence to the liability limitation with respect to BBC.

3          Fluence argues it is not bound by COGSA's $500 per package liability limitation in

4  the Booking Note or the BBC Bills of Lading.  However, there is *prima facie* evidence of

5  fair opportunity.[18]  First, the language noted above in section B(i), in both the Booking

6  Note and BBC Bills of Lading, clearly invoke COGSA because the shipment at issue was

7  to "a port in the United States."  *See* ECF No. 164, Ex. 27 at 3.  Second, there is a space

8  for declared value and space for any additional charge if value is declared.  *See id.* at 1.

9  And third, the section B(ii) clause explains that should COGSA apply, there will be a $500

10  per package liability limitation if no value is declared.  *See id.* at 3.  Finally, BBC is listed

11  as the Carrier for purposes of the Booking Note, and section 3(c)'s liability clause states

12  that the liability of the Carrier (and other servants, agents, or independent contractors)[19]

13  shall not exceed the limits of liability under the Special Clauses, if applicable.  *See id.*  As

14  stated above, the shipment at issue was to a port in the United States, invoking COGSA

15  and making the Special Clauses—including COGSA's $500 per package liability

16  limitation—applicable.

17          Accordingly, there is *prima facie* evidence that BBC provided Fluence with fair

18  

---

19  [17]      Even so, the first page of the Booking Note states: "It is hereby agreed that this
20  Contract shall be performed subject to the terms contained on Page 1 and 2 hereof, which
       shall prevail over any previous arrangements and which shall be superseded (except as to
21  the deadfreight, detention, demurrage and breach of contract damages) by the terms of the
       Bill of Lading." ECF No. 161-1, Ex. 2 at 1.  With respect to the breach of contract damages,
22  the liability limitation remains the same in both the Booking Note and the BBC Bills of
       Lading, meaning the $500 per package liability limitation therein applies either way.
23  [18]      Again, Fluence does not appear to dispute that the language in the Booking Note and
24  BBC Bills of Lading invokes COGSA and sufficiently provides notice respecting a
       declared value.  Instead, Fluence argues it was not provided these contracts prior to this
25  litigation.
26  [19]      The Court notes that the Booking Note and the BBC Bills of Lading may extend the
       liability protections therein to Vessel per this Himalaya clause, but the Court need not
27  decide the issue given that the SCHENKERocean Bill of Lading names the Vessel
28  specifically.

opportunity. But once again, Fluence argues it did not receive the Booking Note or the BBC Bills of Lading until after this litigation commenced. As explained below, pursuant to the doctrine of judicial estoppel and the Supreme Court's holdings in *Norfolk S. Ry. Co. v. Kirby*, Fluence is bound by both the Booking Note and the BBC Bills of Lading for purposes of enforcing COGSA's $500 per package liability limitation.

ii.   <u>Judicial Estoppel</u>

The Ninth Circuit explains the doctrine of judicial estoppel:

> The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. The policies underlying preclusion of inconsistent positions are general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings. Judicial estoppel is intended to protect against a litigant playing fast and loose with the courts. Because it is intended to protect the integrity of the judicial process, it is an equitable doctrine invoked by a court at its discretion. Judicial estoppel is most commonly applied to bar a party from making a factual assertion in a legal proceeding which directly contradicts an earlier assertion made in the same proceeding or a prior one.

*Regents of the Univ. of California v. Aisen*, No. 15-cv-1766-BEN-BLM, 2016 WL 4097072, at *2 (S.D. Cal. Apr. 18, 2016) (quoting *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)).

Fluence argues that since the outset of this litigation, it has maintained that it "did not receive, and thus is not bound by, the BBC Bills of Lading or the Booking Note." ECF No. 201 at 30. Fluence has maintained this position with respect to the BBC Bills of Lading. However, when previously arguing against the enforcement of a forum selection clause in the BBC Bills of Lading, Fluence asserted:

-43-

> Briese incorrectly relies on the BBC bills of lading. This matter involved a contract of private carriage, so the Booking Note terms, including its forum selection clause, control. The Booking Note requires litigation in a court of proper jurisdiction.

ECF No. 51 at 25.  Even though Fluence later stated that it did not receive the Booking Note and Addendum prior to filing suit, Fluence relied on the Booking Note in opposing enforcement of the forum selection clause in the BBC Bills of Lading requiring that suit be brought in the Southern District of Texas.

This Court also relied on Fluence's argument when it denied the motion to enforce the forum selection clause in the Bills of Lading, ultimately giving Fluence its chosen forum.  This Court's prior Order even noted the specific arguments made by Fluence, stating:

> Fluence explains the Booking Note and Addendum entered into by DB Schenker and BBC, "constituted a contract of private carriage, a voyage charter."  Fluence argues in these cases, the charter party agreement acts as the contract of carriage, and the Bills of Lading act as receipts.  Fluence maintains the Bills of Lading cannot unilaterally alter the terms of the Booking Note.

ECF No. 63 at 11–12.  Although the Court did not decide which contracts controlled or superseded others, it accepted Fluence's argument that the Booking Note was one of the contracts on which Fluence based its lawsuit, thereby not enforcing the clause in the BBC Bills of Lading.[20]

---

[20]     Fluence cites the Court's prior Order, *see* ECF No. 63, to argue the Court has already held that Fluence is not bound by the BBC Bills of Lading and therefore, the Court should find the same here.  However, this holding was made at the motion to dismiss stage, before the Court reviewed the evidence submitted here.  Furthermore, the law respecting enforcement of a forum selection clause differs in some respects from that of the enforcement of a COGSA liability limitation set forth in a maritime contract.  After review of the evidence submitted, legal authority, and arguments on record, the Court finds Fluence is bound by the BBC Bills of Lading.  *See infra* Part VI.C.5.iii.

In addition, although Fluence argues it is not bound by the Booking Note, its summary judgment briefing maintains that this is a case of private carriage with a charter party, where the Bills of Lading act as mere receipts. *See* ECF No. 199 at 15–16. But now that different legal arguments and issues of contract interpretation are before the Court, Fluence omits its prior argument that the Booking Note controls and instead, asks only that COGSA's $500 per package liability limitation therein be disregarded for lack of notice. The Court finds this argument at odds with Fluence's prior position, because the same clause invoking COGSA's package limitation in the Booking Note also includes the language Fluence relied on in arguing that litigation could be brought in any "proper jurisdiction"—*i.e.*, the clause Fluence cited to avoid the forum selection clause. *See* ECF No. 164-1 at 3, Ex. 27 at 3.

The Court recognizes that parties may take different positions throughout litigation, based on alternate theories of liability. In fact, Fluence does so here arguing that even if the Court finds Fluence is bound by the contracts incorporating COGSA, Defendants engaged in unreasonable deviation voiding any said provision. *See infra* Part VI.C.6. Fluence does not take a different position with respect to its arguments that it is not contractually bound and instead, argues an alternate theory should the Court disagree. However, Fluence's position as to the Booking Note is different. Not only did Fluence rely on the Booking Note in prior briefing, but Fluence's summary judgment motion argues against enforcing the $500 per package liability limitation for lack of notice, while simultaneously relying on the Booking Note to argue the contract at issue is one of private carriage. As noted above, Fluence points to terms in the Booking Note, including "charter parties"—a term this court relied on in part to find a dispute of fact as to whether the contract was one of private rather than common carriage. *See* ECF No. 161-1 at 22; *see supra* Part VI.B.2. If the Court had found this case to be one of common carriage, it would not have reached the instant argument that Fluence is contractually bound by COGSA's liability limitation, because COSGA would automatically apply. Fluence cannot rely on the terms it likes to support one argument, and then ask the Court to disregard terms—in

1   the same clause—to further Fluence's theory.  *See Protzmann v. Hist. Real Est. & Fin.*,

2   No. CV0803385SJOJCX, 2009 WL 10671387, at *4 (C.D. Cal. June 3, 2009) (quoting

3   *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001)) ("Judicial

4   estoppel prevents 'a party from gaining an advantage by asserting one position . . . and then

5   later seeking an advantage by taking a clearly inconsistent position.'").

6        In addition, the Email Communications between Fluence and Schenker, attached in

7   support of Fluence's motion for summary judgment, also indicate that Fluence was aware

8   of the Booking Note, and that the Booking note governed.  In an email sent by Liesert of

9   Schenker to Becker and Rochow of Fluence, after discussing the increased container count

10  for the BBC Finland, Liesert stated: "we are pleased to inform you that these additional

11  containers can be shipped at the same conditions as per governing booking note."  ECF

12  No. 161-1, Ex. 1 at 11–12.  This communication appears to put Fluence on notice that a

13  booking note would govern the shipments negotiated for Fluence by Schenker.  In addition,

14  an attachment that Schenker sent to Fluence states that "B/L-and/or B/N-Conditions of

15  carrier's to apply," which Schenker argues refers to the Bills of Lading and Booking Note.

16  ECF No. 204 at 7, Ex. 40 at 2.  Both Fluence's and Schenker's evidence invoke the Booking

17  Note[21] undermining Fluence's argument that it was not on notice of the Booking Note, and

18  that the Email Communications control.

19        The only real evidence that Fluence is not bound by the Booking Note is the fact that

20  Fluence was not a party to it.  But Fluence has essentially waived this argument by relying

21  on the Booking Note in succeeding on both prior and contemporaneous arguments during

22  this litigation.  Accordingly, Fluence is judicially estopped from arguing that it is not bound

23  by the terms of the Booking Note.

24

25

26  [21]    There is a dispute of fact as to which piece of evidence constitutes the official offer

27  by Schenker to arrange for the transport of Fluence's Cargo.  Here, the Court only points
    to the Email Communications and attachments as additional evidence that Fluence was on

28  notice of the Booking Note.

iii.   Application of *Norfolk S. Ry. Co. v. Kirby*

Although the analysis above is sufficient to bind Fluence to COGSA's $500 per package liability limitation with respect to BBC, in the interest of justice, the Court also finds Fluence is bound under the Supreme Court's holdings in *Norfolk S. Ry. Co. v. Kirby*. There, the Supreme Court held that "an intermediary binds a cargo owner to the liability limitations it negotiates with downstream carriers . . . ." *Kirby*, 543 U.S. at 34.  Fluence argues that *Kirby* does not apply to this case, while BBC argues the opposite.  Even if the BBC Bills of Lading (and not the Booking Note) control, the analysis for both documents is the same, and the Court finds the holdings in *Kirby* extend COGSA's protections—as contracted for—to BBC.

*Kirby* involved a shipment of machinery from Australia to Alabama. *Id.* at 18.  The shipment by Vessel "was uneventful," but the last leg of the journey involved carrying the cargo by train. *Id.*  During this final, inland leg, the train derailed, causing extensive cargo damage. *Id.*  The shipper hired an intermediary to arrange for delivery of the goods and issued a bill of lading. *Id.* at 19.  "Having been hired by [the shipper], and because it d[id] not itself actually transport cargo," the intermediary hired a downstream carrier to transport the containers. *Id.* at 21.  To formalize that contract, the downstream carrier issued its own bill of lading to the intermediary. *Id.*  The carrier's bill of lading contained COGSA's $500 per package liability limitation and extended "that limitation to potential damage on land as well as on sea." *Id.*  The carrier, acting through a subsidiary, hired a railway company to transport the cargo for the inland portion of the journey. *Id.*  The shipper (and its insurer) sued the railway company, which argued (among other things) that the shipper's "potential recovery could not exceed the amounts set forth in the liability limitations contained in the bills of lading for the machinery's carriage." *Id.*  The district court held that the railway company's liability was capped at $500 per container, and the Eleventh Circuit reversed. *Id.* at 22.  The United States Supreme Court granted *certiorari* and held that the railway was sheltered by COGSA's limitation on liability contained in the bills of lading. *Id.* at 22, 35.

The analysis relevant here is that of the bill of lading between the downstream carrier and the intermediary, to which the shipper and the railway were not parties.  The shipper argued that it could not "be bound by the bill of lading that [the intermediary] negotiated with the [carrier] unless [the intermediary] was then acting as [the shipper's] agent." *Id.* at 33.  The Supreme Court disagreed, explaining that while not a traditional agency relationship, the intermediary acted as the shipper's "agent for a *single, limited* purpose: when [the shipper] contracts with subsequent carriers for limitation on liability." *Id.* at 34.  The Supreme Court was clear that "an intermediary binds a cargo owner to the liability limitations it negotiates with downstream carriers," explaining that this holding "ensure[s] the reliability of downstream contracts for liability limitations." *Id.*

*Kirby* is directly on point given the nature of the relationships between the parties there and the parties in this case.  Fluence is the shipper, Schenker is the intermediary, and BBC and Briese both serve as downstream carriers (Briese being akin to the railway company in *Kirby*).  As such, under *Kirby*, Schenker was authorized to negotiate the limitation of liability with BBC.  Fluence attempts to distinguish *Kirby* as a case involving common carriage, arguing that the holdings do not apply to a situation involving private carriage.  The Court disagrees.

Although the *Kirby* holdings are derived from common carriage precedent, the Supreme Court did not limit its reach to common carriage.  *Kirby* explained that "[a] rule prompting downstream carriers to distinguish between cargo owners and intermediary shippers might interfere with statutory and decisional law promoting nondiscrimination in common carriage." *Id.*  The Court further stated that it would "undermine COGSA's liability regime" and here, in all written contracts at issue, COGSA was invoked. *Id.*  The Court gave other reasons, including that "a limited agency rule tracks industry practice," and that "[i]n intercontinental ocean shipping, carriers may not know if they are dealing with an intermediary, rather than with a cargo owner." *Id.* at 34–35.  The Court explained that without this rule, "carriers would have to seek out more information before contracting, so as to assure themselves that their contractual liability limitations provide true

-48-

protection." *Id.* at 35.  The Court held that this "task of information gathering might be very costly or even impossible . . . ."  *Id.*  Here, BBC negotiated with Schenker, and not with Fluence directly—and per the Email Communications Fluence attaches to its briefing, Fluence was aware that Schenker was in negotiations with BBC for the transport of Fluence's Cargo.  Although there is only one party removed from BBC and Fluence, if BBC had to seek out more information from all shippers through which it did not negotiate directly, such a scenario would undermine the holdings in *Kirby*.

Furthermore, although there is an issue of fact as to whether the contract at issue is for common or private carriage, that is because certain facts support both arguments.  Even if this case is one for private carriage, the roles of the parties here mirror those in *Kirby*.  Fluence engaged an intermediary, Schenker, to arrange for delivery of the Cargo at issue, which, in turn, negotiated with BBC.  These facts are undisputed, despite the overall disputes of fact as to the common versus private carriage distinction.  As such, the facts supporting the private carriage argument do not create a dispute as to whether *Kirby* applies here.  As explained above, the facts presented by Fluence support the theory that the contract was note entirely private and not entirely common, given the previously noted testimony that the Voyage was not entirely tramp or liner, as well as the contradictory terms in the Booking Note (*e.g.*, "Liner Terms" versus "Charty Parties").  *See supra* Part VI.B.2. This evidence creates a conflict with Defendants' assertion that the facts support only a theory of common carriage.  *See id.*  But even Fluence's evidence shows that the agreement has at least some characteristics of a common carriage arrangement.  And this evidence does not change the relationships of the parties with respect to Fluence hiring Schenker to engage BBC.  Given this relationship, the Court finds that Fluence was responsible for obtaining the BBC Bills of Lading.  *See Carman Tool & Abrasives, Inc.*, 871 F.2d at 901 ("Parties who do not deal with the carrier directly have a responsibility to obtain a copy of the bill of lading if they have an interest in knowing its terms. We decline to place on the carrier the burden of tracking down these remote parties and advising them of the terms of the bill of lading.").

1    Again, although *Kirby* drew certain holdings from common carriage precedent, it

2    did not limit its application to common carriage.  If this were a situation where Fluence had

3    contracted directly with the Vessel/Briese, which happens often in private carriage, there

4    would be no *downstream* carriers or limited agency relationship between Schenker and

5    Fluence, making *Kirby* less applicable.  However, a determination of whether and to what

6    extent *Kirby* applies will depend on the facts of each case.  Here, because the parties'

7    relationships mirror those in *Kirby*—and certain undisputed facts show the agreement

8    between the parties share aspects of a common carriage arrangement—the Court finds

9    *Kirby* applicable.  This is especially true given *Kirby*'s holding that a different rule would

10   undermine COGSA's regime, and the parties in this case incorporated COGSA into

11   multiple contracts.  Accordingly, despite Fluence not being a party to the BBC Bills of

12   Lading, the protections of the $500 liability limitation negotiated by Schenker in arranging

13   for the carriage of Fluence's Cargo extend to BBC.

### 6.   *Unreasonable Deviation*

15   Alternatively, Fluence argues that COGSA's $500 per package liability limitation

16   does not apply here, because Defendants' conduct rises to the level of unreasonable

17   deviation, preventing enforcement of the liability limitation.

#### i.   Legal Standard

19   At common law, a geographic deviation during a scheduled voyage would strip a

20   carrier of its defenses to liability, making "the carrier the effective insurer of the goods."

21   *Vision Air*, 155 F.3d at 1170 (citation omitted).  The carrier could not rely on liability

22   limitations in the bill of lading.  *Id.* at 1170–71.  The rationale was that "[t]he deviation

23   was regarded as exposing the goods to such unreasonable risks not anticipated by the

24   parties as to constitute a breach of the contract for carriage."  *Mbacke*, 2008 WL 220369,

25   at *5 (citing *Vision Air*, 155 F.3d at 1171).  "[T]he doctrine was expanded beyond the

26   geographic context to encompass certain breaches of the contract of carriage serious

27   enough to merit the harsh consequences the deviation doctrine imposes."  *Vision Air*, 155

28   F.3d at 1171.  These breaches became known as quasi-deviations—the most common

-50-

example being the stowage of cargo on deck. *Id.*

The doctrine was traditionally applied broadly, but the Ninth Circuit "limited the circumstances under which it applies" after the enactment of COGSA. *Mbacke*, 2008 WL 220369, at *5 (quoting *Vision Air*, 155 F.3d at 1172). "[C]ourts and commentors agree that the doctrine should be sharply limited and have displayed a certain hostility toward expansion of the deviation doctrine, especially in the context of quasi-deviation." *Vision Air*, 155 F.3d at 1173 (citing cases). In *Vision Air*, the Ninth Circuit held that mere negligence, gross negligence, and recklessness are all insufficient to constitute an unreasonable deviation. *Id.* at 1175. Instead, only "a carrier's intentional destruction of . . . goods it contracts to transport constitutes an unreasonable deviation which renders inapplicable COGA's limitation of liability provision." *Id.*; *see also Sea-Land Serv., Inc. v. Lozen Int'l, LLC.*, 285 F.3d 808, 818 (9th Cir. 2002) ("In order for a deviation to be 'unreasonable,' the carrier must intentionally have caused damage to the shipper's goods."). To prove the required intent, there must be evidence of a culpable state of mind. *Vision Air*, 155 F.3d at 1176. The actor does not necessarily need to "intend or desire the consequences of his act, but "[i]f 'he believes the consequences are substantially certain to result,'" then he "will be found to have acted with intent." *Id.* (citations omitted).

ii.    Discussion

In arguing that Defendants' conduct rises to the level of unreasonable deviation, Fluence points to numerous pieces of evidence, including: (1) the alleged stowage failures; (2) noncompliance with the CSM; (3) BBC and Briese's alleged knowledge of the shortage in lashing equipment; (4) expert deposition testimony opining that the stow collapse was inevitable and bound to occur; and (5) BBC's communications with Captain Ponce as allegedly applying commercial pressure. Defendants counter by arguing that even considering the evidence Fluence cites, it is not enough establish the culpable state of mind required to succeed on an unreasonable deviation claim. Briese also points to the deposition of the Captain Ponce and Chief Mate Simakin to support its argument that there was no intent to damage the Cargo.

-51-

Moving to the evidence, Daniel Millet[22] opined that "the cargo was not secured in accordance with the" CSM, and that no single officer on the Vessel reviewed the CSM prior to loading the goods.  ECF No. 161-1, Ex. 33 at 17, 21–22.  Millet also testified that he could not recall whether BBC undertook any special considerations to make sure that Fluence's 9-foot-6-inch containers could be adequately secured aboard the Vessel, *see id.* at 10, as required by the CSM.  Millet also confirmed "that 20-foot containers, bridge fittings, and tension pressure elements weren't used."  *Id.* at 47.  When asked if the crew "made the intentional decision to use chains without checking the cargo securing manual," Millet responded that he did not "know the reason why they chose to use the chains, but the chains are not allowed under the [CSM] . . . ."  *Id.* at 49.

Millet was also asked whether the cargo was secured in Hold 2 and if it tipped over into the void space, Millet responded "[y]eah, there was -- there was a collapse of the stow in holding 2, yes."  *Id.* at 17–18.  When asked he if thought the cargo was secured in a manner that put the ship and crew at risk, he responded that "all cargo should be stowed and secured in accordance with the [CSM], and if it's not, then there's a potential for it to shift during the voyage."  *Id.* at 18.  Millet confirmed that was what happened here.  *Id.*  Millet subsequently confirmed that the fire put the crew at risk.  *Id.* at 19.  When asked if, under "the exact same weather conditions . . . [and on the] same route, this cargo would not have been damaged but for the failure to comply with the [CSM] . . . ," Millet responded: "Entirely likely that that would be the case, yes."  *Id.* at 48.  Finally, when asked essentially the same question, whether under the same weather conditions and on the same route, if the cargo damage was bound to occur, Millet agreed.  *Id.*

---

[22]  Briese filed a list of 35 objections to Fluence's use of Daniel Millet's deposition testimony.  *See* ECF No. 208.  Briese objects to the form of all questions and notes certain questions as being hypotheticals and outside the scope of Millet's expertise.  Briese fails to cite a single Federal Rule of Evidence and provides no analysis.  *See generally id.*  As such, these objections are **OVERRULED**.  The Court further notes that because the unreasonable deviation is decided in Briese's favor, there is no prejudice to Briese in the Court considering the evidence.

Fluence also points to the deposition testimony of its own expert, Robert Tagg,[23] who confirmed the following opinion: "The decisions that resulted in an inadequately prepared vessel and an inadequately trained crew to attempt this voyage led to the predictable and inevitable result of severe cargo damage." ECF No. 161-1, Ex. 35 at 3–4. When asked what he meant by inevitable, Tagg stated "[t]hat the cargo was essentially unsecured and a ship going to sea. And it was very likely that the ship would see conditions that would – would tip the stacks over because of their unsecured nature." *Id.* at 4.  Tagg explained that this was "very likely" because it was a transoceanic voyage and there was a likelihood of encountering something beyond calm conditions . . . ." *Id.* at 4–5.

Moving to Captain Ponce, Fluence argues that BBC applied commercial pressure to the Captain, despite his safety concerns.  Fluence is correct that Captain Ponce stated how he wanted "to satisfy BBC and the client," but his full statement reads as follows:

> Yes. For me, it's assuming that I can satisfy the Briese and the BBC also and the client because if I am going to head back, it's more delay, and assuming that we can cross Pacific Ocean safely on that condition, that is my decision at the time.  So this is to satisfy BBC and the client also that we can reach safely but, yeah.

ECF No. 161-1, Ex. 25 at 12.  Captain Ponce then confirmed that even though the cargo was not secured in accordance with the CSM, he "chose to head out to sea anyway because [he] thought that [he] could make it safely across the ocean." *Id.* at 12–13.

On April 23, 2021 at 9:48 a.m., Captain Ponce emailed BBC, informing it that due to unfavorable weather conditions, including wave heights of more than 7m along the route, the Vessel needed to reduce speed, delaying arrival in San Diego by two days.  ECF No. 161-1, Ex. 68 at 4.  BBC replied that the "clients are unfortunately very demanding," and

---

[23]   All objections to Fluence's use of Robert Tagg's deposition testimony are **OVERRULED**, because the Court rules against Fluence on its unreasonable deviation claim.  As such, Defendants are not prejudiced by the Court considering the evidence.

asked for a copy of the weather forecast on which the revised ETA was based, which was sent at 12:06 p.m. on the same day. *Id.* at 3. BBC responded that they "had a second look into the route advice from DTN" and "[b]ased on the forecast and SPOS information, it doesn't look like it is necessary to reduce the speed." *Id.* at 2. BBC attached screenshots from the route, stating that the wave height was expected to be less than 7m. *Id.* However, BBC also stated: "Of course, this is based on a forecast and inaccuracies are always possible as you know." *Id.* The BBC representative further added (in bold font) that "[n]eedless to say that the safety of the crew, vessel and cargo always has priority." *Id.* That evening, Captain Ponce responded to BBC, noting their message, but stating that to be safe and "to avoid loss of life and damage to vessel and environment" the vessel "will slow down and wait for the [low pressure] to be clear and continue the passage." *Id.* A follow-up message was sent on April 24, 2021, noting that while BBC was correct as to the waves being less than 7m, the direction it was coming from was not a "navigable direction of wind and sea." *Id.* Captain Ponce confirmed that he would increase the speed once it was "safe/clear to pass the [low pressure] area." *Id.*

When asked what his reaction was to BBC's email contending the weather did not show 7m waves, Captain Ponce stated that it seemed like it was still his decision, but that BBC wanted him to proceed ahead without reducing speed. ECF No. 161-1, Ex. 26 at 9–10. When asked if BBC was second guessing his opinion, Captain Ponce responded, "that's correct." *Id.* When asked whether Captain Ponce was concerned that the cargo stack in the holds might collapse, he responded yes. *Id.* at 11. Captain Ponce explained: "I am concerned at that time if we will proceed – if we will encounter this low pressure, then there must be a possibility that will happen." *Id.*

Captain Ponce denied getting any pressure from Briese to change course or increase his speed on April 24, 2021. *Id.* at 13. However, Captain Ponce confirmed that he did "feel the pressure" from BBC. *Id.* at 13–14. Captain Ponce confirmed that he regretted proceeding, based on the stow collapse and smoke coming from the hold, and indicated that it would have been better to reduce the speed. *Id.* at 14. Captain Ponce confirmed he

-54-

1    would have preferred to follow his own plan with respect to route and sea.  *Id.*

2         Email communications also confirm that on April 24, 2021 at 8:00 a.m., the Vessel

3    did reduce speed "to keep clear from incoming [low pressure] in pacific."  ECF No, 161-

4    1, Ex. 69 at 3.  Eight hours later, at 4:00 p.m., the "Vessel increased speed and continued

5    passage following SPO GC route plan . . . ."  *Id.*  On April 26, 2021 at 11:34 p.m., the

6    Vessel altered its course "to avoid unfavourable strong wind and sea . . . ."  *Id.*  On April

7    27, 2024 at 5:00 p.m., the Vessel was reportedly "rolling/pitching & pounding heavily

8    [with] sea spray all over deck at all times."  *Id.*  On the same day, it was indicated that there

9    would be another two-day delay in arriving to San Diego.  *Id.* at 2.  Jens Nielson of BBC

10   responded by asking if it was possible to find a way for the ETA to not jump days on a

11   regular basis.  *Id.*  Nielson asked that Captain Ponce provide explanations and calculations

12   about the jumping ETAs.  *Id.*  Nielson further explained that she needed to update the

13   clients, and that this was the first question they would ask.  *Id.*  Captain Ponce responded

14   that the Vessel was finding a way to avoid the bad weather, to review his "VESLINK

15   report," and that he was trying to find a way to arrive safely in San Diego.  *Id.* at 1.  Nielson

16   stated: "[I] fully understand the need to think about the safety of the crew, vessel and cargo

17   and that is not the issue."  *Id.*  Nielson continued by saying, "these deliberations must be

18   based on some parameters and all [I] am asking for is for you to provide these evaluations

19   / calculations so that we can inform our clients properly as to the eta [S]an [D]iego and the

20   basis for calculating the same."  *Id.*  Nielson then specifically asked for information on how

21   Captain Ponce reached and calculated the present ETA of May 9, 2021 at 12:00 p.m.  *Id.*

22        Captain Ponce agreed at his deposition that, based on the above emails, BBC was

23   pressing him to proceed as fast as he could to San Diego, and that it was not considering

24   the safety of the crew.  ECF No. 161-1, Ex. 26 at 16.  Captain Ponce also confirmed that

25   notwithstanding the pressure to increase speed, he would continue to sail at a low speed.

26   *Id.*  Captain Ponce confirmed that this was the first voyage where he felt pressure, but also

27   established that he felt he had the authority to make safety-based decisions while he was

28   the master of the Vessel.  *Id.* at 17.

Briese argues that the person primarily responsible for the Cargo's stowage was Chief Mate Simakin, making his state of mind most relevant.  ECF No. 206 at 25. Simakin's deposition testimony confirms that on the Voyage at issue, he was responsible for the stowage of the Cargo aboard the BBC Finland.  ECF No. 167-1 at 23.  Chief Mate Simakin further stated that before departure, he decided to lash the containers with chains instead bridge fittings.  *Id.* at 59.  When asked if he was concerned about the shortage of stacking cone doubles, Chief Mate Simakin stated: "I can say again that when I was loading -- loading these containers, I was sure that everything okay, it will be enough, stowage good, stability good, vessel was ready to sail." *Id.* at 62.  Chief Mate Simakin further confirmed that despite using the lash chains instead of bridge fittings, when he was at the Hai Phong port, he was sure that it was sufficient for a heavy-weather voyage.  *Id.* at 129. Chief Mate Simakin further stated that this Voyage was the only time there has been a stack collapse of containers in his time sailing.  ECF No. 195-1 at 82.  Chief Mate Simakin also stated: "So as I told you before, during the loading and on departure, I was sure that the ship in all respects ready for voyage, to go into sea, yes, I can confirm.  I realized it again, I will repeat, I realized by mistakes then only after opening hatches in Amori." *Id.* at 107.

Captain Ponce further testified that when leaving Hai Phong, as far as he knew from the Chief Mate Simakin, the cargo was properly stowed, but there was no mention if it was in accordance with the CSM.  ECF No. 197-1 at 59.  Captain Ponce subsequently confirmed that he assumed the cargo had been stowed properly.  *Id.*  Captain Ponce further stated that he gave instructions to the Chief Mate to put additional chains on for a long voyage.  *Id.* at 66.  Captain Ponce continued that he was satisfied that if the chains were employed, the Cargo would be secured inside the hold.  *Id.*  Finally, Captain Ponce confirmed that even though the cargo was not secured in accordance with the CSM, he chose to head out to sea anyway because he thought they would make it safely across the ocean.  *Id.* at 72–73.

Turning to case law, Fluence cites *Jindo Am. Inc. v. M/V Tolten* to argue that an unreasonable deviation occurred.  No. CV 01-3256 SVW (EX), 2001 WL 34132110 (C.D. Cal. Dec. 12, 2001).  There, Jindo sought to recover for damage to its cargo that occurred

on the M/V Tolten enroute from Shanghai to Vancouver, Washington, stopping in Long Beach, California along the way. *Id.* at \*1. The cargo was made up of corrugated steel containers sized at both 53-feet long and 40-feet long. *Id.* All of the 53-foot containers were offloaded at Long Beach, along 138 of the 40-foot containers. *Id.* Seventy-two of remaining 40-foot containers were shipped to Vancouver, 65 of which incurred substantial damage. *Id.* The plaintiff alleged "that the damage resulted from a quasi-deviation, wherein the defendants inadequately stowed the cargo for passage to Vancouver with substantial certainty the damage would result." *Id.* at \*1. Upon leaving Shanghai, the charterer defendant "represent[ed] that there would be a shifting of the remaining cargo after the Long Beach offload," but the charterer later instructed the crew to not re-stow/shift the cargo, because it would be too expensive. *Id.* at \*6–7.

Relying on the charterer's representation that the remaining cargo would be shifted at Long Beach, the Chief Officer did not properly secure the 40-foot containers with lashing during the initial loading in Shanghai . . . ." *Id.* at 7. The ship's crew recognized and relayed to the charterer "that the cargo was improperly stowed in the holds prior to departure from Long Beach," and the charterer defendant "instructed the ship's crew not to make adjustments necessary to properly secure the cargo because of the costs of such adjustments." *Id.* "The crew complained and eventually attempted to secure the cargo in the holds using unapproved" lashings. *Id.* "Jindo's expert contend[e]d that 'it was inevitable that the container stowage in those holds would collapse.'" *Id.* The Chief Officer at the time, also made statements "that he was uncomfortable with the stowage at Long Beach, felt that it was inadequate, and recognized that the cargo should have been re-stowed." *Id.*

The Court sees similarities between *Jindo* and the instant case, including allegations surrounding improper equipment, the stowage of cargo, and poor weather conditions. However, the case at hand is distinguishable in a few important respects. First, Fluence cites no evidence that Captain Ponce or Chief Mate Simakin reached out to BBC or Briese stating that the Cargo was unsafely stowed and that different equipment would be necessary

for safety purposes, and in response, were denied such requests based on costs.[24]  Even if, as Fluence contends, certain equipment was not available in Vietnam, Chief Mate Simakin felt the Cargo was safely stowed with the equipment available.  Second, both Captain Ponce and Chief Mate Simakin repeatedly stated that they felt the Cargo was secure, and that the voyage would be safe upon leaving the Hai Phong port.  For example, Captain Ponce confirmed that even though the Cargo was not secured in accordance with the CSM, he "chose to head out to sea anyway because [he] thought that [he] could make it safely across the ocean."  ECF No. 197-1 at 59.  Likewise, Chief Mate Simakin confirmed that despite using chains instead of additional bridge fittings, he felt the cargo was stowed properly and was "sure that everything was okay."  *See* ECF No. 161-1, Ex. 27 at 17.  Based on this testimony, as to Captain Ponce and Chief Mate Simakin, there was no substantial certainty that cargo damage would occur.

Third, although Captain Ponce stated that he felt commercial pressure from BBC to reduce his speed, he also confirmed that: (1) notwithstanding the pressure to increase speed, he would continue to sail at a low speed; and (2) he felt he had the authority to make safety-based decisions while he was the master of the Vessel.  *Id.*  Furthermore, the email correspondence between Captain Ponce and BBC, though contentious at times, shows that Captain Ponce was the person making the decisions, and that BBC representatives recognized how the safety of the crew, vessel, and cargo were a priority.  *See* ECF No. 161-1, Ex. 68 at 2 (BBC responding to Captain Ponce: "Needless to say that the safety of the crew, vessel and cargo always has priority"); *id.* at 1 (Captain Ponce responding to

---

[24]  BBC also objects to Fluence's citation to Chief Mate Simakin's testimony, arguing it is taken out of context, citing Federal Rule of Evidence 106.  ECF No. 232.  However, the Court has reviewed the testimony in context and determined that even if Chief Mate Simakin requested additional equipment, this evidence does not create a dispute of fact as to unreasonable deviation.  That is because even with the request, Fluence pointed to no evidence that BBC denied this request based on cost, or that BBC or Chief Mate Simakin were substantially certain the Cargo would be damaged without the equipment.  *See supra* Part VI.C.6.ii.  Because the Court was able to review the evidence in context, there is no risk of confusing a jury, and the objection is **OVERRULED**.

-58-

BBC: "For the safe side to avoid loss of life and damage to vessel and environment will slow down and wait for [low pressure] to be clear and continue the passage.").

Captain Ponce also indicated his support for BBC's position regarding the 7m wave height, noting BBC was correct but explaining how the problem involved the direction in which the water was coming at the Vessel, as well as the wind. *Id.* Furthermore, in later communications, a BBC representative explained that she fully understood the need to think about the safety of the crew, the Vessel, and Cargo—stating that was not the issue. ECF No. 161-1, Ex. 69 at 1. Instead, she was asking for more explanation along with calculations for the ETA so that she could inform the clients. *Id.* BBC representatives provided their opinion respecting the speed of the Vessel, but there is no indication that BBC instructed Captain Ponce to remain at high speed regardless of safety conditions. Based on this evidence, the Court cannot say that the Captain Ponce, Simakin, or BBC were substantially certain that damage to the Cargo would occur.

In addition, *Jindo* is not binding authority, and its interpretation of the Ninth Circuit's holdings in *Vision Air* is somewhat broad. *Vision Air* made clear that the doctrine of quasi-deviation "should not be liberally expanded." 155 F.3d at 1175. The Court specifically held that mere negligence, gross negligence, and recklessness do not support a finding of unreasonable deviation. *Id.* In *Vision Air*, the cargo consisted of two refueler trucks, and the damage occurred when "the refuelers were off-loaded using the ship's own cranes." *Id.* at 1167. Spreader bars were not used to keep the cables that were attached to the trucks away, nor was there a platform under the trucks. *Id.* When the first truck was lifted, the cables shifted under the truck's weight and caused it to jolt and swing in the air. *Id.* at 1167–68. When placed on the pier and the cables were removed, severe damage was visible—the cables had crushed the sides of the truck's refueling tank, doors, and fenders. *Id.* at 1168. Despite this visible damage to the first truck, the same method was employed to offload the second truck, resulting in similar damage. *Id.*

The Court held there was no unreasonable deviation as to the first refueler, even though there was testimony stating "it was a forgone conclusion that the wire cables used

-59-

1  . . . would cut into the body work of the heavy trucks," and that "the use of wire sings

2  without spreader bars was certain to cause damage . . . ." *Id.* at 1176.  The Court explained:

> Although this testimony might be sufficient to demonstrate that the damage was likely, or even substantially certain to occur, it provides no basis to conclude that the stevedores had any belief that such was the case. It does not support a finding of intent with respect to the first refueler because it would not allow a rational trier of fact to draw an inference as to the stevedores' state of mind.

10  *Id.*  The Court did, however, find unreasonable deviation as to the second refueler truck,

11  given the visible and severe damage to the first refueler truck that resulted from using the

12  same method of off-loading.  *Id.*  Being aware of the damage to the first refueler truck and

13  continuing to proceed anyway indicated that those involved were aware the damage was

14  substantially certain to occur while off-loading the second refueler.  *Id.*

15  Given the above analysis and holdings from *Vision Air*, the statements in this case—

16  provided in hindsight—that the damage was "inevitable" and "bound to occur" do not

17  create a dispute of fact as to unreasonable deviation.  Even if these statements were

18  accepted as true, they were made in hindsight and do not support the culpable state of mind

19  requirement.  Instead, the evidence here shows that when the Vessel left the Hai Phong

20  port, both Captain Ponce and Chief Mate Simakin felt the Cargo was secured and that they

21  could safely make the Voyage to San Diego.  With respect to BBC, their email

22  communications (expressing different views than those of Captain Ponce as to the weather)

23  still gave Captain Ponce the authority to make speed and routing decisions and indicated

24  that safety was took priority, despite disagreeing with Captain Ponce's position at times.

25  Had more damage occurred enroute from Amori Japan to San Diego, due to the same

26  alleged equipment issues, maybe the outcome would be different.  But that is not the case.

27  Fluence also argues that BBC and Briese knew of the lashing and stow deficiencies

28  but failed to act.  Fluence bases this assertion on the stow plan and the use of 20' containers

and the fact that the final stow plan showed the containers were missing.  However, even with the evidence Fluence cites, there is no indication that BBC or Briese knew the shortage of certain lashing equipment was substantially certain to cause damage to Fluence's Cargo, *see* ECF No. 161-1, Exs. 53, 54, especially seeing that Captain Ponce and Chief Mate Simakin felt the chains were sufficient.  The BBC communications appear to show a discussion of how to use various equipment and that they would wait for the Master and Chief Officer's suggestions.  *Id.*  Although the discussions of the equipment beforehand, coupled with the failure to comply with the CSM, would serve to create disputes of fact as to negligence, that is not enough to establish unreasonable deviation as a matter of law. The same is true with respect to the emails attaching the stow plans.  *See* ECF No. 161-1, Exs. 47 and 67.

Finally, if Fluence is attempting to argue that BBC and Briese did not deliver a seaworthy vessel to carry Fluence's Cargo, given the lack of equipment, that is not enough. In *Vision Air*, the Ninth Circuit adopted a holding from the Second Circuit "that failure to provide a seaworthy ship does not constitute an unreasonable deviation that voids COGSA's liability limitation, even where the carrier is on notice of the defect."  *Vision Air*, 155 F.3d at 1174 (citing *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 71–72 (2d Cir.1974)).  And again, Captain Ponce and Chief Mate Simakin felt the cargo was safely stowed despite any alleged negligence, gross negligence, or even recklessness with respect to the equipment.  Because the Court finds no disputed facts rising to the level of unreasonable deviation, Fluence cannot avoid COGSA's $500 per package liability limitation.

### 7.  *Motion for Adverse Inference*

In a final attempt to circumvent its contractual obligations under COGSA, Fluence filed a separate motion for adverse inference, arguing that Briese altered documents, created inaccurate records, and failed to preserve evidence central to the case.  *See generally* ECF No. 159-1.  Based on these assertions, Fluence now seeks an adverse inference that the lost evidence would have supported its claim for unreasonable deviation,

preventing summary judgment on the issue of COGSA's liability limitation.

i. <u>Legal Standard</u>

"'Spoliation' is 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Bickoff v. Wells Fargo Bank N.A.*, No. 14-cv-01065-BEN-WVG, 2016 WL 3280439, at *4 (S.D. Cal. June 14, 2016), *aff'd*, 705 F. App'x 616 (9th Cir. 2017) (quoting *Reeves v. MV Transportation, Inc.*, 186 Cal. App. 4th 666, 681 (2010)).   "It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (citing *Nation–Wide Check Corp. v. Forest Hills Distributors*, 692 F.2d 214, 217–18 (1st Cir.1982)).   "The Ninth Circuit has approved the use of adverse inferences as sanctions for spoliation of evidence but has not set forth a precise standard for determining when such sanctions are appropriate." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012).

"Courts in this Circuit typically apply a three-part test, requiring the party seeking an adverse inference from spoliation to show that: '(1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a 'culpable state of mind'; and (3) the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Al Otro Lado, Inc. v. Wolf*, No. 317-cv-02366-BAS-KSC, 2021 WL 631789, at *4 (S.D. Cal. Feb. 18, 2021), *report and recommendation adopted sub nom. Al Otro Lado, Inc. v. Mayorkas*, No. 19-cv-01344-BAS-MSB, 2021 WL 1170212 (S.D. Cal. Mar. 29, 2021) (citation omitted); *see also Apple Inc.*, 888 F. Supp. 2d at 989–90 (stating that trial courts have widely adopted the same three-part test and citing cases).[25]

---

[25] Despite straying from legal precedent, Fluence advocates for this test, while Briese asks the Court to apply Federal Rule of Civil Procedure 37(e).   The Court applies the test cited by Fluence and widely accepted in this Circuit.

ii.   <u>Discussion</u>

As an initial matter, Fluence seeks an adverse inference against all Defendants but only details conduct by Briese with respect to the altered and lost evidence. Despite any "unity of interest" Fluence notes, the motion for adverse inference makes no arguments or allegations of specific conduct by BBC or Schenker (other than mentioning Schenker through Fluence's reply to Schenker's opposition). As such, it cannot plausibly be argued that BBC or Schenker acted with the requisite "culpable" state of mind to spoliate or hide evidence. Accordingly, although Schenker opposes the Court adopting any adverse inference—and BBC joins in Schenker's and Briese's oppositions—the Court focuses only on the briefing set forth by Fluence and Briese in resolving the issue.

Fluence makes numerous allegations of improper conduct by Briese during discovery and in producing evidence throughout this litigation. However, many of these allegations focus on evidence that has since been produced, meaning those records have not been lost or destroyed. Fluence also alleges that certain documents have been altered but explains to the Court *how* those documents were altered and discusses the original and later versions of the documents. After spending several pages focusing on these documents, Fluence argues that Briese's conduct must be considered in light of the motion for adverse inference. Fluence cites no case law supporting this proposition. The Court will not spend time analyzing documents that have been produced and will limit its discussion with respect to any allegedly altered documents. The Court's discussion will focus on those documents that were lost, destroyed, or altered to the extent the original information is not available from any source.

Fluence essentially argues that the spoliation of three pieces of evidence support this Court granting Fluence's motion for adverse inference: (1) the "altered" deck log; (2) the voyage data recorder information (the "VDR"); and (3) the O/S navigator's handwritten notes. *See generally* ECF No. 159-1. Fluence contends this lost evidence supports its claim for unreasonable deviation. The Court disagrees.

1

iii.      Alteration of the Deck Log

2          The deck log at issue does not appear to have been lost or withheld.  Instead, Fluence

3   argues the deck log was altered and different versions were produced.  Fluence explains

4   that the deck log is a hand-written, hard-copy document that records all significant

5   activities onboard the ship.  ECF No. 159-1 at 16.  Fluence argues that three total versions

6   of the deck log have been produced.  The first during September 2021, the second during

7   March 2022, and the third during July 2022.  *Id.*  Fluence contends that the second version

8   is a duplicate of the first, with the following two differences: (1) "There is a note at the

9   bottom left of page 23, which includes notes from the date of the incident (April 28, 2021),

10  that states, "SHIFTING OF CARGO;" and (2) "There is a note at the bottom left of page

11  24, which includes notes from the date after the incident (April 29, 2021), that states,

12  "HEAVY WEATHER DAMAGE."  *Id.*  Fluence contends that because these notes were

13  not on the September 2021 version of the deck log, they were added at some point between

14  September 2021 and March 2022.  *Id.*  Fluence argues the amendments are unusual, citing

15  the second officer's testimony "that in his entire career he had not seen a situation where

16  someone went back and added notations to the face of the deck log."  *Id.*  Fluence further

17  explains that "any changes or corrections to the deck log are typically initialed by the

18  person making the change," but that these changes were unsigned.  *Id.*

19         Fluence continues that the third version of the deck log, now contains "official

20  records that had been appended to the deck log, including a Sea Protest, Statement of Facts,

21  and documents Briese describes as 'training records.'"  *Id.*  Fluence points out that "Exhibit

22  27 shows page 23 of the deck log (previously produced in Exhibits 23 and 25)" with the

23  Sea Protest "now appended and stamped over the existing page 23."  *Id.* at 17.  Fluence

24  also points to Exhibit 28, arguing it "shows page 24 of the deck log (previously produced

25  in Exhibits 24 and 25), with the Statement of Facts now appended and stamped over the

26  existing page 24."  *Id.*  Essentially, Fluence is arguing that each official document was

27  stamped over the original documents, making it clear these documents were not on the two

28  previous versions produced in September 2021 and March 2022.  *Id.*  Fluence contends

-64-

that "[t]he creation of this third version of the deck log must have occurred between the addition of the notes at the bottom of pages 23–24 in September 2021 and the inspection of the Vessel (all after the initiation of litigation)." *Id.*

The problem with Fluence's deck log arguments—as Briese points out—is that every versions of the allegedly altered deck log(s) appear to have been produced. After all, Fluence describes the alterations in detail. As such, there is no spoliated or missing evidence to analyze with respect to the deck logs. Furthermore, in its reply, Fluence does not respond to Briese's argument that the deck logs have been produced and are therefore, not subject to an adverse inference. Fluence can present evidence of the allegedly altered deck logs at trial so long as that evidence remains relevant and admissible to Fluence's remaining claims and defenses.[26] *See Sherwin-Williams Co. v. JB Collision Servs., Inc.*, No. 13CV1946-LAB WVG, 2015 WL 4077732, at *5 (S.D. Cal. July 6, 2015) ("Although the Court declines to give an adverse inference instruction, this ruling does not foreclose Defendants' counsel from presenting evidence that the toner was destroyed after a request to preserve it had been made, and from arguing any reasonable inference that follows from such evidence."). However, without missing or spoliated evidence, the Court declines to enforce any adverse inference. Accordingly, as to the deck logs, the Court **DENIES** Fluence's motion.

iv.      <u>Voyage Data Recorder</u>

Fluence argues that "Briese failed to preserve information stored on the Vessel's Voyage Data Recorder (VDR), the equivalent of a 'black box' on commercial airlines." ECF No. 159-1 at 18. Fluence states that "[t]he VDR stores information, including the actual conversations and words spoken by those on the bridge, for a thirteen-and-a-half-hour period." *Id.* After this time period, any data that is not downloaded within that period is recorded over. *Id.* Fluence argues there is a tremendous amount of data concerning Vessel events, not available elsewhere, including "the ship's position, speed, and heading,

---

[26] This is also true for the other pieces of evidence discussed *infra* in Part VI.C.7.iv–v.

along with RADAR image data, rudder order and response, engine order and response, hull openings status, watertight and fire door status, and wind, direction, and speed." *Id.* There is also recording of "the VHF communication audio and the on-the-bridge audio, which provides minute-by-minute, audio timeline of events occurring on the Vessel and would show what actually happened during the cargo stow collapse." *Id.*

"Captain Ponce agreed that when an accident occurs, the 'captain needs to download the [] recording.'" *Id.* This requires physically removing a drive from the VDR "like a console." *Id.* "Captain Ponce confirmed that prior to the voyage at issue in this case, the VDR was working properly." *Id.* Briese's internal policies also require a download of the VDR in cases of a marine incident. *Id.* at 18–19. Fluence argues that under these circumstances, the VDR should have been saved, and that "Captain Ponce had the time and support to do so." *Id.* at 19.

Turning to the evidence cited, Briese's own Risk Assessment Tools state: "It is a mandatory requirement[] of the company that in cases of a marine incident the data of the VDR must be saved and provided by technician to the company in order to assist the investigation process." ECF No. 159-1, Ex. 31 at 2. In arguing that Captain Ponce had time to preserve the VDR, Fluence cites the Declaration of Logan Rodricks, a Marine Consultant retained by Fluence to investigate the circumstances of the stow collapse and fire in Hold No. 2. *See* Declaration of Logan Rodricks, ECF No. 159-52 at ¶¶ 1–2. Rodricks opines:

> [Its] shocking to learn the Master and/or Vessel's Officers have completely forgotten to save the VDR data as they were also following the 'Change of Watch at Sea' . . . checklist as per the Bridge Procedures Guide . . . , which is logged in as completed. Three, four-hour navigational watches elapsed before the data could be overwritten and the Master had sufficient time to preserve it.

*Id.* at ¶ 21. Essentially, Rodricks is saying that because other procedures were followed

and completed, there was time to download the VDR.  Rodricks also notes how the "description of the incident and the actions taken for a fire out at sea with the accompanied heavy weather is beyond any ordinary practice of seamanship." *Id.* at ¶ 22.  He claims that "[t]he time frame, type of counter measures executed with due awareness to the condition of the Vessel and the surrounding does not corroborate with the actions taken and description of the incident." *Id.*  On the one hand, Fluence argues that the incident was so severe there was a possibility of abandoning ship,[27] meaning the VDR had to be recorded. On the other hand, Fluence argues there was plenty of time to download the VDR under the circumstances.  While both could be true in theory, Fluence is essentially alleging how serious the situation was while also saying, the circumstances were not so serious as to prevent Captain Ponce from downloading the VDR.

Captain Ponce's deposition testimony provides his take on why he did not preserve the VDR:

> So the period of thirteen and a half hours, I was not able to get this data and download it because that incident which was very intense, I was focusing about the fire incident as well as the rough sea.  So I have forgotten to do this.

ECF No. 159-1, Ex. 8 at 8.  The deposition excerpts then skip a page.  After the skipped, page, Captain Ponce confirms that the VDR records the ship's speed, date and time, the ship's heading, main alarms on the bridge, engine order and response, wind direction and speed, the ship's position, as well as watertight doors and fire doors.  *Id.* at 9–10.  Captain Ponce also stated that the VDR "is a system where it records everything that's happening

---

[27]     It appears that once the crew knew there was a fire—or at least smoke coming from one of the holds—Captain Ponce instructed the crew to prepare for the possibility of abandoning ship, and to gather documents they would need.  ECF No. 159-1, Ex. 12 at 9. The crew was also gathering equipment for the possible abandonment of the ship, all of which took between 30 and 45 minutes.  *Id.* at 10.

-67-

1    and communicated on the bridge." *Id.* at 5.  After thirteen and half hours, the recording is

2    overwritten.  *Id.* at 10.

3        Given the evidence above, the Court finds that Captain Ponce was responsible for

4    downloading the VDR and had an obligation to do so in the case of an incident.  However,

5    Captain Ponce—and even Fluence—detail the nature of the situation as being fairly

6    serious, given the potential need to abandon ship.  Under the circumstances, it is difficult

7    for the Court to say whether or not Captain Ponce should have prioritized downloading the

8    VDR over completing his other obligations.  And although the Court finds that Captain

9    Ponce did have a duty to preserve the evidence, the issue is not dispositive, because

10   relevance is also required for Fluence to obtain an adverse inference.  There is simply not

11   enough evidence in the record to conclude that the VDR is relevant to Fluence's

12   *unreasonable deviation claim*.  With respect to Fluence's other claims, that is another story.

13   But the argument before the Court involves only Fluence's claim for unreasonable

14   deviation.

15       Fluence contends "[t]he loss of voice recordings of conversations on the bridge is

16   especially critical" to know what happened in the aftermath of the fire.  *Id.*  Fluence

17   speculates as to what was said in those voice recordings, posing the following questions:

18

19           In the immediate aftermath of the fire, did the officers discuss
             preserving or not preserving the VDR? Did they discuss their
20           failure to properly secure the cargo? Did they discuss the shifting
             of the cargo? Did they discuss cargo damaged found in hold? Did
21           they discuss instructions or directions received from those on-
             shore, such as Briese and BBC?
22

23

24   *Id.* at 19.  The problem with these questions is that they are entirely speculative.  Fluence

25   seeks an adverse inference that the lost evidence would have supported a finding of

26   unreasonable deviation but as analyzed at length *supra*, that standard is high.  ECF No.

27   159-1 at 30.

28       There is already deposition testimony from Captain Ponce and Chief Mate Simakin

-68-

indicating that both Officers felt the Cargo would make it safely to San Diego when the Vessel left the Hai Phong port, despite not securing the Cargo in compliance with the CSM. As such, even if the Court were to make the leaps Fluence asks and impose an adverse inference, it could only find a dispute of fact with respect to the destroyed VDR data. But there is not enough here giving rise to such a dispute. To succeed on a claim for unreasonable deviation there must be a culpable state of mind. Given Fluence's unreasonable deviation arguments, the VDR recording would need to include statements indicating that the crew was substantially certain the cargo would be damaged *when the Vessel left the Hai Phong port*. The likelihood of any such statement is a stretch. There could very well be statements made in hindsight that the Cargo was not properly lashed—especially once the crew noted smoke coming from Hold 2—but as stated above, a hindsight statement made after the damage occurred, and not when the Cargo was loaded, would not show the culpable state of mind required to create a dispute of fact as to Fluence's unreasonable deviation claim.

Some courts have inferred that evidence is relevant, given the nature of the spoliation. *See, e.g.*, *Deerpoint Grp., Inc. v. Agrigenix, LLC*, No. 118CV00536AWIBAM, 2022 WL 16551632, at *15 (E.D. Cal. Oct. 31, 2022) ("Courts may find intentional spoliation where it is shown, or reasonably inferred, that the spoliating party acted purposefully to avoid its litigation obligations."). Here, however, there is no evidence that Captain Ponce intentionally destroyed the VDR in order to bury evidence in future litigation, nor is there any indication that what was said on the bridge would create a dispute of fact sufficient for Fluence's unreasonable deviation claim to survive summary judgment. As such, the Court finds no prejudice to Fluence respecting the Court's unreasonable deviation findings. Without any indication that the recording was intentionally destroyed or contained statements rising to the level of unreasonable deviation, the Court finds Fluence is not entitled to the inference it seeks. *See Bickoff*, 2016 WL 3280439, at *5 ("There is no evidence supporting an interpretation that guarantees permanent financing. It would not make sense to base the ambiguity on this wholly unsupported possibility and

then interpret it that way when other evidence does not support it.").  Again, Fluence can present such evidence at any potential trial with respect to its remaining claims and defenses, so long as the evidence is relevant.  As to Fluence's motion for adverse inference, however, the Court **DENIES** Fluence's request with respect to the VDR.

v.    <u>O/S Navigator Notes</u>

Last, Fluence contends that Briese "cannot produce the only other contemporaneous recording of the events at sea"—the O/S Navigator's handwritten notes.  ECF No. 159-1 at 19.  "The O/S Navigator took handwritten notes during the incident at sea that detailed the evening's events in real time," but "those notes have not been preserved."  *Id.*  Fluence argues "Captain Ponce testified that these noted included contemporaneous documentation of the times of events that occurred on the Vessel," and "admitted the . . . notes were the basis of the document subsequently included in the deck log as the Statement of Facts."  *Id.*  Fluence argues that Captain Ponce admits the "typewritten Statement of Facts was modified based on Briese's suggestion and that information was deleted as a result . . . , making the loss of these original notes critical."  *Id.*

Briese counters that the navigator who took the notes, Francis Faith Dayaday, describes the notes as "some scrap printer paper that [are customarily used] on the bridge to make scratch paper notes of information that we will ultimately use in a formal report or write in a formal logbook."  ECF No. 182 at 26–27 (citing the Declaration of Francis Faith Dayaday, ECF No. 182-2 ("Dayaday Decl.") at ¶ 5).  Briese argues "[t]hese scrap or 'scratch paper' notes were then used to transcribe 'chronological notes into the Statement of Facts without any alteration."  ECF No. 182 at 27 (citing Dayaday Decl. at ¶ 7).  "These notes 'are always routinely discarded after they are used to make a formal log entry or complete a formal document. [] Dayaday's handling of the scrap paper notes in question did not depart from the usual and appropriate custom and practice of discarding them after completing the formal document or log entry required or requested by the Captain or a senior officer.'"  *Id.*  And "Dayaday vehemently denies that she in any way intentionally destroyed these scrap paper notes."  ECF No. 182 at 27 (citing Dayaday Decl. at ¶ 12)

-70-

Briese further argues that Fluence never took the necessary steps to depose Dayaday—"including putting the Statement of Facts in front of her and asking if what that document states is an accurate reflection of her notes.[]"  ECF No. 182 at 27.  Although Fluence did ask Captain Ponce whether the notes were saved, and at that time asked to take Dayaday's deposition, "Fluence never timely noticed her deposition."  ECF No. 185-1 at 28.  Briese continues that from the date Fluence received the copy of the crew list from Briese's counsel on September 20, 2021, Fluence knew "of the identity of Vessel officers, including the O/S Navigator, Ms. Dayaday."  *Id.*  Briese argues that Fluence's failure to depose Dayaday is reason enough to deny any adverse inference request, because Fluence did not inquire as to Dayaday's state of mind in discarding the scrap notes, whether she knew of a probability of litigation, or whether the notes contained any evidence respecting the crew's allegedly culpable state of mind for purposes of deciding Fluence's unreasonable deviation claim.  ECF No. 182 at 29.  Briese asserts: "There is no attempt made to connect the notes with the knowledge of the crew about the possibility of damage when the cargo was loaded in Vietnam."  *Id.*

Fluence replies that it only learned of Dayaday's importance during Captain Ponce's delayed and lengthy deposition.  ECF No. 188 at 8.  Fluence contends it reached out to Briese about deposing Dayaday and that Briese's counsel never responded to the emails, nor did they produce Dayaday for deposition.  *Id.* at 8, 11.  However, Fluence also admits that "[h]aving already pursued and prevailed on multiple discovery disputes with Briese, Fluence did not pursue an order from the Court because the disputes delayed completion of fact discovery and the start of expert discovery."  *Id.*

Fluence cites only the deposition testimony of Captain Ponce in its factual assertions concerning the notes at issue.  Captain Ponce testified at deposition that the O/S Navigator took notes down on a piece of paper, including the time.  ECF No. 159-1, Ex. 10 at 3.  Captain Ponce further stated that the O/S Navigator wrote down the time of the fire alarm sounding.  *Id.* at 56.  Captain Ponce claimed that what is written on the Statement of Facts is what was written on the notes.  *Id.* at 6.  Captain Ponce confirmed that he copied what

was on the paper into the Statement of Facts. *Id.* With respect to Captain Ponce changing the facts from seeing Cargo damage to assuming Cargo damage (another allegation in Fluence's briefing), Captain Ponce claims there is a language barrier and that maybe he did not clearly state that he was assuming damage based on the fire rather than actually seeing it. ECF No. 159-1, Ex. 10 at 7–8. Captain Ponce stated that due to the fire, he assumed there was smoke damage. *Id.* at 8. As to the call with Briese, Captain Ponce stated that what is in the Statement of Facts is what was written on the O/S Navigator's piece of paper. *Id.* at 12. Captain Ponce also indicated that he did not know where the paper was, that it had been more than a year, and that he was not sure if Dayaday threw it in the trash. *Id.* at 4.

As to any change in the Statement of Facts, Fluence appears to be aware of the changes and again, can use this evidence at trial if relevant to its remaining claims and defenses. With respect to Dayaday not being deposed, by Fluence's own admission, it did not bring the issue before the Court—apparently because other discovery disputes were delaying the completion of fact discovery. This explanation is insufficient. The Court clarifies that it does not condone any of the alleged conduct by Briese in delaying Dayaday's deposition, if true. But if Dayaday was so important as to bring a motion for adverse inference respecting her hand-written notes, Fluence should have brought any disputes over her deposition before the Court, whether it would delay discovery or not. The Court will not resolve a discovery dispute at this stage in litigation during the determination of an adverse inference request related to summary judgment.

Without any real attempt by Fluence to figure out whether Dayaday's notes differed from Captain Ponce's Statement of Facts and testimony regarding the notes, and in what respects, the Court cannot simply assume their content. This is especially true in light of Dayaday's declaration denying any ill-intent. *See* Dayaday Decl. at ¶ 12. Dayaday took those notes and was therefore in the best position to shed light on their content. Even more, the notes Fluence seeks were written twelve days after the loading of the Cargo—*i.e.*, the relevant time frame to evaluate the crew's state of mind with respect to Fluence's

-72-

unreasonable deviation claim.  Again, Fluence argues BBC, Briese, and the Vessel's crew were substantially certain the Cargo damage would occur based on how it was loaded in Hai Phong.  While there is a mere possibility that Dayaday's notes could have contained some information helpful to Fluence, both the distance in time and Fluence's failure to pursue Dayaday's deposition weigh heavily against Fluence here.  There is simply no justification to grant an adverse inference based on Dayaday's missing notes, given the record before the Court, and because Dayaday herself could have been questioned.  *Cf. Chappell-Johnson v. Bair*, 574 F. Supp. 2d 87, 102 (D. D.C. 2008) (citing *Kronisch*, 150 F.3d at 128) ("The destruction of evidence, standing alone, it not enough to allow a party who has produced no evidence – or utterly inadequate evidence – in support of a given claim to survive summary judgment on that claim.").  The Court will not base its ruling on pure speculation.  There is also a question of whether Dayaday had a duty to preserve the notes, given the statement in her declaration that "[s]uch notes are <u>NEVER</u> saved or preserved and are always routinely discarded after they are used to make a formal log entry or complete a formal document."  *See* Dayaday Decl. at ¶ 9.

Accordingly, Fluence's motion for adverse inference with respect to Dayaday's handwritten notes is **DENIED**.  Because Fluence did not meet its burden in seeking an adverse inference and the Court finds no disputed facts rising to the level of unreasonable deviation, the Court **GRANTS** partial summary judgment in favor of Defendants holding that Fluence is contractually bound by COGSA's $500 per package limitation on liability.  Fluence's motion for summary judgment seeking to avoid COGSA's liability limitation is **DENIED**.

## D.   Defendants' Liability

Fluence argues that the Vessel, BBC, Schenker Deutschland, and SchenkerOcean are liable for the alleged damage to Fluence's Cargo.  ECF No. 161-1 at 19–21.  Fluence argues the Vessel is liable for the damage *in rem*, as well as for breach of bailment.  Fluence argues Schenker Deutschland and SchenkerOcean are liable for breach of contract, and that Schenker Deutschland is also liable for negligence.  Lastly, Fluence argues that BBC is

1   liable for breach of bailment.  Each argument is analyzed in turn below.

2           **1.     *The Vessel's In Rem Liability***

3           First, Fluence argues that "[m]aritime law has long 'held ships liable in rem for cargo

4   damage due to improper stowage.'"  ECF No. 161-1 at 19 (quoting *Man Ferrostaal, Inc.*

5   *v. M/V/ AKILI*, 704 F.3d 77, 83 (2d Cir. 2012)).  Fluence asserts that because its cargo was

6   received undamaged by the Vessel and delivered damaged, a *prima facie* case of liability

7   exists here.  *See id.*  Fluence states that its negligence claim gives rise to *in rem* liability

8   but provides no analysis of negligence.  ECF No. 161-1 at 19.

9           Second, Fluence argues the Vessel is "liable under the mutual lien theory," because

10  "[o]nce a vessel sails, there is a 'union of ship and cargo' entitling the cargo and ship to

11  reciprocal liens."  ECF No. 161-1 at 19 (*Krauss Brothers Lumber Co. v. Dimon S.S. Corp.*,

12  290 U.S. 117, 121–22 (1933)).  Fluence again reiterates that when its Cargo was delivered,

13  it was "in good and undamaged condition and properly secured within the containers," but

14  the Vessel failed to deliver the Cargo to San Diego, undamaged.  ECF No. 161-1 at 19.

15  Fluence points to the numerous admissions of negligence by the Vessel's crew and expert

16  witness that led to the cargo damage, in arguing that Fluence has "satisfied the element of

17  its *in rem* claims against the BBC Finland."  *Id.* at 19–20.

18          Briese counters that Fluence has not met its burden of proof in showing the Vessel

19  is liable for breach of contract.  ECF No. 206 at 7.  Briese explains that "Fluence (a) fails

20  to identify contractual provisions breached, (b) fails to provide specific facts as to how

21  contractual provisions were breached, and (c) provides no reasoning why breach of those

22  unspecified facts entitles it to judgment as a matter of law."  *Id.*  Briese further argues that

23  "Fluence failed to produce sufficient evidence establishing a *prima facie* case of 'good

24  condition' when the cargo was loaded on the Vessel," which is "a foundation detail" that

25  cannot be ignored.  *Id.*

26          Fluence's claim arguing the Vessel's *in rem* liability appears to be based on: (1) the

27  negligent stowage of the Cargo; and (2) a mutual lien theory for breach of contract.

28  However, Fluence is not entirely clear in in its briefing, citing certain cases but failing

clarify the legal standards under which Fluence seeks relief.  Fluence's argument regarding the Vessel's *in rem* liability only cites its own SSMF 75, which in turn cites paragraph five of the Declaration of Van Hai Nguyen, stating:

> Based on my review of the photographs in the delivery reports, the Cubes that were loaded into containers that were then carried on the BBC Finland were in undamaged, good condition and were properly secured in those containers.

ECF No. 161-1, Ex. 73 at 2.  Briese argues that Fluence fails provide sufficient evidence that the Cargo was delivered undamaged but cites no legal authority or factual evidence to contest that of Fluence.  Attached to the Nguyen declaration, however, are small pictures of what appear to be the Cubes as loaded into the containers.  This serves as some evidence that the Cargo was received in good condition when delivered, but the pictures are quite small and Fluence cites no evidence and provides no argument explaining how the Cargo was properly secured in the containers.  Without further explanation, it is difficult for the Court to make a determination based on the pictures alone.  Given the record before the Court, it is clear that Fluence's Cargo was damaged, but the lack of evidence explaining how the Cubes were secured therein leaves the Court guessing.  As such, with respect to the damages element of either a negligence or breach of contract claim, Fluence has established Cargo damage.  Fluence has not, however, established that the damage is connected to the alleged breach of contract or negligence claims.

Although Fluence cites other evidence related to the Vessel in its factual background, with respect to its actual argument that the Vessel is liable *in rem*, Fluence expects the Court to fill in the blanks.  Briese's argument in response is likewise lacking, but at least spells out the elements of a breach of contract claim.  Fluence's reply to Briese cites SSMFs 1, 2, 3, 4, and 11 when referring to the "contract of affreightment," affirming that Fluence's claim for *in rem* liability is in part based on breach of contract.  ECF No. 219 at 4.  These citations are to: (1) portions of the Email Communications dated February

1    3, 2021 to March 2, 2021 stating the $6,500 price to ship each container for a minimum of
2    100 containers, with increases later, ECF No. 161-1, Ex. 1 at 27–38; (2) a paragraph of its
3    Amended Complaint describing the Cubes, *see* FAC at ¶ 5; (3) the Booking Note
4    Addendum, *see* ECF No. 161-1, Ex. 4 at 1; and (4) another portion of the Email
5    Communications with Fluence representatives confirming that Schenker should proceed
6    with booking the Vessel for the end of March, *see* ECF No. 161-1, Ex. 1 at 30–31.

7          Ignoring the fact that these citations were made in Fluence's reply brief and not its
8    summary judgment motion (depriving Briese of the chance to respond), Fluence again
9    appears to pick portions of the different documents it likes in piecing together the contract
10   of carriage that the Vessel allegedly breached.  Although the Court found Fluence bound
11   by COGSA's liability limitation in the various contracts at issue, the Court did not conclude
12   whether the Email Communications cited by Fluence are actually part of the contract
13   carriage on which Fluence bases its liability argument.  This is especially true in light of
14   Schenker's evidence that the excel spreadsheet and email in response constituted the offer
15   by Schenker and acceptance by Fluence.  The Court found the COGSA liability limitation
16   consistent with the Email Communications in the event that those Communication do form
17   part of the contract but did not make a final determination as to Schenker and Fluence's
18   competing evidence.

19         Even if the Court were to assume *arguendo* that the cited Email Communications
20   and Booking Note Addendum make up the contract of affreightment, Fluence does not
21   explain how the Vessel is liable under these alleged contracts when it was not a party to
22   them with respect to its assertion of a mutual lien theory.  The Court will not make these
23   leaps for Fluence, given that the Vessel had not even been booked during certain portions
24   of the Email Communications cited.  There is also the issue of Fluence's FAC and prior
25   briefing relying in part on the Sea Waybills for the Vessel's *in rem* liability, which is not
26   consistent with Fluence's argument here.  Without clarification in Fluence's briefing, the
27   Court finds disputes of fact and **DENIES** summary judgment for *in rem* liability of the
28

Vessel based on breach of contract and negligence.[28]  *See Bickoff*, 2016 WL 3280439, at *2 (citing *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007)) ("A moving party bears the initial burden of showing there are no genuine issues of material fact.").

### 2.   *Breach of Contract by Schenker Deutschland and SchenkerOcean*

A claim for relief for breach of contract under California law must show: (1) a legally enforceable contract between the parties; (2) the defendant's breach of that contract; and (3) damage to the plaintiff caused by the defendant's breach. *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 (9th Cir. 2017); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1489, 49 Cal.Rptr.3d 227 (2006).  "Under federal law, to establish a claim for breach of contract, the plaintiff must prove '(1) the terms of a maritime contract, (2) that the contract was breached, and (3) the reasonable value of the purported damages.'" *Shelter Forest Int'l Acquisition, Inc. v. COSCO Shipping (USA) Inc.*, 475 F. Supp. 3d 1171, 1181 (D. Or. 2020) (quoting *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005) (citing *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 605–06 (1991))).  Regardless, the result is the same here.

---

[28]    The Court also notes that "[t]his Circuit recognizes a maritime tort lien irrespective of contractual obligations." *Albany Ins. Co. v. M.V. Istrian Exp.*, 61 F.3d 709, 710 (9th Cir. 1995) (citing *All Alaskan Seafoods, Inc. v. M.V. Sea Producer*, 882 F.2d 425, 430 (9th Cir.1989)).  "A carrier which receives undamaged goods, but which delivers damaged goods is subject to the rule applicable to all bailees and a *prima facie* case of liability exists." *Albany Ins. Co.*, 61 F.3d at 710 (citing *Schnell v. The Vallescura*, 293 U.S. 296, 305 (1934)).  However, the Ninth Circuit has held "that a maritime lien is an extraordinary remedy which should be allowed sparingly because it is not a matter of public record." *Usher v. M/V Ocean Wave*, 27 F.3d 370, 373–74 (9th Cir. 1994) (citation and internal quotation marks omitted).  Consequently, because the Court cannot be sure that this is the relief Fluence seeks (given its references to both negligence and breach of contract), it will not engage in this analysis *sua sponte*.  Furthermore, based on the multiple Defendants and disputed facts as to who is responsible for the allegedly faulty Cargo stowage—which Fluence contends caused the damage at issue—the Court will not enter judgment for Fluence without more clarity as to what Fluence seeks and pursuant to what authority.

1    Fluence argues that Schenker Deutschland and SchenkerOcean are both liable for

2    breach of contract.  ECF No. 161-1 at 20.  Fluence provides that "Schenker Deutschland

3    contracted with Fluence to transport its cargo from Vietnam to San Diego for $6,500 per

4    container," and that "SchenkerOcean is identified as 'Carrier' on the Sea Waybills

5    Schenker Deutschland issued."  *Id.*  Fluence contends that both entities breached the

6    contract because a substantial amount of Fluence's Cargo was damaged at sea, satisfying

7    the elements required for breach of contract.  *Id.*

8    Schenker argues that Fluence fails "to meet its burden of proving the specific terms

9    of the alleged contract, the specific breach, causation, and damages with undisputed

10   material facts and admissible evidence."  ECF No. 204 at 14. Schenker further explains

11   that "Fluence is inconsistent in its view of the 'contract of affreightment.'"  *Id*.  Schenker

12   points out that Fluence cites no undisputed material fact addressing a contract provision

13   stating, "that no cargo can be impacted by the hazards of carriage at sea."  *Id.*  Schenker

14   further argues that because Fluence suffered a substantial amount of cargo damage alone

15   is insufficient to establish breach of contract.  *Id.*

16   The Court agrees with Schenker in that Fluence's Cargo being damaged is not

17   enough to prevail on summary judgment for breach of contract.  The damage to the Cargo,

18   though undisputed, suffices to eliminate only one element of the claim (but again, whether

19   the Cargo was properly secured when delivered remains in question).  Fluence must also

20   establish the terms of the contract and Schenker's alleged breach.  Fluence's analysis for

21   Schenker's alleged breach of contract is conclusory at best, and the extent of the contract

22   of carriage remains in dispute.

23    In its three-sentence argument, Fluence cites SSMFs 3, 4, and 32, which in turn cite

24   the Email Communications between Schenker and Fluence, as well as the Sea Waybills

25   issued by Schenker Deutschland. ECF No. 161-2 at 3, 7.  When arguing Fluence contracted

26   with Schenker Deutschland, it only cites the Email Communications.  Fluence then cites

27   the Sea Waybills to point out that SchenkerOcean is identified as the "Carrier."  As such,

28   Fluence's summary judgment motion appears to rely on the Email Communications to

form the basis of the contract and the Sea Waybills to establish SchenkerOcean's status as carrier. Fluence's reply to Schenker states that "Schenker contracted with Fluence to transport its cargo of 333 9'6" containers, containing 954 cubes, from Vietnam to San Diego for $6,500 per container." ECF No. 220 at 4. Fluence again references those SSMFs citing the Email Communications, but also cites SSMF 11, which refers to the Booking Note Addendum reflecting the increase in Cargo to 333 containers. Fluence thus appears to rely on the Email Communications, the Booking Note Addendum (thereby bringing the Booking Note into play), and with respect to SchenkerOcean, the Sea Waybills. After stating these supposed terms in its reply, Fluence flatly contends: "Schenker breached these terms." ECF No. 220 at 4. Fluence then cites evidence of the Cargo damage. Once again, however, damage to Fluence's Cargo is only one element of a breach of contract claim.[29]

Not only does Fluence fail to explain how Schenker breached the contract, but there are disputed facts as to what exactly the contract and terms at issue are. As noted *supra* in Parts VI.C.2 and VI.D.1, Fluence argues the contract of affreightment is the Email Communications between it and Schenker. Schenker disputes this arguing the offer to Fluence were in attached excel spreadsheets that referenced the Carrier's Booking Note and Bills of Lading as controlling, which Fluence accepted. The Court cannot say whether either of these pieces of evidence constitute the offer and acceptance at issue between Schenker and Fluence, especially seeing that there are also written contracts in the form of

---

[29]    Fluence contends that the Email Communications between it and the Schenker entities formed the contract. ECF No. 161-1 at 22. Fluence attaches over 42 pages of these Communications between Schenker and Fluence representatives, some of which are in German. *See* ECF No. 161-1, Ex. 1 at 1–43. The only term Fluence clarifies in its motion for summary judgment is that "Schenker Deutschland contracted with Fluence to transport its cargo from Vietnam to San Diego for $6,500 per container." ECF No. 161-1 at 20. Fluence's factual background provides some additional guidance but does not entirely clarify how Schenker breached those terms. *See* ECF No. 161-2 at 3–4. Although certain terms can be gleaned from the Email Communications, Fluence has left the Court to define the remaining terms.

Sea Waybills between these parties.[30]  In addition, because there are several Defendants and disputes of fact as to which Defendant (or Defendants) caused the damage to the Cargo, the Court cannot say the alleged breach of contract by Schenker is connected to the damage at issue.

Finally, Fluence cites the deposition testimony of Schenker Deutschland AG designee, Christoph Hilgers.  ECF No. 161-1, Ex. 18.  Hilgers revealed some information regarding Schenker's vetting process in selecting vessels as done in the course of business.  Hilgers further described the vetting process for the Vessel at issue here.  However, the testimony does not clarify the terms of the contract or that the parties agreed on a particular vetting process in the "contract" itself.  Although actions performed in the course of business can be implied in contracts, the Court cannot make any such findings based on the arguments before it.  As such, the Court finds issues of fact as to the terms of the parties' contract, as well as how Schenker breached the alleged contract.  The Court therefore **DENIES** summary judgment on the issue of whether the Schenker entities breached their contractual obligations to Fluence.

### 3.   *Negligence of Schenker Deutschland*

To establish negligence under California law, the plaintiff must prove: "(1) the existence of a duty to exercise due care; (2) breach of that duty; (3) causation; and (4) damage."  *Attisha Enterprises, Inc. v. Cap. One, N.A.*, 505 F. Supp. 3d 1051, 1055 (S.D. Cal. 2020) (citing *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 500 (Cal. 2001)).  "To establish maritime negligence, a plaintiff must 'demonstrate that there was a duty owed by the defendant to the plaintiff, breach of that duty, injury sustained by [the] plaintiff, and a causal connection between the defendant's conduct and the plaintiff's injury.'"  *Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000) (quoting *In re Cooper/T. Smith*, 929 F.2d 1073, 1077 (5th Cir.1991)).  The elements are essentially the same.

---

[30]    Furthermore, if Fluence is alluding to Schenker's selection of the Vessel, Schenker disputes that the Vessel was unseaworthy.  For example, points out that the Vessel sailed safely from Amori, Japan to San Diego, California.

Fluence argues that Schenker Deutschland is a carrier and not a freight forwarder, making Schenker Deutschland liable for the damage to Fluence's Cargo. ECF No. 161-1 at 20. Fluence further argues that "even as a freight forwarder, Schenker Deutschland is nevertheless liable to Fluence 'for negligence in supervising the transport of cargo.'" *Id.* Fluence argues "[t]his includes Schenker's 'negligence in hiring a carrier.'" *Id.* (quoting *Shonac Corp. v. Maersk, Inc.*, 159 F. Supp. 2d 1020, 1025 (S.D. Ohio 2001)). Fluence contends that "Schenker performed virtually no due diligence in vetting the BBC Finland, a vessel not designed or equipped to carry the cargo, before recommending it to Fluence." ECF No. 161- at 20. Fluence continues that Schenker Deutschland did not verify the Vessel's ability to "carry 9'6" containers, [whether it] was suitably equipped, or [whether it] had suitable insurance." *Id.* Fluence further reiterates that the Vessel was not designed to carry the containers, that the Vessel had substantial shortages of lashing equipment, that the crew never reviewed the CSM, and that these issues led to the damage of Fluence's Cargo. *Id.* at 20–21. Fluence argues that Schenker would not have selected the Vessel had it performed its due diligence. *Id.* at 21.

Schenker counters that "Fluence has not articulated what duty Schenker breached, or how that was the cause of Fluence's injury." ECF No. 204 at 14. Schenker contends Fluence's argument that the Vessel was not equipped "is an improper unseaworthiness claim against a NVOCC." *Id.* Schenker further argues that it "did not control the Vessel or employ the crew and thus did not have the duty to make it ready for Fluence's cargo." *Id.* Schenker claims Fluence's position that Schenker was negligent in recommending the Vessel is undermined because: (1) Fluence allowed the Cargo to be reloaded on the Vessel after the incident and to continue the Voyage to San Diego, rather than requesting the Cargo be transported to another vessel; and (2) Fluence continued doing business with Schenker and booking BBC Chartering to carry Fluence's other cargo on other BBC vessels (indicating that Schenker's selection of a BBC Vessel was not negligent). *Id.* at 15. Schenker contends it reasonably relied on BBC to ensure the Vessel and crew were equipped for the Voyage, and Fluence has not shown that Schenker's reliance on BBC was

-81-

1  negligent.

2      Despite Schenker's contention that Fluence fails to articulate any duty or causation,

3  Fluence argues that Schenker's lack of diligence in selecting a Vessel suitable for Fluence's

4  Cargo led to the damage here—*i.e.*, had Schenker performed appropriate due diligence, it

5  would not have selected the BBC Finland.  Fluence again cites the deposition testimony of

6  Schenker Deutschland AG designee, Christoph Hilgers, who revealed some information

7  regarding Schenker's process in selecting vessels.  ECF No. 161-1, Ex. 18.  Hilgers

8  described the vetting process for the Vessel at issue here, stating how Schenker uses an

9  online platform through the French Ministry of Transport, called Equasis that provides

10  information about vessel particulars, board state control status, and other information.  *Id.*

11  at 4.  When asked what else Schenker does in terms of vetting the Vessel, Hilgers replied

12  that there are a few standard terms "in our booking note conditions which usually already

13  should be transpired together with inquiry.  But that is not done very consistently." *Id.* at

14  5.  Hilgers further stated that Fluence did have standard terms asking carriers to provide

15  certain documents and information about the vessel.  *Id.*  Hilgers continued that the vetting

16  includes verifying the Vessel's insurance, which Fluence focuses on in alleging that

17  Schenker booked the Vessel without verification.  However, Fluence does not appear to

18  dispute that the Vessel was insured—only that Schenker did not timely verify it before

19  booking.  The Court finds this argument irrelevant.  Even if Schenker recommended a

20  Vessel before confirming its insured status, Fluence does not explain how the alleged

21  failure to verify insurance before booking caused the Cargo damage.  *Id.*  Fluence also

22  points to its factual assertions surrounding the crew's loading of the Vessel but fails to

23  explain how the crew's decision-making in loading the Vessel make Schenker liable for

24  negligence.

25      Next, Fluence points to Daniel Millet's deposition testimony, confirming the

26  Vessel's CSM instructed that 9-foot 6-inch containers "should not be stowed without

27  special consideration."  ECF No. 161-1, Ex. 33 at 27.  BBC and Briese's naval architect

28  expert, Gurpreet Grewal, stated in his deposition that "[i]n his mind, a special consideration

-82-

would have to go through a structural engineer or somebody who understands structures so that they can calculate if any considerations that they make are good enough to operate." ECF No. 161-1, Ex. 34 at 4–5.  Millet's deposition testimony states that he could not recall whether Briese or BBC undertook any special considerations to determine whether the Cargo could be adequately secured on the Vessel.  ECF No. 161-1, Ex. 33 at 27.  Fluence also points to testimony that the crew did not review the CSM and that BBC was aware the Vessel lacked lashing equipment before the voyage.  *Id.* at 22.  These allegations support a claim for negligence with respect to stowing the Cargo, especially in light of other evidence in the record discussed throughout.  The problem with the evidence as it relates to Schenker is that Fluence does not establish how Schenker is responsible: (1) for BBC and Briese's alleged failure to undertake special considerations per the CSM; (2) for the crew not reviewing the CSM; and (3) for BBC's prior knowledge of the shortage in lashing equipment.  None of these facts implicate Schenker.  *See also* ECF No. 161-1, Ex. 3 at 2 (setting out the responsibilities of BBC and Briese with respect to supplying the Vessel and stowing the Cargo).  Furthermore, Schenker disputes that the Vessel was not designed to carry 9-foot 6-inch containers.  For example, Schenker's opposition cites a Container Stowage Plan showing 9-foot 6-inch containers to argue that the Vessel was suited to carry such Cargo.  *See* ECF No. 204 at 6, Exs. 38, 76.

Although there is a possibility that Schenker accepted liability for decisions made by BBC, Briese, and the crew, Fluence does not direct the Court to any such evidence.  Concluding that Schenker did not adequately vet the Vessel (which Schenker disputes) and thereby caused BBC, Briese, and the crew's conduct, which in turn caused the damage to the Cargo, is too tenuous an argument based on the record before the Court.  As a NVOCC, Schenker argues it did not own, charter, or crew the BBC Finland—a contention supported by the Charter Party between BBC and Briese, indicating that Briese was responsible for supplying the Vessel and crew, and that BBC was responsible for handling the Cargo.  *See* ECF No. 161-1, Ex. 3 at 2.  As such, Fluence has not established a breach of duty or causation and several disputes of fact remain.  For all of these reasons, the Court **DENIES**

Fluence's motion for summary judgment with respect to its negligence claim against Schenker Deutschland.

### 4.   *Breach of Bailment*

Fluence argues that the Vessel, BBC, Schenker Deutschland, and SchenkerOcean are liable for breach of bailment, because there is no dispute that they "accepted Fluence's cargo and failed to deliver it to San Diego undamaged."  ECF No. 161-1 at 21.  Fluence argues the "numerous failures by the vessel's crew led to Fluence's cargo being damaged" and therefore, Fluence has satisfied the elements of its breach of bailment claims.  *Id.*

As an initial matter, Fluence provides no specific citations in its argument and instead, points to pages 6 through 10 of its summary judgment motion, which reference over 75 of Fluence's SSMFs, many of which Defendants adamantly dispute.  The SSMFs contain citations to over 30 Exhibits, many with pin cites but some without.[31]  Regardless, its argument section for breach of bailment does not cite any specific piece of evidence, even as a just an example.  Fluence's vague contention that there were numerous failures by the Vessel's crew does not even reference whether the breach occurred during the loading of the Cargo or during the Voyage itself.  Nor does Fluence explain the relationships between the parties or in any way discuss each Defendant/Defendant subgroup separately to explain how they are all liable for breach of bailment.

That being said, based on the evidence in the record, the Court can surely see an argument for breach of bailment with respect to certain Defendants.  But Fluence fails to connect the dots, or even provide a sufficient legal standard for its breach of bailment claims.  For example, Fluence bases its breach of bailment argument on its proposition that the contract was one of private carriage, arguing that "[a] carrier in private carriage is a bailee of the shipper's cargo."  ECF No. 161-1 at 21.  However, as held *supra*, the Court finds an issue of fact as to whether the contract is one of private or common carriage.  As such, if the status of certain Defendants as bailees relies primarily on the private carriage

---

[31]   For example, SSMF 101 cites five Exhibits to support one sentence, with four of those Exhibits containing no pincites or explanation.  *See* ECF No. 161-2 at 14.

distinction, the factual dispute as to common and private carriage would need to be resolved at trial before the Court could proceed to Fluence's breach of bailment claims.  And as noted in *supra* in Part VI.C.5.iii., even if the contract is ultimately one of private carriage, undisputed facts show that the arrangement between Fluence and Defendants share at least some characteristics of common carriage—*i.e.*, the relationships of the parties and the fact that Fluence did not contract directly with Briese or BBC to arrange for the Cargo's transport.

These facts are important in the context of a breach of bailment claim, because "[t]he Second Circuit and Fifth Circuit each has adopted the rule that a claim for bailment regarding damaged ship cargo fails unless (1) 'delivery to the bailee is complete' and (2) '[the bailee] has exclusive possession of the bailed property, even as against the property owner.'"  *Navigators Mgmt. Co., Inc. v. IMC Shipping China Co.*, No. LA CV 2301204-JAK-MARx, 2023 WL 8939214, at *5 (C.D. Cal. Nov. 7, 2023) (quoting *QT Trading, L.P. v. M/V Saga Morus*, 641 F.3d 105, 111 (5th Cir. 2011); *Thyssen Steel Co. v. M/V Kavo Yerakas*, 50 F.3d 1339 (5th Cir. 1995); and *Man Ferrostaal, Inc.*, 704 F.3d at 88).  It follows that "no inference of negligence against the bailee arises if his possession of the damaged bailed property was not exclusive of that of the bailor."  *Navigators Mgmt. Co.*, 2023 WL 8939214, at *5 (quoting *Man Ferrostaal*, 704 F.3d at 88.).  Other Circuits and at least one court in this district have taken note of this view as well.  *See, e.g.*, *N. Ins. Co. of New York v. Point Judith Marina, LLC*, 579 F.3d 61, 69 (1st Cir. 2009) (analyzing the exclusivity requirement for bailment); *Bear, LLC v. Marine Grp. Boat Works, LLC*, No. 14-CV-2960-BTM-BLM, 2017 WL 1807650, at *7 (S.D. Cal. May 5, 2017) (distinguishing the facts before the court by stating how the exclusivity requirement applies in cases involving actions against ship owners for cargo damage).

Here, Fluence argues that the BBC Finland *in rem*, BBC, and Schenker are liable because they failed to deliver the Cargo to San Diego undamaged.  While failure to deliver the cargo undamaged creates a presumption against the bailee, that presumption only arises if there is exclusive possession.  *See Man Ferrostaal*, 704 F.3d at 88.  The only discussion

of exclusive possession by Fluence is in its reply to Schenker's opposition, where Schenker contends it never had exclusive possession of the Cargo. Fluence counters that a party may have exclusive possession of cargo through its agents and that here, Schenker contracted with BBC to load and stow the cargo. ECF No. 220. This is not enough. Although Fluence is correct that carriers can maintain exclusive control and custody of cargo through those agents it hires directly, *see Man Ferrostaal*, 704 F.3d at 89, Fluence must provide some analysis. In its reply to Schenker, Fluence appears to argue that Schenker is the bailee and BBC is the agent. ECF No. 220 at 4–5. Simultaneously, in its reply to BBC, Fluence appears to maintain that BBC is liable for breach of bailment as bailee.[32] *See* ECF No. 217 at 12. Fluence does not clarify *when* each Defendant maintained exclusive possession of the Cargo. Even more, if Schenker or BBC took responsibility for and maintained exclusive possession, Fluence fails to explain how the Vessel would be liable under a breach of bailment theory. *See Man Ferrostaal*, 704 F.3d at 88 ("When a charterer has taken responsibility for stowage of cargo aboard a ship, the ship owner does not have exclusive possession and cannot be held liable as a bailee.").

Fluence essentially argues that all Defendants are liable breach of bailment, without clarifying which Defendants represent agents, which are bailees, and which maintained exclusive possession whether directly or through agents. The Court will not sort this out for Fluence. It is the movant's task to apply the law to the facts of the case in making its arguments. Accordingly, the Court **DENIES** Fluence's motion for summary judgment as to its breach of bailment claims.

## VI.    **OBJECTIONS**

The parties all assert evidentiary (and certain procedural) objections to various documents in the record, *see* ECF Nos. 172, 178, 204-1, 207, 208, 209, 211, 213, 232, 239,

---

[32]    The Court further rejects Fluence's agency argument because it was made for the first time in its reply, not giving Schenker an opportunity to respond. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (explaining that a "district court need not consider arguments raised for the first time in a reply brief.").

many of them having already been addressed in the body of this Decision.  Concerns over the admissibility of evidence are heightened in jury trials.  Evidentiary rules protect juries from wasting time with irrelevant evidence and misleading expert evidence.  These rules also guard against witnesses offering to tell jurors what the law is, reserving that task for the judge.  These concerns lessen in the context of a bench trial.[33]  With this in mind, the evidentiary objections are, as a whole, **OVERRULED**.  Even so, the Court addresses certain objections below.

Schenker set forth numerous evidentiary objections to forty-three of Fluence's Exhibits and declarations citing Federal Rules of Evidence 106, 403, 602, 702, and 802.

---

[33]      *See, e.g.*, *Kassel v. United States*, 319 Fed. Appx. 558, 560-61 (9th Cir. Mar. 12, 2009) ("His testimony in this regard was as an expert witness, rather than a percipient witness, and the testimony should have been excluded.  Fed. R. Evid. 701, 702.  But even though the testimony should have been excluded, its admission was harmless as there was no jury which could have been misled."); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) (recognizing reduced risk of prejudice in bench trial compared to jury trials); *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977) ("It may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records, and testimony based on them."); *Kirsch v. United States*, 2024 U.S. Dist. LEXIS 24787, *5 (D. Haw. Feb. 13, 2024) ("Motions in Limine filed pursuant to Federal Rule of Evidence 403 regarding prejudicial evidence, however, are generally inapplicable in a bench trial.  In a bench trial, there is no jury from which to shield prejudicial evidence.  The Court is able to exclude any improper inferences from relevant evidence in reaching its decision."); *Food & Water Watch, Inc. v. United States EPA*, 2024 U.S. Dist. LEXIS 9638, *31, n.10 (N.D. Cal. Jan. 18, 2024) ("Plaintiffs correctly note that Federal Rule of Evidence 403 is of lesser import in the context of a bench trial rather than a jury trial, particularly as it relates to potential for prejudice, but it is not to be ignored entirely."); *Schilder Dairy, LLC v. DeLaval, Inc.*, 2011 U.S. Dist. LEXIS 71952, *7–8 (D. Idaho July 5, 2011) ("Although *Daubert*'s reliability and relevancy requirements continue to apply in a bench trial (as is the case here), the customary concerns surrounding FRE 702's precautions in a jury setting – that of keeping unreliable expert testimony from the jury – are understandably not present in the bench trial."); *Joseph S. v. Hogan*, 2011 U.S. Dist. LEXIS 76762, *9–10 (E.D.N.Y. July 15, 2011) ("It follows then that in a bench trial, the risk is with exclusion of expert testimony rather than with its admission — it is exclusion that has the potential for an indelible impact on the record; if the appellate court disagrees that the expert's testimony was unreliable, a review for harmless error will be thwarted.").

1   ECF No. 204-1 at 3–4.  Schenker also argues that Fluence did not authenticate its Exhibits

2   with a declaration, and that Fluence should not be allowed to do so on reply because this

3   would deprive Defendants of proper notice.  ECF No. 204-1 at 2–3.  Fluence responds to

4   the objections and authenticity challenge in a separate brief.  ECF No. 218.  Fluence argues

5   that the sheer number of objections complicate any legitimate review by the Court, and that

6   several of the exhibits at issue support facts Schenker does not dispute.  *Id.* at 14.  The

7   Court agrees.

8        With respect to authenticity, Schenker does not contest that the documents are what

9   Fluence claims them to be, and authenticity hinges on "whether the documents are 'what

10  its proponent claims.'"  *See Davis v. HSBC Bank*, 691 F.3d 1152, 1161 (9th Cir. 2012)

11  (quoting *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 533 (9th Cir. 2011)); *see also*

12  *Davis*, 691 F.3d at 1160–61 (finding no challenge to authenticity where the plaintiff did

13  not challenge whether the documents at issue were what the proponent claimed them to be

14  and instead, plaintiff challenged his access to and review of them); *cf. Beverly Hills Reg'l*

15  *Surgery Ctr., L.P. v. Grp. Hospitalization & Med. Servs., Inc.*, No. CV 22-01217-RSWL-

16  MRWx, 2022 WL 1909550, at *3 (C.D. Cal. June 3, 2022) (granting a request for judicial

17  notice "because Plaintiff's FAC necessarily relies on the Plan documents, and Plaintiff

18  does not dispute that the documents attached to Defendant's Motion are in fact the Plan

19  documents.").  Here, Schenker's argument is undermined because Schenker relies on many

20  of the documents it contends Fluence has not authenticated.

21       In addition, Fluence argues that based on the 2010 amendment to Federal Rule of

22  Civil Procedure 56(c)(2), documents do not need to be authenticated at the summary

23  judgment phase.  Fluence argues that Schenker cites case law that predates this amendment.

24  The Court agrees.  Rule 56(c)(2) states: "A party may object that the material cited to

25  support or dispute a fact cannot be presented in a form that would be admissible in

26  evidence."  The Court has considered Fluence's specific evidentiary objections and as a

27  general matter, **OVERRULES** them.  The Court will not disregard all of Fluence's

28  evidence for lack of authenticity in light of Rule 56(c)(2), especially when Schenker and

1  other Defendants rely on many of those documents.  Accordingly, for purposes of summary

2  judgment, the Court **OVERRULES** Schenker's broad objection challenging the

3  authenticity of Fluence's evidence.  *See also United States v. Blanchard*, 867 F.3d 1, 6 (1st

4  Cir. 2017) (quoting *United States v. Paulino*, 13 F.3d 20, 23 (1st Cir. 1994)) ("The standard

5  the district court must apply in evaluating a document's authenticity is whether there is

6  'enough support in the record to warrant a reasonable person in determining that the

7  evidence is what it purports to be.'").

8      Schenker also objects to Fluence's Supplemental Disclosures filed on December 19,

9  2023, arguing that Fluence produced 1,170 new documents and a new witness when fact

10  discovery closed over one year before the disclosures were filed.  ECF No. 239 at 1–2.  As

11  to excluding the information at trial, the objection is **OVERRULED** *without prejudice* as

12  premature.

13      Next, are BBC's objections to portions of Fluence's reply filed in response to BBC's

14  opposition to Fluence's motion for summary judgment.  ECF No. 232.  BBC cites FRE 602

15  in objecting to Fluence's allegation that BBC does not maintain a publicly available tariff,

16  which was raised for the first time Fluence's reply.  *Id.* at 2.  Because the issue was raised

17  for the first time in Fluence's reply, the Court will not consider the argument.  *See Zamani*

18  *v. Carnes*, 491 F.3d at 997 (explaining that a "district court need not consider arguments

19  raised for the first time in a reply brief.").  The Court thus **DENIES** BBC's request to

20  judicially notice the two referenced websites to prove BBC's point.

21      The Court also **OVERRULES** the objections to Defendants various notice of

22  joinders.  Not only are certain notice of joinders irrelevant, but the Defendants here share

23  a unity of interest with respect to the Court's finding that Fluence is bound by COGSA's

24  $500 per package liability limitation.  Furthermore, Defendants each set forth sufficient

25  briefing to support the Court's finding.

26  **VII.  <u>CONCLUSION</u>**

27      For the foregoing reasons, and based on the arguments and evidence cited, the Court

28  **ORDERS** as follows:

1. The Court **DENIES-IN-PART** Defendants' motions to strike, and objections to, Fluence's SSMF supporting its motion for summary judgment.

2. The Court **DENIES** as premature and *without prejudice* Fluence's motion to exclude the expert testimony and report of Rosemary Coates.

3. The Court **DENIES-IN-PART** Defendants' motions to strike, and objections to, the declaration and expert report of Professor Martin Davies attached in Support of Fluence's motion for summary judgment.

4. The Court **DENIES** as premature and *without prejudice* Defendants' motions to strike, and objections to, Professor Davies declaration and expert report attached in support of Fluence's motion to exclude the expert testimony and report of Rosemary Coates.

5. The Court **DENIES** Fluence's and Defendants' Motions for Summary Judgment with respect to whether the contract of carriage is private or common, finding on disputes of material fact.

6. The Court **GRANTS** summary judgment in favor of Defendants, holding COGSA's $500 per package liability limitation applies by force of contract. Fluence is thus bound by COGSA's $500 per package liability limitation with respect to all Defendants.

   a. The Court finds Fluence bound by the $500 per package limitation in the SCHENKERocean Bill of Lading with respect to Schenker and the Vessel.

   b. The Court finds Fluence bound by the $500 per package limitation in the Booking Note and BBC Bills of Lading with respect to BBC.

7. The Court **DENIES** Fluence's motion for adverse inference.

8. The Court **DENIES** Fluence's motion for summary judgment as to the Vessel's *in rem* liability.

9. The Court **DENIES** Fluence's motion for summary judgment as to the alleged breach of contract Schenker.

10. The Court **DENIES** Fluence's motion for summary judgment as to the alleged

1    negligence of Schenker Deutschland.

2         11.    The Court **DENIES** Fluence's motion for summary judgment for its alleged

3    breach of bailment as to all Defendants.

4         12.    As a general matter, the Court **OVERRULES** the parties' evidentiary and

5    procedural objections.

6         13.    The Court **ORDERS** that any future briefing by the parties must cite directly

7    to specific pages in record.  These citations must be included in the parties' memorandums

8    of points and authorities and not in separately attached documents.

9

10        **IT IS SO ORDERED.**

11    DATED:    March 27, 2024                    _____

12                                               **HON. ROGER T. BENITEZ**
                                                 United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28